United States District Court
Southern District of Ohio
Western Division


PACE LOCAL UNION 5-1967, et al,

    Plaintiffs,                                    No. C-1-01-301
                                                  (Weber, J.; Novotny, M.J.)

vs.

INTERNATIONAL PAPER COMPANY,

    Defendant.


**REPORT AND RECOMMENDATION[1] THAT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 44)
BE GRANTED**

    This matter is before the Court on defendant's motion for summary judgment (Doc. 44) filed pursuant to Fed. R. Civ. P. 56(c) and the parties responsive memoranda. (Docs. 45, 47, 49, 50). This action is brought pursuant to both § 301 of the Labor Management Relations Act ("LMRA") and ERISA. (Doc. 28). Plaintiffs, members of Pace Local Union 5-1967, seek severance benefits from their former employer, defendant International Paper Company.

### I. BACKGROUND

    Plaintiffs initiated this action to recover severance payments under the Effects Bargaining Agreement ("EBA") between International Paper Company ("defendant") and Pace Local Union 5-1067 ("Union") that provided severance benefits in connection with the sale of defendant's Hamilton B Street Mill ("Mill") to SMART Papers ("SMART"). The individual plaintiffs in this matter all worked at the Mill as hourly employees represented by the Union. Pursuant to the EBA,

---

    [1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

defendant's employees were required to go through the interview process with SMART in order to be eligible for severance.  Employees who were not offered jobs by SMART and employees who were offered jobs by SMART but were subsequently terminated, through no fault of their own, within eighteen (18) months of the sale date, were entitled to severance.  Plaintiffs are comprised of former defendant employees who:

(1) were offered employment by SMART and declined;
(2) were offered and accepted employment by SMART but later quit;
(3) were offered and accepted employment by SMART and are currently employed with SMART;
(4) applied for employment with SMART but withdrew their application;
(5) were on disability but who have been released from their doctors to return to their former classifications.

(Doc. 28, ¶ ¶ 6-10).

Plaintiffs do not dispute that they are ineligible for severance under the explicit terms of the EBA.  Nevertheless, plaintiffs assert that they are entitled to severance because defendant made available a "secret phone number" to a few select employees by which they could call and tell SMART they did not wish to receive a job offer, and ultimately receive severance pay.  As a result, plaintiffs argue defendant breached the terms of the EBA in violation of the LMRA and breached its fiduciary duty to equitably administer the EBA pursuant to ERISA.

Prior to the completion of discovery, defendant filed a motion to dismiss. (Doc. 21).  The motion was denied. (Doc. 35).  Defendant now seeks summary judgment and dismissal of the action. (Doc. 44).  Defendant contends that it complied with the terms of the EBA, was not responsible for the hiring of SMART's workforce, and that plaintiffs are not entitled to severance under the terms of the EBA.  In response, plaintiffs assert that the doctrine of equitable estoppel allows their recovery of severance payments.

## II.  FACTS

In June 2000, defendant merged with Champion International Company ("Champion").  Defendant acquired the Mill as a result of the merger with Champion.  On December 29, 2000, defendant entered into an Asset Purchase

Agreement with SMART for the purchase of the Mill. On January 22, 2001, defendant met with the Union to discuss the effects of the sale of the Mill to SMART. (Bray deposition, page 26). Tim Bray, local president, Ken Stanifer, international representative, and Irvin Sandlin, local vice president attended the meeting on behalf of the Union. *Id.* Tom Stewart, the Labor Relations Consultant, Annetta Johnson, the Mill Human Resources Manager, and Milt Lewis, the Mill Supervisor of Employee Relations, represented defendant at the meeting. *Id.*

At the start of the meeting, the parties discussed vacation, severance pay, healthcare, pension, life insurance, death benefits, dental benefits, employee assistance plan, job placement, financial counseling, retirement and eligibility. *Id.* at 27. As a result of the discussions, Stewart drafted the Effects Bargaining Agreement. (Stewart deposition, page 8; Bray deposition, page 30-32). Stewart presented a draft of the EBA on January 23, 2001. *Id.* The Union agreed to each of the provisions of the EBA on or about January 26, 2001, and the EBA was adopted *Id.* The resulting EBA states in relevant part:

> Employees who do not receive an employment offer from SMART Papers will be paid 60 hours pay at the rate of their current permanent classification . . .on the date of sale [of the mill] for each full and pro-rata year of continuous service with International Paper. Payment will be a lump sum within 30 days following date of sale and this payment will be subject to all applicable taxes.
>
> Employees who do receive an employment offer from SMART Papers will not be entitled to severance pay unless they are terminated from SMART Papers, through no fault of their own, within eighteen (18) months of the sale date. . .
>
> To be eligible for severance pay, an employee must be actively at work on the date of sale. Employees on disability or other approved leaves must be released to return to work in their full classification.
>
> ***
>
> Employees who do not receive an employment offer from SMART Papers and elect to continue medical coverage under COBRA, will have their coverage continued at Company expense to the end of the

3

> month in which the employee is terminated and for three (3) full months thereafter.
>
> ***
>
> Employees who have met the age and service requirements for retiree life insurance as of the date of sale will retain their eligibility for the death benefit from the International Paper Plan whenever they elect to retire.
>
> ***
>
> Employees who have met the age and service requirements for Retiree Medical Coverage as of the date of sale will retain their eligibility for the Retiree Medical Benefits from the International Paper Plan whenever they retire.
>
> State and local agencies will be utilized to identify employment opportunities for interested employees. Assistance with resume preparation will be provided.
>
> The Company will continue to provide employer assistance support for three 3 full months following the date of sale. The Company will provide financial group counseling sessions by a certified financial planner.

Union Representative Deposition, Ex. 9, Effects Bargaining Agreement ("EBA").

    SMART hired Mary Rita Weissman as its director of Human Resources, and began its hiring process for the Mill on or about January 16, 2001. (Weissman deposition, page 11). Weissman and SMART management established hiring criteria and drafted an application packet. *Id.* at 12. Annetta Johnson, the Mill Human Resources Manager, made the application packets available to defendant's employees and instructed the employees to return the completed applications to Weissman. *Id.* at 12-13. SMART conducted interviews during the week of January 21, 2001. *Id.* at 19. After the interviews were completed, Weissman made recommendations to Daniel Maheu, a consultant employed by SMART to hire SMART's workforce. (Maheu Affidavit, ¶ 2, 5, attached to Doc. 44 ("Maheu

Aff.")); Weissman deposition, page 30). SMART was solely responsible for determining which employees would receive offers of employment. (Weissman deposition, pages 28, 47).

Weissman used a color-coded system to reflect her recommendations for employment to Maheu. (Weissman deposition, page 30). Green represented employees who should be offered employment, yellow represented borderline employees, and red represented employees not recommend for employment. *Id.* Based on Weissman's recommendations, Maheu determined which employees were offered employment with SMART. *Id.*; (Maheu Affidavit, ¶5).

Even if employees did not want to work for SMART, under the terms of the EBA, they were required to go through the interview process in order to receive severance benefits. (Union Representative deposition, page 9). During the hiring process, employees could communicate their desire not to work for SMART. For example, Weissman testified that at the end of the interview employees were asked:

> "Is there anything else that we haven't asked you but you think it's important for us to know as we are making a decision about your employment with SMART?"

(Weissman deposition, page 35-36). In response, Weissman testified that many people said "I don't want to work for you guys." *Id.* However, an employee's desire not to work for SMART, was only one factor in deciding whether or not an employee would be given a job offer by SMART. *Id.* at 38. Raymond Arthur, defendant's former employee, stated he did not want to work for SMART, yet Weissman recommended that he receive an offer. *Id.* at 28, 34-35.

Other employees told their supervisors that they did not want a job offer from SMART. For example, defendant's former employee Herbert Marcum, told his supervisor, Tom Weiser, that he wanted to retire and did not want an offer from SMART. (Marcum Affidavit, ¶ 1, attached to Doc. 44 ("Marcum Aff."); Weiser Affidavit, ¶4, attached to Doc. 44 ("Weiser Aff.")). Weiser was questioned by SMART as a reference for Marcum. (Weiser Aff. ¶ 5). Weiser stated that Marcum was an excellent worker, but that Marcum did not want to work for SMART. *Id.*; (Weissman deposition, page 36-37). SMART's interviewer told Wieser that Marcum should communicate his desire not to work for SMART himself. (Weiser

Aff. ¶ 5). The SMART interviewer gave Weiser a telephone number for Marcum to call if he wished to contact SMART. *Id.* Marcum used the number to contact SMART. (Marcum Aff. ¶ 2). Ultimately, Marcum was not offered employment with SMART. (Weissman deposition, exhibit 15).

The telephone number given to Marcum was Weissman's cell phone number which was displayed on her business card. Furthermore, Annetta Johnson, defendant's former Human Resources Manager, when asked by defendant's supervisors what to tell their employees who did not want to work for SMART, testified that she advised the supervisors to instruct the employees to indicate their disinterest in the interview. (Johnson deposition, pages 22-23). If the employee had already completed the interview, Johnson told the supervisors that the employees should contact SMART, specifically Weissman, and gave the supervisors Weissman's phone number to pass on the employees. *Id.*

On February 9, 2001, defendant and SMART finalized the sale. (Bray deposition, page 33). SMART offered employment to 410 of defendant's 577 hourly Mill employees. (Maheu Aff. ¶ 10). Several of defendant's former managers were offered and accepted employment by SMART, including Annetta Johnson and Milton Lewis. Shortly after the sale, SMART became aware that a few employees' job offers must be rescinded because SMART had eliminated their former positions. (Maheu Aff. 12). Defendant was not involved in SMART's post-sale termination process. Each of the employees were required to sign a Confidentiality Agreement with SMART.

On March 6, 2001, SMART presented defendant with the final list of employment offers. SMART divided defendant's employees into nine groups: (1) employees with job offers from SMART; (2) employees offered and accepted jobs with SMART; (3) employees offered jobs with SMART and declined; (4) employees who did not apply with SMART; (5) employees who did not participate in an interview with SMART; (6) employees who did not participate in the drug screen; (7) employees without job offers from SMART; (8) employees offered and accepted jobs with SMART but who were subsequently terminated through no fault of their own; and (9) miscellaneous. (Weissman deposition, ex. 15).

After receiving the list, George Payton, defendant's Manager of Divestitures and Closures, determined which employees were entitled to severance pursuant to the EBA. (Payton deposition, page 29). Payton determined that employees from

6

lists seven and eight, defendant's former employees who were not offered jobs with SMART and employees who were offered and accepted jobs with SMART but were subsequently terminated through no fault of their own, were entitled to be paid severance. *Id.* It is undisputed that defendant paid employees entitled to severance pursuant to the EBA.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## VI. DISCUSSION

In response to defendant's motion for summary judgment, plaintiffs argue that they have alleged sufficient facts to establish: (1) a claim for breach of contract under the LMRA; and (2) a claim for breach of fiduciary duty under ERISA. Each argument will be addressed in turn.

**A.   Plaintiffs have Failed to Allege Facts Sufficient to Establish Breach Contract under the LMRA.**

Section 301 (a) of the LMRA confers subject matter jurisdiction to federal courts over "suits for violations of contracts between an employer and a labor organization. . . ." 29 U.S.C. § 185. The enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation as long as their application is not inconsistent with federal labor policy. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991) (*citing International Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983). When disputes regarding collective bargaining agreements arise, "courts should look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Armistead*, 944 F.2d at 1293

Here, there is no dispute over the express terms of the EBA. Only employees who did not receive an employment offer from SMART and employees who did receive an employment offer from SMART, but were terminated from SMART, through no fault of their own, within eighteen months of the sale date were entitled to severance. More importantly, plaintiffs have not established that defendant failed to pay severance to qualified employees under the EBA. Accordingly, defendant is entitled to judgment as a matter of law as to plaintiffs claims for breach of the EBA under the LMRA [2].

---

[2] In addition, defendant argues that, in the alternative, they are entitled to judgment as a matter of law on plaintiffs' breach of contract claim under the LMRA because plaintiffs failed to exhaust contractual administrative remedies prior to filing this action. (Doc. 44, page 28-32). The Court agrees. The EBA is an amendment to the CBA. *See Angel v. United Paperworks Int'l*

B.   **ERISA Applies to the Effects Bargaining Agreement**

Plaintiffs assert that defendant, "acting as an ERISA administrator," violated its fiduciary duty by misleading employees regarding their benefit rights, and therefore, defendant should be estopped from denying them severance benefits under the EBA. (Doc. 45, pages 12-17). However, defendant maintains that the EBA is not an ERISA plan, and therefore, the Court lacks subject matter jurisdiction over these claims. (Doc. 47, page 17). Thus, before evaluating plaintiff's claim that defendant breached its fiduciary duty, the Court must decide whether the EBA was an ERISA plan.

ERISA applies to any "employee benefit plan." 29 U.S.C. § 1002(1). The hallmark of an ERISA benefit plan is that it requires an "ongoing administrative program to meet the employers obligation." *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1409 (6th Cir. 1996). In determining whether an ERISA plan exists, the Sixth Circuit has stated that:

> [s]imple or mechanical determinations do not necessarily require the establishment of . . . an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Sherrod v. General Motors Corp.*, 33 F.3d 636, 638 (6th Cir. 1994).

"ERISA does not purport to cover all programs that benefit employees. Instead, its coverage is limited to employee welfare benefit plans, which are defined as any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical,

---

*Union Local 1967*, 2003 LEXIS 3668 (S.D. Ohio 2003)(interpreting this same set of agreements, the Court determined that the EBA is an amendment to the CBA and that in order to vindicate rights that arise under the agreement, the plaintiff was required to exhaust grievance procedures provided by the CBA.)

or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services...." 29 U.S.C. § 1002(1); *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1409 (6th Cir. 1996)(*citing Sherrod v. General Motors Corp.*, *supra*).

The Sixth Circuit recently decided the related case of *Campbell v. International Paper*, 02-3658, (6th Cir. 2003)(unpublished). *Campbell* arises out of the same Hamilton B Street Mill sale as the instant action, and raises the same argument as that raised by plaintiffs in the instant action that the EBA is governed by ERISA. In *Campbell*, the Sixth Circuit upheld the Honorable District Judge Beckwith's dismissal of the claim pursuant to Fed. R. Civ. P. 12(b)(6), and affirmed that the EBA does "not represent or constitute a Plan under ERISA" because it does not require International Paper to exercise sufficient discretion to meet the requirements identified in *Fort Halifax Packing Co., Inc., v. Coyne*, 482 U.S. 1, 11 (1987)(requiring an ongoing administrative program by employer to qualify as ERISA plan).

The Sixth Circuit panel was not unanimous in its non-binding[3] holding in *Campbell*. Circuit Judge Cole wrote a strong dissent and concluded that Judge Beckwith's finding that the EBA is not an ERISA plan is inconsistent with the Sixth Circuit precedent. *Campbell v. International Paper*, 02-3658, slip-op *3 (6th Cir. 2003) (Cole dissent). Judge Cole relied heavily upon *Shahid*, *supra*, in which the Sixth Circuit found Ford's Voluntary Termination Plan ("VTP") to be an "employee benefit plan." The *Shahid* Court concluded: "Fords VTP is an ERISA plan since the major features of the plan include (1) substantial severance payment; (2) professional re-employment assistance; (3) continuance of medical and life insurance coverages for up to one year; and (4) retirement 'grow in' provision. *Shahid*, 76 F.3d at 1410. Judge Cole found that, just as in *Shahid*, International Paper's EBA provides for substantial severance payments, the continuation of medical and life insurance coverage, and professional re-employment assistance. Furthermore, the EBA appears to be ongoing, because defendant's could be required to process requests for benefits and make severance payments for up to eighteen months after the plant's sale date. See *Campbell v. International Paper*, 02-3658, slip-op *3 (6th Cir. 2003)(Cole dissent).

---

[3] An unpublished opinion is not binding precedent. *See In re Van Dresser Corp.*, 128 F.3d 945. 948 (6th Cir. 1997); 6th Cir. R. 206.

Here, it is recognized that the EBA provides defendant with a mechanical determination; an employee's eligibility is specifically dictated by the terms of the EBA. Defendant was not required to analyze each employee's circumstances, it was simply given lists of eligible employees by SMART and then paid severance to the employees listed in the categories that met the requirements under the EBA. In *Sherrod*, the Sixth Circuit examined a benefit option plan implemented pursuant to a collective bargaining agreement, under which employees could receive a one-time lump payment. *Sherrod,* 33 F.3d at 639. The Court found that this was not an ERISA plan because the plan was not ongoing and the employer did not exercise any discretion over the execution of the plan. *Id*. Furthermore, in another case involving Ford's VTP plan, the Sixth Circuit stated that "the eligibility to participate in the VTP was not left open to discretion of any managerial personnel; rather, an employee's eligibility was specifically dictated by criteria specified in the VTP guidelines, which were determined through the collective bargaining process. *Nelson v. General Motors Corp.*, 156 F.3d 1231, 1998 WL 415993, * 3 (6th Cir. 1998).

Defendant's former employees could be eligible for severance under the express terms of the agreement up to eighteen months after the sale date. Thus, the administration of the EBA should be classified as ongoing. Furthermore, other features of the EBA (substantial severance payments, the continuation of medical and life insurance coverage, and professional re-employment assistance) mirror the features of the Plan in *Shahid*, which the Sixth Circuit found to be an ERISA plan. Accordingly, this Court agrees with Judge Cole that the EBA is more closely akin to the agreement in *Shahid* and is indeed an ERISA plan.[4] This Court has jurisdiction to address plaintiffs' ERISA arguments.

---

[4] Should this reviewing Court find the opinion of Judge Beckwith as affirmed by the Sixth Circuit to be more persuasive, plaintiffs' ERISA claims for breach of fiduciary duty and equitable estoppel are properly dismissed for lack of subject matter jurisdiction. Alternatively, as explained below, even assuming the EBA is an ERISA plan as recommended herein, defendant's are entitled to judgment as a matter of law as to plaintiffs' ERISA claims. Whether the EBA is deemed an ERISA plan or not, plaintiffs' claims fail.

### 1. Plaintiffs have Failed to Allege Facts Sufficient to Establish that Defendant Breached its Fiduciary Duty.

Plaintiffs assert that defendant breached its fiduciary duty by failing to distribute severance benefits under the EBA "equitably and without discrimination." (Doc. 45, page 1).

The intent of Congress in enacting ERISA was to protect the "interests of participants in employee benefit plans . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." *Drennan v. General Motors Corp.*, 977 F.2d 246 (6th Cir. 1992) (*citing* 29 U.S.C. § 1001 (b)). ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Misleading communications to plan participants "regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for a breach of fiduciary duty." *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1163 (6th Cir.1988) (citations omitted). In *Berlin*, the Court concluded that material misrepresentations concerning an existing ERISA plan, would give rise to liability. *Id.*

Plaintiffs maintain that defendant provided certain employees with a secret telephone number they could use to inform SMART that they did not want a job offer. Thus, these certain "preferred" employees did not receive job offers and were thereby entitled to severance. Plaintiffs further maintain that defendant breached its fiduciary duty because a few "preferred" employees who were offered and accepted jobs with SMART and were subsequently terminated were able to receive severance. Plaintiffs assertions are factually inaccurate and unsupported by the evidence.

Plaintiffs contend that Herb Marcum was given a "secret number" to call by his supervisor, Weiser. After he called the number, SMART changed his color coding from green to red. Further, a note was attached to his file stating "called and said he is not interested in job offer." (Weissman deposition, pages 40, 65-68). Marcum did not receive an offer and subsequently received severance. Plaintiffs assert that Marcum's recovery of severance is "smoking gun" evidence of defendant's secretive and selective means of ensuring certain employees received severance. (Doc. 45, page 3).

The undisputed evidence reveals that the "secret number" alleged by plaintiff's was the telephone number of Weissman, SMART's Human Resources Director. This was only one of many ways employees could communicate with SMART that they did not wish to receive a job offer. If an employee did not wish to receive an offer from SMART they could tell their supervisor, write in on their application, tell their SMART interviewer, and/or tell Weissman directly. (Maheu Aff. ¶ 8; Weissman deposition, pages 28, 34-36, 38). Thus, even if the so called "secret number" was not made available to every employee, there remained a number of openly recognized ways by which employees could tell SMART they did not want a job offer.

Also undisputed is the fact that even if an employee stated that he or she did not wish to receive a job offer from SMART, this did not mean he or she would not be given an offer of employment. Weissman testified that an employee's desire not to work for SMART was only one of many factors in deciding whether an employee would be given a job offer. (Weissman deposition, page 38). More importantly, SMART was solely responsible for hiring its workforce and establishing its hiring criteria. *Id*. at 28, 47. SMART, not defendant, made the determination whether or not Marcum should receive an employment offer with SMART. Defendant had no control over which employees were given offers by SMART.

Plaintiffs have failed to produce any evidence that defendant's communications regarding the EBA were misleading or inconsistent. Since the adoption of the EBA, defendant has maintained that only those employees who were not offered jobs by SMART and employees who were offered jobs by SMART but were subsequently terminated through no fault of their own within eighteen (18) months of the sale date, were entitled to severance. Plaintiffs have failed to identify any of defendant's communications which misled its former employees regarding the terms of the EBA.

Furthermore, plaintiffs have failed to produce any evidence that defendant exercised discrimination in its administration of the EBA. SMART divided defendant's employees into nine lists and provided the lists to defendant. Defendant then determined which lists of employees were eligible under the terms of the EBA. It is undisputed that defendant paid severance to all qualifying employees under the EBA. Accordingly, plaintiffs have failed to produce sufficient evidence to establish that a reasonable jury could conclude defendant breached its fiduciary duty to administer the plan. As a matter of law, defendant is entitled to

summary judgment as to plaintiffs claim for breach of fiduciary duty.

### 2. Plaintiffs are not Entitled to Invoke the Doctrine of Equitable Estoppel under the LMRA or ERISA.

Plaintiffs maintain that defendant should be equitably estopped from enforcing the terms of the EBA. Thus, plaintiffs argue that under the doctrine of equitable estoppel, they are entitled to severance, despite the fact that they were offered jobs by SMART.

The elements of equitable estoppel in an ERISA / LMRA action are as follows:

> 1) conduct or language amounting to a representation of material fact;
> 2) awareness of the true facts by the party to be estopped;
> 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct towards the party asserting the estoppel such that the latter has a right to believe that the former's conduct be so intended;
> 4) unawareness of the true facts by the party asserting the estoppel; and;
> 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.1991).

In order to prevail on a claim of equitable estoppel, plaintiffs are required to prove each element. *Trustees of the Michigan Laborers' Health Care Fund*, 209 F.3d 587, 591 (6th Cir. 2000). However, a party cannot seek to estop the application of an unambiguous written provision in an ERISA plan. *Marks v. Newcourt Credit Group, Inc.* 342 F.3d 444, 456 (6th Cir. 2003). To allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. *Id.* (*citing Sprague v. Gen. Motors Corp.* 133 F.3d 388, 403 (6th Cir. 1998) (en banc), cert denied, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998)). In *Sprague,* the court noted that "principles of estoppel . . . cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Sprague v. General*

*Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998); See also *Fink v. Union Central Life Ins. Co.,* 94 F.3d 489, 492 (8th Cir.1996); *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 458 n. 12 (11th Cir.1996), *cert. denied,* 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997). The Court further noted:

> Estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party.

*Sprague*, 133 F.3d at 404.

Plaintiffs assert the doctrine of equitable estoppel should apply because defendant helped preferred employee's secure severance by giving them a secret number to call. Again, the Court finds plaintiffs' argument lacks merit. Plaintiffs cite several cases in which the Sixth Circuit has applied the doctrine of equitable estoppel in ERISA/LMRA cases. However, plaintiffs use of caselaw without a factual foundation is not sufficient to withstand a motion for summary judgment. For example, in *Amistead, supra*, a case cited by plaintiffs, the Court applied the doctrine of estoppel because it found that the employer misled its employees regarding their eligibility for retiree health and life insurance. Here, plaintiffs have failed to establish that defendant misled or made any misrepresentations regarding the terms of the EBA. Plaintiffs reliance on *Aponi v. Sunshine Biscuits, Inc*., 809 F.2d 1210 (6th Cir. 1987), is similarly misplaced. In *Aponi*, the Court found that the employer made misrepresentations regarding eligibility to recover retirement benefits, and therefore, estoppel was appropriate.

In *Angel v. United Paperworks Int'l Union Local 1967*, 2003 LEXIS 3668 (S.D. Ohio 2003), the Court reviewed the same allegations at issue in this matter. Looking at the claim of estoppel the Court noted:

> Plaintiffs do not claim that International Paper did not follow the procedures in the EBP as to them, only that other employees were treated more favorably than the EBP allows. . . Similarly, Plaintiffs' estoppel claim is not in truth based on an alleged representation or

15

> misrepresentation of fact by International Paper. The essence of
> Plaintiffs' estoppel claim is that International Paper failed to disclose
> that it would commit an unfair labor practice by engaging in direct
> dealing with other employees.[5]

*Angel v. United Paperworks Int'l Union Local 1967*, 2003 LEXIS 3668 , *38 (S.D. Ohio 2003).

Defendant has maintained that: (1) only those employees who were not offered jobs by SMART; and (2) employees who were offered jobs by SMART but were subsequently terminated through no fault of their own within eighteen (18) months of the sale date, were entitled to severance.  The fact that defendant provided certain employees with the cell phone number of Weissman, SMART's Human Resources Director, is not evidence of a misrepresentation regarding the terms of the EBA.  Again, employees had several obvious and known avenues by which to communicate their desire not to receive an offer from SMART.

More importantly, the terms of the EBA are clear and unambiguous.  Under the explicit terms of the EBA, plaintiffs admittedly are not entitled to severance.  Thus, to allow plaintiffs to recover severance would be "to enforce something other than the plan documents themselves," which is inconsistent with ERISA.  *See Sprague*, 133 F.3d at 404.  Accordingly, defendant is entitled to judgment as a matter law with respect to plaintiffs' claims of equitable estoppel under both the LMRA and ERISA.

---

[5] Defendant argues that plaintiffs' claim of breach of contract under the LMRA is actually a claim of "direct dealing", in which case, the NLRB has exclusive jurisdiction.  The Court agrees.  In *Angel* the Court went on to note:

> Plaintiffs have not, in other words, pled in this count facts which show a violation
> which is also remedial under § 301. Plaintiffs have simply attempted to plead
> around the exclusive jurisdiction of the NLRB.

*Angel*, 2003 LEXIS 3668 at *38.

16

## V. CONCLUSION

In sum, the Court concludes that defendant is entitled to judgment as a matter of law on plaintiffs' claims of breach of contract under the LMRA and breach of fiduciary duty under ERISA. Furthermore, the Court finds that plaintiffs may not invoke the doctrine of equitable estoppel because the terms of EBA are clear and unambiguous.

**IT IS THEREFORE RECOMMENDED THAT:**

Defendant's motion for summary judgment (Doc. 44) should be **GRANTED** and this case **CLOSED**.


Date:  December 30, 2003                        s/ Susan M. Novotny
                                               Susan M. Novotny
                                               United States Magistrate Judge

# United States District Court
## Southern District of Ohio
## Western Division

PACE LOCAL UNION 5-1967, et al.,

    Plaintiffs,                                  No. C-1-01-301

                                            (Weber, J.; Novotny, M.J.)

vs.

INTERNATIONAL PAPER COMPANY,

    Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN (10) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).