UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
PACE LOCAL UNION 5-1967       :   Case No. C-1-01 301
et al.                            (WEBER, JUDGE)
         Plaintiffs           :   (Magistrate Judge Novotny)
                              :
vs.                           :
                              :
INTERNATIONAL PAPER COMPANY
                              :
     Defendant
```

### PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED

Robert I. Doggett (0016849)
Trial Attorney for Plaintiffs
6740 Clough Pike, Room 200
Cincinnati, Ohio   45244
Tel: 513/241-6116

Janaury 16, 2004

TABLE OF CONTENTS

|  | PAGE |
|---|---|
| STATEMENT OF CASE................................... | 1 |
| I Objections to Magistrate's Report on the merits .... | 1 |
| Objection 1 ......................................... | 1 |
| Objection 2 ......................................... | 2 |
| Objection 3 ......................................... | 3 |
| Objection 4 ......................................... | 4 |
| Objection 5 ......................................... | 5 |
| Objection 6 ......................................... | 5 |
| Objection 7 ......................................... | 5 |
| Objection 8 ......................................... | 5 |
| Objection 9 ......................................... | 8 |
| II. Objections to the Report's holding that Plaintiffs forfeited their claims, arbitration and NLRB .. | 9 |
| Objection 10 ........................................ | 9 |
| Objection 11 ........................................ | 10 |
| Objection 12 ........................................ | 12 |
| CONCLUSION .......................................... | 15 |

TABLE OF CASES

| | |
|---|---|
| Alliance Rubber Co., 286 NLRB 645 (1987)................. | 12 |
| Anderson v. AT&T Corp., 147 F.3d 467, 158 LRRM 2385 (6th Cir. 1998)............................ | 14 |
| Apponi v. Sunshine Biscuits, Inc., (Apponi I) 652 F.2d 643, 107 LRRM 3095 (6th Cir. 1981) ........... | 10,12 |
| Apponi v. Sunshine Biscuits, Inc., (Apponi II) 809 F.2d 1210, 124 LRRM 2494 (6th Cir. 1987)............... | 13 |
| Armistead v. Vernitron Corp., 944 F.2d 1287 [138 LRRM 2559] (6th Cir. 1991)........... | 13 |

TABLE OF CASES (CONTINUED)

| | PAGE |
|---|---|
| AT&T Technologies v. Communications Workers of America, 475 US 643, 121 LRRM 3329 (1986).......................... | 10 |
| Burke v. Latrobe Steel Co., 775 F 2d 88 (3d Cir, 1985)... | 10 |
| Crane Sheet Metal v. NLRB, 675 F.2d 256 (10th Cir. 1982). | 12 |
| DelCostello v. Teamsters, 462 U.S. 151, 113 LRRM 2737 (1983) | 11 |
| Heheman v. E.W. Scripps Co., 661 F.2d 1115, 1124 (6th Cir. 1981) ...................................... | 9 |
| NLRB v. Bratten Pontiac, 406 F.2d 349 (4th Cir. 1969).... | 12 |
| Smith v. Evening News, 371 US 195, 51 LRRM 2646 (1962). | 11 |
| Vaca v. Sipes, 386 US 171 (1967)......................... | 11 |

TABLE OF STATUTES

29 USC §185 (LMRA §301)....................................passim

29 USC §1132 (ERISA)...................................... passim

D#PACE - \PACE1967\IPCASES\OBJECT.MAG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PACE LOCAL UNION 5-1967 : Case No. C-1-01 301
et al. (WEBER, JUDGE)
    Plaintiffs : (Magistrate Judge Novotny)

vs. :

INTERNATIONAL PAPER COMPANY
     :
    Defendant

**PLAINTIFF'S OBJECTIONS TO
MAGISTRATE'S REPORT AND RECOMMENDATION THAT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED**

STATEMENT OF CASE

I. <u>Objections to Magistrate's Report on the merits.</u> Defendant International Paper Company (herein called IP) filed a motion for summary judgment which the Magistrate Judge in her Report (herein called Report) has recommended be granted. Plaintiffs state the following objections to the Report, and shall brief each Objection later in this Brief.

Objection 1. The Report credited the disputed testimony of Tom Weiser in his Affirmation that a phone number was given to him by a SMART interviewer, and that IP HR manager Anetta Johnson also gave supervisors the number of chief SMART interviewer Mary Rita Weissman to give to their employees who did not want a job offer from SMART. (Report, pp. 5-6). This clearly attempted to offset a key contention of Plaintiff, that there was a special cell phone number given by IP supervisors to only a few IP employees as a coded message that the should be denied a job offer by SMART so they could receive severance pay. The Report then held that Plaintiffs' assertions regarding the secret number for preferred employees was factually inaccurate and unsupported by the evidence.

(Report p. 12, third paragraph). This clearly showed that the Report credited highly disputed evidence of IP favorably over our undisputed evidence as to Anetta Johnson and as to Hocutt Phillips, our evidence here must be credited.

Weiser's claim that he got "the number" from a SMART interviewer is belied by Weissman's testimony (Weissman depo. 40):

> "I have no clue how people got my cell phone number. I certainly did not give it to them.... I certainly had no intention of people calling me on my cell phone **but several people did.**"

And Weiser admitted in his affirmation that he only gave "the number" to Herb Marcum. Why not give it to all the employees he supervised? Because Weiser was in on the secret deal.

Objection 2. The Report totally ignored the undisputed testimony of Tim Bray that after Bray had talked to Marcum about the phone number to call, which was Weissman's and he had talked to Weissman, he called Anetta Johnson, IP's Human Relations Manager at the time about this. Anetta told Bray on January 26, 2001 that Weissman's number had been given for certain people to call to let SMART know they would rather have severance pay than a job with SMART. (Bray, 58-59, Johnson depo. 19-20, 45-47). Thereupon, Bray told Anetta:

> "Anetta, we need to get this information out to the people to let them know that if they would rather have a severance than being hired, they would be able to call and let the people know.
> "She said, Tim, I can't do that. She said I worked for International Papers and we had promised SMART Papers a pool of employees to hire to run the mill." (Bray depo, 58-59, our Memo Contra).

Anetta Johnson in turn testified that she gave IP supervisors Weissman's cell phone number to give to employees to call Weissman

2

and tell her they did not want a job offer, that she had got Weissman's cell phone number got off her business card. (Johnson depo. 8-9, 18-20, 44-47). She did not deny that she dissuaded Bray from publishing the phone number because she worked for IP and they had promised SMART Papers a pool of employees to hire to run the mill. Bray's testimony on these critical facts was undisputed. This fact is one of the most critical components of our case for estoppel, because the top HR manager for IP **before the sale** admitted that giving out the number was secret and selective, not for general knowledge.

Objection 3. Hocutt Phillips was in charge for IP of running the mill and shutting it down as IP prepared for SMART Papers to take over operation of the Hamilton Mill (See Phillips depo., p. 10, attached to IP Reply brief). The Report also ignored the testimony that Hocutt Phillips conducted one of the afternoon meetings Saturday February 10, 2001, of employees being offered jobs by SMART, during which the secret phone number came up. Tim Bray who was there testified:

> "At the meeting of February 10th at 3:00, there at the end of the meeting Hocutt Phillips was holding...Jesse Lane said to Hocutt Phillips, it was my understanding there was a number that you could call or tell your supervisor if you did not want to work for SMART, that we would receive the severance. And Hocutt Phillips said, yes. And Jesse Lane said, why wasn't we informed of that? And Hocutt said, well, we were agents of International Paper and we had promised SMART Papers that we would have them employees to hire from." (Bray depo. 61).

Bill Rumpler, an IP employee who also attended this same afternoon meeting 2/10/01, testified (Rumpler depo. 17):

> "Well, Jesse Lane was in our group of 50 people and he said he heard there was a number that we could have called and

got the severance pay. And Hocutt Phillips said, that's right, yes. And then he said, why didn't we get it then? Why didn't we get that number? And Hocutt Phillips said, because we promised SMART Papers a work force."

This is additional proof that Weissman's cell phone number was given out to a few and not made known for all IP employees. Bray, Rumpler and others heard Hocutt Phillips admit there was a number to call to tell SMART you did not want a job offer from SMART, that they did not give Jesse Lane and others this number because IP had promised SMART Papers a work force. On summary judgment, the Court cannot weigh the evidence and here must credit the evidence that once again a top manager of IP had known there was a number a few could call to tell Weissman and SMART they wanted severance pay, not a job offer. On the merits of this case if and when it goes to trial, we believe that the trier of fact will credit Bray and Rumpler over Phillips, but on summary judgment Bray and Rumpler have corroborated the secrecy of "the number." And common sense tells one, wait a minute, if an IP employee did not want a job from SMART, they need only refuse it. Why the secret number and "the call" then? Exactly as a coded message the caller wanted severance pay from IP, not a job. It was clearly erroneous for the Report to state that Plaintiffs' assertions regarding the secret number for preferred employees was factually inaccurate and unsupported by the evidence. (Report p. 12).

Objection 4. Plaintiffs object to the Report's finding that Plaintiffs do not dispute that they are ineligible for severance under the explicit terms of the EBA (Effects Bargaining Package). (Report p. 2). Plaintiffs contend that the EBA is not clear and is

4

ambiguous, as in the provision that employees accepting jobs with SMART will receive severance pay from IP if "terminated through no fault of their own." The undisputed evidence in this record shows that SMART allowed a certain few employees to refuse job they had been offered (Napier) or quit calling them "terminated through no fault of their own" while denying this to others.

Objection 5. The Report ignored the contention of Plaintiffs that SMART's HR managers acted as agents of IP in reporting who was eligible for severance pay and who was not. As arranged by IP, SMART's HR managers were IP's agents because reports from SMART's HR people was the only way IP could determine who to pay severance pay.

Objection 6. We object to the Report's finding that Plaintiffs have failed to produce any evidence that defendant's communications regarding the EBA were misleading or inconsistent. (Report, p. 13) We have shown conclusively that IP managers aided a few employees to receive severance pay, and contend that the giving out of the coded phone number became itself a virtual assurance of receiving severance pay. And we ask - why not generally give the number out, if it was a benign thing? It is now conclusive that IP had the opposite intent, give the number only to a few because they promised SMART a work force.

Objection 7. Plaintiffs object to the Report's conclusion that Defendant IP is entitled to judgment as a matter of law on Plaintiffs' claim of breach of contract under the LMRA (29 USC §185). (Report, p. 8).

Objection 8. While the Report correctly held (in agreement

with 6th Circuit Judge Guy) that ERISA applies to the EBA (Report pp. 9-11), the Report erred in several findings that Plaintiffs had not established IP's violation of its fiduciary duty to administer the EBA fairly and without discrimination, namely:

- holding that Plaintiffs' assertions are factually inaccurate and unsupported by the evidence. (Report p. 13;

- holding that Plaintiffs have failed to produce any evidence that IP's communications regarding the EBA were misleading or inconsistent (Report p. 13) while as noted supra ignoring the fact that SMART was an agent for IP in advising who was eligible for severance pay.

- holding and applying law to this case, that a party cannot seek to estop the application of an unambiguous written provision of an ERISA plan. (Report p. 14). In fact, the EBA drafted by IP proved to be ambiguous in several respects, one being the interpretation of a SMART employee being "terminated through no fault of their own within 18 months." The undisputed evidence showed (the following excerpts from our Memo Contra Sum J):

> (1) Anetta Johnson and Milton Lewis handled Hubert Napier's refusal of Smart's job offer. (Johnson depo. 65-69; Lewis depo. 16-17, Ex. 2). Anetta Johnson testified that when Hubert called and complained she told him "[T]he job offer stands" (Johnson depo. 66, line 7) and that she later received a FAX from his attorney and that she had taken care of Smart's "rescission" of his job offer. (Id., 67).
>
> (2) Milton Lewis also handled the rescission of Smart job acceptances (not offers as IP states) of Joe Born, Jimmy Taylor, Michael Thomas, James Ratliff and Randy Tackett, and the voluntary terminations of Frances Spurlock, Ray Asher and Hank Walker. (Lewis depo. Ex. 1A-1H; Ex. 4, Ex. 6; Lewis depo. 20-21 regards Spurlock). Lewis included in the agreements with Joe Born, Jimmy Taylor, Michael Thomas, James Ratliff and Randy Tackett a provision for non-disclosure or consequential legal action (Id. Ex 1A-1H), which IP claims was to keep it

from IP, but this was designed so Born et al. would not tell their fellow employees how they got out of their job offers and got severance pay. And as Tim Bray testified, he found copies of these job acceptance rescissions of Born, Ratliff, Taylor and Thomas slid under the union office front door (Bray depo. 77), showing that the real target of non-disclosure was the Union and fellow employees. And Joe Born, Jimmy Taylor, Michael Thomas, James Ratliff, Randy Tackett, Frances Spurlock, Ray Asher and Hank Walker all received severance pay from IP. (Payton depo. Ex 8).

Equally disingenuous is IP's claimed acceptance of Smart's "information" that Ray Asher, Frances Spurlock, and Henry Walker were terminated "through no fault of their own." (Maheu depo. Ex 1, page IP-P100127, Smart list 3/6/01). Maheu got it right in his affidavit attached to IP's Brief, where he stated that Ray Asher, Frances Spurlock and Henry Walker **were given the choice of staying with Smart or resigning and chose to resign.** (Maheu affidavit attached to IP Brief, pp. 5-6). The excuse was they did not get the identical job they had with IP, an excuse which is found nowhere in the EBA. How did IP handle others who did not like the jobs Smart had offered them and also quit? In the case of Govan Begley, IP wrote him 4/13/2001, denying his request for severance pay because he had received a job offer from Smart, and had voluntarily left Smart. (Payton depo. Ex. 2, page IP-P100092). And as to Larry Combs, George Payton referred his request for severance pay to IP counsel, who wrote Comb's attorney:

> "Mr. Combs voluntarily resigned his position with Smart Papers. Therefore he was not 'terminated through no fault of his own." (Payton depo. Ex. 3, page IP-P1000026).

Quitting their SMART job as Asher, Spurlock, Walker and others chose to do was not "terminated through no fault of their own," as IP had made clear in separating the Asher, Spurlock and Walker

7

sheep from the Begley and Combs goats. All of this simply shows a buddy system at work, which IP initiated before Smart took over and which IP continued afterwards, the essence of estoppel.

The SMART HR managers Anetta Johnson and Milton Lewis held the same positions with IP a few days before they did these things and reported to IP that Hubert Napier, Joe Born, Jimmy Taylor, Michael Thomas, James Ratliff, Randy Tackett, Frances Spurlock, Ray Asher and Hank Walker were entitled to receive severance pay. Their agency for IP is an essential fact that we had noted (Memo Contra Sum J, p. 13) and that the Report ignored with no comment the same. The Report fell into IP's trap of the claim of a wall of corporate separation between IP and SMART.

It can thus be seen that the widest latitude was given to the ambiguous EBA phrase "terminated through no fault of their own," which was but another means of granting severance pay to some who **actually went to work for SMART** and who were given the choice to stay or quit, while denying this choice to others, e.g. Begley and Combs for two. One can sense these sorry things by their smell.

Objection 9. The Report quotes from an ERISA case that:

> "Estoppel requires reasonable or justifiable reliance by the party asserting the estoppel... (which can be) **seldom if ever** be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of a plan document...." (Report p. 15)

The Report then asserts and assumes that the EBA terms are clear and unambiguous, and even it were, this is one such "seldom" case. To see what IP and SMART did here is nothing less than outrageous, but these Plaintiffs stand to be denied their rightful claim by the Report's superficial analysis. As to the ambiguity of

the EBA we further note as the Report found that IP drafted the EBA and the Union agreed (Report p. 3, second paragraph). Thus, any ambiguity should be resolved against the party who drafted the contract. We note the maxim: "He who speaks must speak plainly." The shenanigans of IP and its agent SMART in separating their severance pay preference sheep from the goats cry out for relief for the Plaintiffs here.

II. <u>Objections to the Report's holdings that Plaintiffs forfeited their claims, no arbitration and NLRB</u>.

Objection 10. Plaintiffs object to the Report's holding that the EBA is an amendment to the CBA which requires arbitration and that Plaintiffs have forfeited their case because they "failed to exhaust administrative remedies prior to filing this action." (Report p. 8, footnote 2). The Report is contrary to the Court's previously holding in this case denying IP's same claim in its motion to Dismiss Plaintiffs' second amended complaint, the Court holding that no arbitration was required of Plaintiffs' claims. (Report, Document 27 and Order of Court, Document 35).

We note that IP and not the Union drafted the EBA (Report, p. 3) and did not include a provision for arbitration of any dispute under the EBA. The maxim "He who speaks must speak plainly" applies here to favor PACE's contention that the EBA is not part of the CBA. And the CBA was due to expire in September, 2001, whereas the EBA provided for its continuing operation for eighteen months, i.e. to August, 2002. The Sixth Circuit had a similar contract before it in <u>Heheman v. E.W. Scripps Co.</u>, 661 F.2d 1115, 1124 (6th Cir. 1981, which was an agreement for lifetime jobs for Post

9

printers. The contract had no arbitration provision. This Court (Hogan, J.) had held for the printers, but limited their damages to the expiration date of the CBA. The Sixth Circuit reversed, holding that the contract was not part of the CBA and continued in force after the CBA expired. Here, the EBA has its own expiration date, 18 months after 1/23/01, and is not part of the CBA. And as the Supreme Court held in <u>AT&T Technologies v. Communications Workers of America</u>, 475 US 643, 121 LRRM 3329 (1986) arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. In <u>Apponi v. Sunshine Biscuits, Inc.</u>, 809 F.2d 1210, 124 LRRM 2494 (6th Cir. 1987), the Sixth Circuit held that plaintiffs did not fail to exhaust the grievance procedure of the collective bargaining agreement because their 29 USC §185 (§301) claim was on a separate contract, the pension agreement.

And our case is as much an ERISA case (which the Report so held) as it is a breach of contract case under 29 USC §185. There is no forfeiture of an ERISA claim for failure to arbitrate even with a CBA in any event, as noted in <u>Burke v. Latrobe Steel Co.</u>, 775 F 2d 88 (3d Cir, 1985), where the Third Circuit stated:

> "Underlying these cases is the basic premise that when Congress has provided a judicial remedy for the denial of certain statutory rights, that forum may not be denied through the arbitration provisions of a collective bargaining agreement. A trilogy of Supreme Court decisions has left no doubt on that score. See <u>McDonald v. City of West Branch</u>, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); <u>Barrentine v. Arkansas-Best Freight System, Inc.</u>, 450 U.S. 728, 101 S.Ct, 1437, 67 L.Ed.2d 641 (1981); <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

Objection 11. Plaintiffs object to the holding of the Report

10

that Defendant argues that we assert a claim of direct dealing "in which case, the NLRB has exclusive jurisdiction. The Court agrees." (Report, p. 16, footnote 5). The Report ignored the landmark cases on this point going back 42 years, in <u>Smith v. Evening News Assn.</u>, 371 U.S. 195, 51 LRRM 2646, 2647 (1962) that §301 provides jurisdiction to adjudicate contract violations which also are unfair labor practices, the Supreme Court stating:

> "The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by §301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under §301."

This settled law, reaffirmed by the Supreme Court in <u>Vaca v. Sipes</u>, 386 US 171 (1967), and in <u>DelCostello v. Teamsters</u>, 462 U.S. 151, 113 LRRM 2737 (1983), negates IP's claim and the Report's holding of exclusive NLRB jurisdiction over this dispute. Our case for contract violation under §301 is thus no less a §301 case if it were also an unfair labor practice. Judge Beckwith in the <u>Angel</u> case and the Report simply erred in holding that Plaintiffs lose because the NLRB had exclusive jurisdiction. And the Report's adoption of that error is in contradiction of the Court's previous rulings in this case that we had established a §301 case, despite IP's same claim of exclusive NLRB jurisdiction. (Previous Report, Document 27 and Order of Court, Document 35). The Report curiously disagrees with this Court in this case on arbitration and NLRB, agrees with Judge Beckwith on a couple of errors she made but correctly disagreed with Judge Beckwith's error that the EBA is not an ERISA plan. We trust that the Court will agree with us that we stated a case to go to trial, despite IP's impedimenta.

Objection 12. Plaintiffs object to the Report's conclusion that Defendant is entitled to judgment as a matter of law on Plaintiffs' claim of breach of contract under the LMRA and breach of fiduciary duty under ERISA, and that Plaintiffs may not invoke the doctrine of equitable estoppel because the terms of the EBA are clear and unambiguous. (Report p. 17).

We have shown a strong case for equitable estoppel, a case which should go the trial, with the EBA's representation that an IP employee had to apply for a job with SMART and be refused, while at the same time, IP managers were secretly helping certain employees call a coded number to tell Weissman or her assistants they did not want a job. Further and equally egregious, IP's agents for reporting those entitled to severance pay, the SMART managers, were selecting preferred employees who had jobs or job offers with SMART (making them clearly ineligible for severance pay) and informing IP a job offer had been rescinded (Hubert Napier, Joe Born, and others) or some who chose to quit were "terminated through no fault of their own." The agency of SMART for IP is seen in the LMRA as held by the NLRB and by federal courts, e.g. NLRB v. Bratten Pontiac, 406 F.2d 349, 70 LRRM 2249 (4th Cir. 1969); Alliance Rubber Co., 286 NLRB 645, 126 LRRM 1217 (1987); and Crane Sheet Metal, Inc. v. NLRB, 675 F2d 256, 110 LRRM 2235 (10th Cir. 1982).

In Apponi v. Sunshine Biscuits, Inc., 652 F.2d 643, 107 LRRM 3095 (6th Cir. 1981) (Apponi I), plaintiffs asserted contract violation under 29 USC §185 (LMRA §301) in their claim for pension benefits under a pension plan, which provided pensions for employees with 15 years of service and 55 years or more of age.

The District Court (SD Ohio) had dismissed their claim on summary judgment because none of the plaintiffs were yet 55 years of age when their employment terminated. Reversing the District Court, the Sixth Circuit held that based upon their affidavits that they were promised pensions once they became 55 although no longer employed by Defendant, the principle of equitable estoppel applied in their favor. The Sixth Circuit revisited the <u>Apponi</u> case in <u>Apponi v. Sunshine Biscuits, Inc.</u>, 809 F.2d 1210, 124 LRRM 2494 (6th Cir. 1987) (<u>Apponi II</u>), where on remand to the District Court, plaintiffs had prevailed and judgment for them of $3+ million was entered. The Court upheld the principle of estoppel as it had held in <u>Apponi I</u>, and again stated:

> "The equitable doctrines of estoppel and waiver are applicable in a Section 301 action to enforce a labor contract. (Citing cases).
> * * * *
> "The elements constituting estoppel as defined by federal common law are: 1) conduct or language amounting to a representation of material facts; 2) the party to be estopped must be aware of the true facts; 3) the party to be estopped must intend that the representation be acted on, or acts such that the party asserting the estoppel has a right to believe it so intended (4) the party asserting the estoppel must be unaware of the true facts; and 5) the party asserting the estoppel must detrimentally and justifiably rely on the representation."

In <u>Armistead v. Vernitron Corp.</u>, 944 F.2d 1287 [138 LRRM 2559] (6th Cir. 1991), which was both a §301 and an ERISA case as here, there was a discrepancy between contract limitations on medical insurance coverage for retirees and plan booklets and documents and what employees were told about their benefits. Affirming the District Court's judgment for the plaintiffs, the Sixth Circuit held on principles of equitable estoppel that the employer had

13

breached the contract literally supporting the employer's claims and also had denied such employees benefits under ERISA stating:

> "Both the LMRA and ERISA authorize the federal courts to **fashion a body of federal common law** to enforce the agreement that these statutes bring within their jurisdiction. <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 403, 108 S.Ct. 1877, 1880 (128 LRRM 2521) (1988). In <u>Apponi v. Sunshine Biscuits, Inc.</u> 809 F.2d 1210, 1217 (124 LRRM 2494) (6th Cir. 1987), this circuit incorporated the doctrine of equitable estoppel into the federal common law of contracts, at least in so far as the agreement at issue is before the federal courts under the LMRA.
> <u>Armistead v. Vernitron Corp.</u>, 944 F.2d 1287.

The Sixth Circuit again followed the principle of equitable estoppel in <u>Anderson v. AT&T Corp.</u>, 147 F.3d 467, 158 LRRM 2385 (6th Cir. 1998), reversing the District Court (again SD Ohio) dismissal of plaintiffs' case on the grounds that the contract literally denied plaintiffs' claims, stating:

> "The federal common law of contracts applicable under the LMRA (§301) includes the doctrine of promissory estoppel (citing <u>Apponi I</u>)."

Literalism is not the touchstone in these estoppel cases, and there are ambiguities in the EBA as we noted. But perhaps one can best note that the devious and secret preference to a few employees that IP's managers and its agents to report severance pay entitlement, SMART managers, have presented to the Court the most egregious case for the application of equitable estoppel. We have shown enough proof of their preferred selections as in Herb Marcum, Ron Pelsor, Merrill Sorrell (their green or yellow = hire, changed to red after their "call", Hubert Napier, Joe Born, Jimmy Taylor, Michael Thomas, James Ratliff and Randy Tackett, whose job offers were "rescinded" and the voluntary terminations of Frances Spurlock, Ray Asher and Hank Walker. (Lewis depo. Ex. 1A-1H; Ex. 4,

14

Ex. 6; Lewis depo. 20-21 regards Spurlock). These are enough but more may be inferred albeit better concealed.

## CONCLUSION

The errors in the Report have been mostly enumerated and challenged. The essential facts and law are that we have established proof of an estoppel case under 29 USC §185 and ERISA 29 USC §1132. The evidence that we presented opposing summary judgment should be credited which shows Defendant IP's breach of contract and also ERISA violation. We note the difficult job of the District Court (SD Ohio), and its several adverse or limiting decisions reversed by the Sixth Circuit on issues similar or the same as here. This case has a disturbing element that the other estoppel case did not have, the secrecy the Defendant's actions in deliberately bypassing the EBA or twisting its terms to benefit a few preferred employees while providing SMART with the workforce it needed. One clear proof of the IP-SMART shenanigans was the promise Milton lewis included in the job acceptance rescissions of favored quitters not to disclose the agreement, e.g.Joe Born et al. (Lewis depo. Ex. 1A-1H). The reason Lewis did this was his attempt to have Born and the other SMART job quitters not tell fellow employees and the Union about the deal they got to beat the EBA. We have found no other estoppel case where the misrepresenting action of the employer was a match for the egregious IP/SMART sneak stuff here.

The Court should reject the errors in the Report of the Magistrate Judge, overrule Defendant's motion for summary judgment and move this case to trial to the Court.

Respectfully submitted,

*/s/ Robert I. Doggett*

Robert I. Doggett (0016849)
Trial Attorney for Plaintiffs
6740 Clough Pike, Room 200
Cincinnati, Ohio   45244
Tel: 513/241-6116

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiff certifies that he served a copy of the above document upon Michael A. Roberts, attorney for Defendant, Graydon, Head & Richey, P.O. Box 6464, Cincinnati, Ohio 45210-6464, and upon Vincent J. Miraglia, Esq. and W. Carter Younger, Esq., McGuire Woods, 1050 Connecticut Avenue, N.W., Washington, DC 20036-5317, co-counsel for Defendant, by first class mail, postage prepaid, this 15th day of January, 2004.

*/s/ Robert I. Doggett*

Robert I. Doggett (0016849)

D:PACE - \PACE1967\IPCASES\OBJECT.MAG