UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PACE LOCAL UNION 5-1967 et al. Plaintiffs | : | Case No. C-1-01 301 (WEBER, JUDGE) (Magistrate Novotny) |
| vs. | : | |
| INTERNATIONAL PAPER COMPANY Defendant | | |

**PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED**

APPENDIX

Excerpts and selected exhibits from following depositions:

Tim Bray deposition

Anetta Johnson deposition

Milton Lewis deposition

Dan Maheu deposition

George Payton deposition

William Rumpler deposition

Kenneth Stanifer deposition

Mary Rita Weissman deposition

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PACE LOCAL UNION 5-1967, et al.,
Plaintiffs,
vs.
INTERNATIONAL PAPER COMPANY,
Defendant.

CASE NO. C-1-01-301

DEPOSITION OF: TIMOTHY D. BRAY
TAKEN: By the Defendant Pursuant to Notice
DATE: November 20, 2002
TIME: Commencing at 11:07 a.m.
PLACE: Offices of: Graydon, Head & Ritchey, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio 45202
BEFORE: Sharon A. Helfrich, Notary Public - State of Ohio



APPEARANCES:

On behalf of the plaintiffs:

Robert L. Doggett, Esq.
215 East Ninth Street
Suite 630
Cincinnati, Ohio 45202-2139

On behalf of the defendant:

Vincent J. Miraglia, Esq.
of
McGuireWoods, L.L.P.
Washington Square
1050 Connecticut Avenue N.W.
Suite 1200
Washington, D.C. 20036-5317

Also present:

Mr. Kenneth C. Stanifer
Mr. Ron Schweitzer
Mr. J. Thomas Stewart

- - -



I N D E X


| TIMOTHY D. BRAY | PAGE |
|---|---|
| Cross-Examination by Mr. Miraglia | 4 |
| Examination by Mr. Doggett | 121 |
| Recross-Examination by Mr. Miraglia | 126 |

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| Defendant's Exhibit 4 | 9 | 9 |
| Defendant's Exhibit 5 | 9 | 9 |
| Defendant's Exhibit 6 | 83 | 83 |
| Defendant's Exhibit 7 | 93 | 94 |
| Defendant's Exhibit 8 | 109 | 110 |
| Defendant's Exhibit 9 | 115 | 115 |
| Defendant's Exhibit 10 | 118 | 118 |

Attachments:

Defendant's Exhibit 1
Defendant's Exhibit 2
Defendant's Exhibit 3


- - -



TIMOTHY D. BRAY

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

CROSS-EXAMINATION

BY MR. MIRAGLIA:

Q. Give me your name and spell it, please.
A. Tim Bray, B-r-a-y.
Q. And what's your current employer?
A. My current employer is Pace International Union.
Q. And your current job title?
A. I'm an organizer.
Q. For purposes of this deposition and for the court reporter, I will need you to give verbal responses. The court reporter can't understand nods of the head or uh-huh or uh-uh. Okay?
A. Yes, sir.
Q. I'm also going to assume that you've understood the question that I've asked you unless you tell me otherwise. All right?
A. Okay.
Q. And if you need a break at all, please let me know and we'll take a break at the next appropriate time. Is that okay?

Q. When were you elected president?
A. March of 1990.
Q. Did you run against Mr. Fouts?
A. Yes. I did.
Q. Who was your vice-president at that time?
A. Michael Carpenter.
Q. What are the other officer positions in the union?
A. As far as officers, that's the only officers. I was also -- I served on the executive board by virtue of being the vice-president and president of the local union.
Q. What other offices or positions are there in the union?
A. Oh, I misunderstood. You have the financial secretary/treasurer, and you have the recording secretary and then you have three trustees.
Q. And you held the union president position for how long?
A. Twelve years.
Q. So 2002?
A. March of 2002; yes, sir.
Q. Who is the current union president?
A. His name is Ronald Schweitzer.
Q. Did you run against Mr. Schweitzer?



A. Yes, I did.
Q. On what date were you no longer president of Local 1967?
A. I will say March 13th of 2002. I believe that's the date, approximately.
Q. Prior to March 2002, who was your vice-president?
A. Irvin Sandlin.
Q. Who was the financial secretary/treasurer?
A. Cordell Mellott. M-e-l-l-o-t-t.
Q. Who was the recording secretary?
A. Pearl -- which is a male -- Hicks, H-i-c-k-s.
Q. And the three trustees?
A. It was David Bowling.
Q. Can you spell the last name?
A. B-o-w-l-i-n-g. David Baker and Jeff Johnson.
Q. Were you and the six people you just named employees of Champion and then International Paper?
A. Yes.
Q. From March 1990 until March 2002, what was your employment status at the Hamilton mill?
A. I was on what they call a union leave of absence.
Q. Can you explain what that means?



A. It means I was on a paid leave of absence, serving in the capacity of the local president of the local union.
Q. Were you being paid by the union?
A. I was being paid by the local union, Local 1967.
Q. What was your salary?
A. The amount?
Q. Yeah.
A. I was on salary.
Q. As of 2002.
A. Approximately 52,000.
Q. That was your last salary with the union?
A. I don't remember, to tell you the truth. It was approximately that much, something like that.
Q. Would you have received benefits under the Collective Bargaining Agreement or was it a separate benefits package that you would have had?
A. It was an agreement that we had worked out with Champion Paper.
Q. Can you explain that to me?
A. The health care, the dental, the life insurance was provided by Champion. My wages was paid by the local union. However, I did not receive -- I did not have any



health benefits under Champion because, where my wife worked, I was under hers.
Q. Did you have dental and life under Champion?
A. Yes.
Q. Was that throughout the 12 years that you were president?
A. Eleven of those years.
Q. What was the 12th year?
A. The 12th year was when Smart Papers acquired International Paper. I did not have any, of course, health care. Dental care. No life insurance provided for, no. I was still serving as president of the local union and, of course, being paid by the local.
Q. What we have referred to as the Champion mill was located where?
A. 601 North B Street in Hamilton, Ohio.
Q. And Champion and the ownership of that mill changed in the year 2000; is that correct?
A. Yes.
Q. Do you recall the date?
A. I'm not sure, but I believe it was around the first of June of 2000.
Q. And who obtained ownership of the mill?
A. A group out of Boca Raton, Florida, I believe;

53

stage, Plant Protection?
A. Yes.
Q. Was there a deadline for you to either accept or reject the offer?
A. Yes.
Q. Do you recall what that date was?
A. You know what, I can't remember if it was 24 hours or 48 hours. I can't remember which it was.
Q. You did it within 24?
A. Yes, I did it within 24.
Q. As union president, were you offered or provided with any information regarding who was given offers or who wasn't?
A. No, I wasn't.
Q. In Pace's initial disclosures that your counsel provided to us, there's reference that you were involved in a conversation discussing a secret telephone number?
A. Yes.
Q. All right. When did that conversation take place?
A. January 26th.
Q. Friday?
A. Yes.

54

Q. Where did that take place?
A. It took place in my union office.
Q. Where was that?
A. It's 1050 Millville Avenue, Hamilton, Ohio, 45013.
Q. Is that on the Hamilton B Street property?
A. No. The local -- Pace Local 196 owns that building and its property, and it's approximately five minutes away from the mill.
Q. I see. And with whom did you have that conversation?
A. The conversation started actually when myself and Ken Stanifer and Irvin Sandlin came back from the meeting on January 26th where we presented the Effects Bargaining Package to the membership.
We went back to pick up our things, and while we were in there we sat and chatted. It was about 6:30. We were walking out the door, myself, Ken and Irvin, and the phone rang. I said, I'd better get this.
So I went back into the vice-president's office, that was the closest phone, and answered the phone. And a gentleman by the name of Herb Marcum told me, he said that he'd just received a call from his supervisor and was given a phone number and he said, if you do not wish to work

55

at Smart and you want your severance, call this number and let them know.
Q. Who was the supervisor?
A. I believe it was Tom Weezer (phonetic). I believe that's his name.
Q. What area did Mr. Herb Marcum work?
A. The drum.
Q. And what was Mr. Weezer's position?
A. He's kind of like the superintendent over the drums. I'm not sure of his official title at that time.
Q. Do you know what the telephone number was?
A. No, I don't know the number, but the guy did give me the number.
Q. Do you have it?
A. No. I do not have it with me.
Q. Do you have it anywhere?
A. Not that I know of, no. The only thing, when he called and told me the number, I said, give me the number and I'll call it and see what happens. It was a 937 area code and then the seven digits. And I told him, this is a Dayton number, Dayton, Ohio is 937 up in that area. So I said, I'll call it and get back with you.
Q. All right.
A. So I called it and Mary Rita Wiesman answered

56

the phone. And she was on a cell phone at the Hamiltonian. And I told her the conversation, that Herb Marcum's supervisor called him and said, if you do not wish to work for Smart and you want the severance package, call this number. I said, what's this all about? She said, this is correct. This is important data we need to know when determining the hiring.
Q. They wanted to know if somebody didn't want to work for them?
A. Yes. So I told her, I said, well, this is some information that our folks need to know about, you know. That's pretty important stuff.
So she told me, she says, well, you know, I'm not sure how much good that will do. People may get hired anyway, but this is data we have to have. Again, I said, I have to let some folks know about this.
I hung up and called Herb Marcum back and I told him, Herb, go ahead and call that number and tell Mary Rita Wiesman you do not wish to work for Smart, you want your severance. I hung up the phone.
So we were walking out, like I said, Ken Stanifer and Irvin Sandlin, and I told them the conversation. They could hear myself, of course, but not the other side so I told them the conversation. I said,

this is information we need to get to the membership. It's pretty important stuff. And I said, I need to go talk to Annetta Johnson about this.

And, of course, by this time it's probably around 7:00 maybe, something like that, and I did notice that on that day, the 26th, that they were having meetings at the Communications Center at the Hamilton B Street mill. So I went over there, drove over there to try to find Annetta Johnson.

Q. And what was Ms. Johnson's position?

A. She was the Human Resource manager.

Q. Did you find her?

A. Not there. I talked to this one woman who happens to work for Annetta and I asked her, is Annetta here? and she said, no.

Q. And who was that?

A. Her name was Tina Laslo, L-a-s-l-o.

Q. She was at that Communications Center?

A. Yeah, she was.

Q. Okay.

A. That was during the retirement session, explaining to the folks what their retirement would be. I asked if Annetta was there. She said, no. I said, do you have her phone number?



Now, the Communications Center, the room is upstairs. So we went down to the HR department and she got on her computer and did what she did and got me Annetta Johnson's home phone number. So right there I called her at home, but Annetta wasn't home. I explained -- told her husband who I was and he said he expected her back within the hour. I think I said, I'm leaving here now, I'm at the mill and it takes about 15 minutes for me to get home. If she comes in within that 15 minutes, tell her to wait until afterwards to call me.

So, again, that's like 20 after 7:00 or whatever, approximately. So I drove home, and at about roughly 8:00 Annetta Johnson calls me at home.

MR. DOGGETT: Still on the 26th?

THE WITNESS: Yes, sir; Friday the 26th.

A. Annetta calls me and I explain to her my conversation with Mary Rita Wiesman -- well, with Herb Marcum and then Mary Rita Wiesman answers the phone. I said, Annetta, we need to get this information out to the people to let them know that if they would rather have a severance rather than being hired, they would know and be able to call and let people know.

She said, Tim, I can't do that. She said, I worked for International Paper and we had promised Smart



Papers a pool of employees to hire to run the mill. And I said, well, if you can't do it, I can do it. This is Friday evening, a little after 8:00. I said, I'll do it.

She said, Tim, it won't do any good. Mary Rita Wiesman will be taking the names to Dan Maheu about 9:00 today with their stuff, the information on the people.

Well, there was nothing I could do. Everything had been turned in by that time and the weekend was coming up.

Q. So you didn't advise anybody about this?

A. I talked to a few folks. It was hard for me to try to get ahold of everyone because, again, it was late Friday and they were turning the names in almost as me and Annetta was speaking. So it was virtually impossible for me to really communicate it out.

But people did know about it. Some of them didn't know what the number was. They had no idea what the number was.

Q. Did they know who Mary Rita Wiesman was?

A. No. They knew there was a group interviewing, but they didn't know --

Q. They didn't know the Wiesman Group?

A. No, I don't think so. I didn't know who it was either until after the fact, like I said.



Q. When you spoke to Ms. Johnson about this, your conversation with Ms. Wiesman, did she know about the number prior to you talking to her?

A. Did she know what?

Q. About the Wiesman number prior to you talking to her?

A. I think so, yes.

Q. Why do you think so?

A. Well, if Tom Weezer knew the number and -- who was the supervisor in the mill, I would think that Annetta Johnson would know it also, because she was the HR manager.

Q. But you don't know for sure whether she did or not?

A. I didn't, no. I didn't ask him.

Q. And she didn't say she knew about it?

A. She knew about the people calling. That was important information. Yes, she knew, but I didn't ask her. But that's when she said, Tim, I can't do that, but it wouldn't do any good for you to do it, because of the time frame.

Q. Did you speak to anybody else other than Ms. Wiesman and Ms. Johnson and Mr. Marcum?

A. That evening?

Q. That evening?

A. Not that I recall.
Q. Did you speak to anybody else at International Paper regarding this issue?
A. That evening?
Q. Ever.
A. Not that I can recall. Now, the subject was brought up, but I didn't bring the subject up. At the meeting of February 10th at 3:00, there at the end of the meeting Hocutt Phillips was holding -- Jesse Lane applied for the job.
Jesse said to Hocutt Phillips, it was my understanding there was a number that you could call or tell your supervisor if you did not want to work for Smart, that we would receive the severance. And Hocutt Phillips said, yes. And Jesse Lane said, why wasn't we informed of that? And Hocutt said, well, we were agents of International Paper and we had promised Smart Papers that we would have them employees to hire from.
Q. Now, this number was to Mary Rita Wiesman?
A. She answered the phone.
Q. And Mary Rita Wiesman was the person that interviewed you?
A. Yes.
Q. So employees -- all employees that were offered



a job or not offered a job met with Ms. Wiesman or one of her employees; is that correct?
A. Yes. During the interview process?
Q. Yes.
A. Yes.
Q. So at that time, during the interview process, employees could have said they did not want to work for Smart, couldn't they have?
A. I suppose so.
Q. Did Mr. Marcum get an offer?
A. No.
Q. Do you know of anybody else that called Ms. Wiesman after their interview and said that they didn't want an offer?
A. I do not.
Q. Other than Mr. Marcum.
A. I do not know.
Q. So the only person you know of that did call Ms. Wiesman was Herb Marcum?
A. Yes.
Q. Did you ever talk to Mr. Weezer?
A. No.
Q. Do you know how Mr. Lane found out about the telephone number?



A. No. He didn't know about it.
MR. DOGGETT: No. I think the question was, do you know how Mr. Lang found out about the phone number?
A. Oh, no, I do not.
Q. Do you know if Mr. Weezer works for Smart Papers now?
A. I believe he does, yes.
Q. As far as you know, Ms. Wiesman worked for Smart Papers, correct?
A. Does she work for Smart Papers?
Q. She was acting as an agent for Smart Papers?
A. I believe so, yes.
Q. And in order to receive an offer from Smart Papers, employees had to interview with either Ms. Wiesman or somebody from her company?
A. They had to complete the whole process.
Q. And from what you've just told me, if they didn't want an offer, they would also have to go through Ms. Wiesman; is that correct?
A. Say that again.
Q. If they didn't want an offer they had to call Ms. Wiesman, also?
A. They didn't know about it. Herb Marcum did.



Q. So if they didn't want an offer, they would have to talk to Ms. Wiesman?
A. Yes.
Q. Do you know of any other method for which any employees would or would not have received an offer other than through Ms. Wiesman?
A. I suppose they could have told their supervisor.
Q. Well, the supervisor was not hiring employees for Smart Papers.
A. But they were interviewing the supervisor about the people.
Q. But Ms. Wiesman was in charge of the offers, correct?
A. I do not know that.
Q. Okay. Did you ever talk to Mr. Stewart regarding this issue?
A. About the phone number?
Q. Yes.
A. No.
Q. Back to Exhibit Number 2, the Effects Bargaining Agreement.
A. Yes.
Q. I just want to clarify that this Effects

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CASE NUMBER C-1-01 301

---------------------------------------)
PACE LOCAL UNION 5-1967, et al., )
Plaintiffs, )
v )
INTERNATIONAL PAPER COMPANY, )
Defendant. )
---------------------------------------)

DEPOSITION OF ANNETTA JOHNSON
(Taken by Defendant)
Raleigh, North Carolina
February 7, 2003

REPORTED BY: Victoria L. Pittman, RPR
Notary Public

APPEARANCES

For the Plaintiffs:

ROBERT I. DOGGETT
Law Office of Robert I. Doggett
215 East Ninth Street, Suite 630
Cincinnati, Ohio 45202
(513) 241-6116

For the Defendant:
VINCENT J. MIRAGLIA
McGuire Woods LLP
1050 Connecticut Avenue, NW, Suite 1200
Washington, DC 20036-5317
(202) 857-1700
(202) 857-1737 (fax)

For Smart Papers:
LAINE S. POSEL
Morgan Lewis
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3724
(202) 739-3001 (fax)

Deposition of Annetta Johnson, taken by the Defendant at Womble Carlyle Sandridge & Rice, 150 Fayetteville STreet Mall, Suite 2100, Raleigh, North Carolina, on the 7th day of February, 2003, at 8:25 a.m., before Victoria L. Pittman, RPR, Notary Public.



CONTENTS


| The Witness: Annetta Johnson | Examination |
|---|---|
| By Mr. Miraglia | 4, 75 |
| By Mr. Doggett | 39, 80 |


INDEX of the EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Effects Bargaining Package | 12 |
| 2 | Smart Papers Data Sheet, 3-6-01 | 27 |
| 3 | Taylor Agreement | 33 |
| 4 | Ratliff Agreement | 33 |
| 5 | Born Agreement | 33 |
| 6 | Thomas Agreement | 33 |
| P-1 | Confidential Documentation | 51 |




PROCEEDINGS

Whereupon,

ANNETTA JOHNSON,

having been duly sworn,

was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. MIRAGLIA:

Q Ms. Johnson, my name is Vincent Miraglia, I represent International Paper in a deposition -- in a case entitled Pace versus -- Pace, et al. versus International Paper.

We're hear to take your deposition today related to your employment at the Hamilton B Street Mill.

First of all, I just want to explain if you ever need a break during our time here, just let me know and we'll, at an appropriate time, take a quick break.

Also, if there's any misunderstanding about my question, if I'm not clear, if you don't understand exactly what I'm asking, please ask me to clarify what I'm asking.

Okay. Have you ever had your deposition taken before?

A Yes.

Q Okay. When was that?

A Three or four years ago.

Q And who was that for?



A Champion International.

Q Do you remember what the name of case was?

A Stewart and -- I don't remember the other employee.

Q Okay. Generally do you recall what the case was about?

A Inappropriate discharge.

Q Okay.

A Salaried employees.

Q Any other depositions you've taken?

A No.

Q Have you ever given testimony before other than that deposition?

A No.

Q Okay. Can you just tell us your full name for the record.

A Annetta Kay Johnson.

Q And your present business address.

A 2400 Ellis Load, Suite 100, Durham, North Carolina 27703.

Q Your date of birth.

A 10-4-61.

Q Just after high school, your education; did you go to college?

A Went to college at the University of Tennessee in

Knoxville and received a Bachelors Degree in Business.
And then started to work for Champion International in Canton, North Carolina and pursued a masters degree there in business, with Western Carolina University of Cullowhee.
Q Did you attain that degree?
A No, I got relocated.
Q What year did you graduate from Tennessee?
A '83.
Q Okay. And what year did you start with Champion?
A '83.
Q In what position did you start with Champion?
A Employee relations trainee, in their trainee program.
Q You said that was in Canton?
A Uh-huh.
Q Ohio?
A North Carolina.
Q Okay. And from Canton, where did you go?
A I went to Walden, New York, retail packaging business for Champion.
Q How long were you there?
A Three years.
Q And then where did you go?
A Pensacola, Florida.



Q How long were you there?
A Eight years.
Q Actually, I forgot. In Walden, what was your job title?
A HR manager, something like that.
Q Still in the human resources department.
A Yes.
Q And in Pensacola, what did you do?
A I worked in the organizational development or effectiveness group for three years. And then in labor relations for five years.
Q Okay.
A All in the human recourses development area.
Q Okay. And where did you go after Pensacola?
A Hamilton Mill, Hamilton, Ohio.
Q What year was that, if you recall?
A '96.
Q And that was still with Champion?
A Yes.
Q Okay. What was your job title there?
A Human Resources Development Manager.
Q And was that your job title throughout your employment with Champion at the Hamilton Mill?
A Yes.
Q We've established at some point in time.



International Paper took over the Hamilton Mill, is that approximately June of 2000; does that sound correct?
A Yes.
Q And you were hired by International Paper.
A Yes.
Q And in what job were you hired?
A Same position.
Q Just briefly, if you could explain your job duties while you were International Paper Human Resources Development Manager.
A When I consider managing the human resources function, it included labor relations function, salary administration, wage administration, benefits training, and organizational improvement.
I also had the health and safety group reporting to me, so that would include loss prevention, security, fire protection.
(Discussion off the record.)
Q Okay. Who were your supervisors?
A Dan Mayheu.
Q I guess we'll get your employment history taken care of and then we'll go back.
When did you cease being an employee of International Paper?
A When the mill was sold to Smart Papers. I don't



recall the date, January, February, sometime, it seems. I think, February of 2001.
Q And then you went to Smart Papers.
A Correct.
Q What was your job title there?
A Vice president of Human Resources and Strategic Planning.
Q And then shortly after that, you left Smart Papers. And where did you go?
A I went to Reichhold, Inc.
Q When was that about?
A When did I start working at Reichhold?
Q Yes.
A In June of 2001.
Q In what position?
A Human Resources Director.
Q Is that where are you currently?
A No.
Q Where are you now?
A I am with the joint venture. I went to Reichhold with the purpose of establishing a joint venture for one of their specialty chemical businesses. So I'm with Dow-Reichhold Specialty Latex; 50/50 joint venture.
Q And what is your position with --
A Human Resources Director.

Q I believe Ms. Weissman testified that that information was primarily with regard to attendance and discipline; is that correct?
A Would have been attendance and discipline, yes.
Q As I understand it, Smart Papers also went through the process of speaking to International Paper's employees' supervisors for references; is that correct?
A That was their reference-checking procedure.
Q And you assisted in making those supervisors available; is that correct?
A I scheduled their interviews, just as I scheduled all employees' interviews.
Q Other than the scheduling of those interviews, did you have any involvement in the those references for Ms. Weissman?
A Well, I as a supervisor had to provide references for the employees that worked directly for me. But other than that, no.
Q As I said, the sale went through from International Paper to Smart Papers on February 9.
Up until that date, did you have any authority whatsoever in the hiring decisions made by Smart Papers?
A None.
Q Did you have any authority in the termination decisions of Smart?



A None.
Q Did International Paper have any authority in the hiring decisions for Smart?
A None.
Q Did International Paper have any authority with regard to the termination of employees for Smart?
A None.
Q Prior to the sale going through, do you recall a conversation that you had with union president Tim Bray?
A Regarding? It's a pretty open-ended question.
Q So you had several conversations with Mr. Bray.
A Sure.
Q Okay. Do you recall Mr. Bray contacting you with regard to a conversation he had with a gentleman by the name Herb Markham?
A That name does not ring a bell for me.
Q Do you recall a conversation with Mr. Bray with regard to Ms. Weissman's cell phone number?
A I recall Tim Bray contacting me regarding a phone number for Ms. Weissman; I don't recall whether or not it was a cell phone.
Q Okay. Can you tell me what you recollect about that conversation.
A As I recall, it was later in January, after we've gone through some of the -- gone through most, if not all,



of the interviews. I got a call from Tim. And I don't recall the specifics of the conversation, but in general, he was wondering if there was -- either the truth about a phone number, is there a phone available, or is there a way for people who don't want job offers to make that known.
Q Okay. Do you recall what your response was?
A Exactly, no. Generally, my response was that employees were really only obligated to participate, fully cooperate in the interview process as stated in the effects bargaining agreement.
If someone doesn't want a job, they should state so during a interview process. If they are -- have completed the interview process and are rethinking their position, they had the ability to contact Smart Papers and let them know that.
That I could not be the go-between around that. That they had to make direct contact with Smart Papers.
Q Is that because you had nothing to do with the hiring decisions made by Smart Papers?
A That's correct.
Q And if anybody wanted to relate anything with regards to the hiring process of Smart Papers, they should contact Smart Papers.
MR. DOGGETT: Well, I think if this deposition's going to be used in lieu of Ms. Johnson's testimony in



court, I think I have to object to the leading form of the questions.
(Pause.)
BY MR. MIRAGLIA:
Q Do you know if International Paper made any -- strike that.
Other than your conversation with Mr. Bray regarding the telephone number, do you recall any other conversations you had with regard to a telephone number of Smart Papers?
A Yes. It would have been in what was called at that time HOT, the Hamilton Operations Team.
MR. DOGGETT: What did she say?
THE WITNESS: The Hamilton Operations Team, acronym HOT.
This was a group of managers and supervisors that were responsible for the daily operations of the mill. And they met on a fairly regular basis.
I was not a member of that team; I was a member of the leadership team. And occasionally I would go to their meetings, particularly during this time, to make sure that there weren't any other issues or questions that they had regarding scheduling interview times, those type of things.
BY MR. MIRAGLIA:
Q With regard to the transition from International

22

Paper to Smart?

A Correct. And there was -- at one of their meetings, there was some question about, as they received questions from their employees on the floor, what should we do if we don't want a job?

And my general guidance was the same as if I gave it to any individual; it was, if they don't want the job, they should so indicate in the interview. But we should encourage them to fully cooperate with the interview process.

Q But if there was any preference of or lack of preference for a job, they should contact Smart Papers.

A The further direction was if it had passed their interview time, that they should feel free to contact Smart Papers -- and when I say that, I mean Mary Rita Weissman. And I gave the supervisors, at that particular meeting, Mary Rita's phone number.

And their guidance, then, would have been to, if an employee asks you, feel free to provide that direction.

Q Okay. You say contact Smart Papers, and I mean Mary Rita Weissman. Why do you put it like that?

A Well, there was no one within International Paper that was affecting the employment decisions by Smart Papers. The lines were very clear. Very clear.

I, as an International Paper employee, was not to

23

be involved with the Smart Papers decision and decision-making process.

Q And Ms. Weissman was one of the few employees of Smart Papers at that time.

A That's correct.

Q Okay. When did your employment with International Paper end?

A February 9 of 2001.

Q The date of the sale?

A The date of the sale.

Q And when did your employment with Smart Papers begin?

A Evening of February 9.

Q So just to clarify, about what time, I guess, on February 9 were you --

A About 5:00, as I remember receiving the offer from Smart Papers for 5:00 on -- I think it was a Friday.

Q Okay.

A February 9.

Q And so shortly prior to that, you were terminated by International Paper.

A I suppose that's the way it occurred.

Q Okay.

A As the sale became final.

Q Sure.

24

I think we have established on Saturday, February 10, the former employees of IP who technically ceased to be IP employees a few hours earlier were called to a meeting and told whether or not they had a job with Smart; is that correct?

A Can you repeat the question? I'm sorry.

Q The day the sale went through, former IP employees were told by Smart Papers whether or not they had a job with Smart Papers.

A That's correct.

Q Can you tell me how that process went.

A Yes.

Q And I'm focussing on the hourly employees at this stage.

MR. DOGGETT: Did you say next day, after the sale?

MR. MIRAGLIA: Yes.

MR. DOGGETT: Would have been Saturday, February 10?

MR. MIRAGLIA: Right.

THE WITNESS: Right.

MR. DOGGETT: Okay.

THE WITNESS: As I recall, on that Saturday, there were several meetings scheduled. And they were scheduled in groups based upon whether or not people were receiving

25

employment offers from Smart Papers for the hourly employees.

Employees that were scheduled in the morning on Saturday morning -- there were several meeting rooms at a particular time in the morning. To the best of my recollection, there were three; one meeting room had Milton Lewis facilitating, one meeting room had Hocutt Phillips facilitating it, and I had the other room.

There were meetings after that, maybe one or two, that I did. Again, that were informing people they were not being extended offers by Smart Papers, which therefore meant they were eligible for severance.

BY MR. MIRAGLIA:

Q According to the effects bargaining agreement.

A According to the effects bargaining agreement.

Later that day, there were meetings -- larger group meetings scheduled where employees were given their job offer by Smart Papers. I was not involved in those meetings.

On Sunday, I met with salaried employees who were not given job offers. And I met with hourly -- one group, I believe, of hourly employees that, for some reason, couldn't meet on Saturday.

Q Okay. In your new role as a Smart Papers employee, did you have any involvement in determining who

opposed to the personnel?
A He definitely was not reporting to personnel.
Q What I'm saying is, your line of reporting and authority on the chart would have been relating to personnel.
A Yes.
Q The people, right?
A That's correct.
Q Hocutt was more like on operations.
A He was, at that time, working as an interesting blend between operations an sales.
Q Yes.
A But he was not in the human resources arena.
Q So he was not in your table of organization, on your -- down your --
A We did not have a reporting relationship.
Q Okay. Now, how -- I take it -- let me see if this is kind of correct. First of all, I should have prefaced my first question by asking you -- you're here on a deposition called by International Paper as you their former agent; isn't that correct?
A I was subpoenaed by the attorneys representing IP.
Q Okay. But you are a former managerial agent of International Paper, are you not?
A That's correct.



Q Now, let's go over to Smart. As I kind of get it, if it was 5:00 on Friday, the clock struck 5:00 p.m. on Friday night, February 9, 2001, and you changed from being and IP employee to being a Smart employee.
A It was about that time, yes, sir.
Q Okay. Now, as to the personnel people I'm interested in, yourself, Barbara Adams, Milton Lewis, how did Smart organize the people part of the, you know, operation, managerial part? You, Barb Adams, Milton Lewis or anybody else we should know about?
MR. MIRAGLIA: I'm sorry, you're referring to the Smart Papers organization at this point?
MR. DOGGETT: Right. Uh-huh.
THE WITNESS: I was in charge of the human resources and strategic planning parts of the business. I do not recall a formal organizational structure below me.
BY MR. DOGGETT:
Q You don't know whether Milton continued to be reporting to Barb Adams and, thus, below you?
A I don't recall that.
Q Okay. How about Barb Adams, did she continue to report to you under Smart?
A I don't recall having a formal organization established.
Q Why did you leave Smart Papers?



A My position was eliminated.
Q So I take it you did not decide to leave, but your job was gone.
A My job was eliminated.
Q Did you know at that time that Milton Lewis continued, employed by Smart when your job was eliminated?
A Oh, yes.
Q Now, I'd like to go back and ask you some questions about what was happening in the last days that you were still International Paper's employee.
From the time effects bargaining took place, do you recall that -- the document's dated January 23, 2001. I think that might have been like a Tuesday; a calendar would confirm that.
But do you recall that's the day -- the date the package is dated at the top is the date that bargaining was completed? Does that sounds about right?
A I recall it being sometime in the January time frame, but I couldn't honestly say whether that was the day it was completed or that was the day the document was drafted.
Q Uh-huh.
A I don't know.
Q Now, representing to you through other testimony of witness, including Tim Bray, that the union -- let me



backtrack with something you had indicated.
I think you indicated that you were told, I think you indicated later in the same week, that the union accepted the agreement, the effects bargaining package.
A I don't recall me saying later in the same week; I recall being notified that there was a ratification or acceptance.
Q I think you used January; is that fair to say?
A I think the record would have to speak for that, I don't recall.
Q You don't remember now from what you -- I'm sorry, I was listening as carefully as I could, but -- let me go on, then, with this.
Mr. Bray has testified that on that Friday, which would have been January 26, 2001, he called you and finally reached you in the evening of that day, to talk about employees getting severance pay. Being -- trying to get severance pay. Do you recall that conversation?
A Specifically about severance pay, no.
Q Do you recall having a discussion, with Tim calling you and telling you something about a phone number Mary Rita Weissman's phone number?
A Yes.
Q Do you recall more what he said about the phone number?

A I don't recall.
Q Do you recall him telling you it was a nine -- it was a 937 exchange, Dayton exchange, or -- ultimately Ms. Weissman said it was her cell phone, but you don't know whether the number was a cell phone or not.
A I don't recall that.
Q Was it your testimony just a few -- you know, about an hour earlier here, that you had given Mary Rita Weissman's phone number to some supervisors?
A [illegible]
Q And -- but you don't know what phone number it was as we sit here now.
A No.
Q You don't know whether it was her cell phone number or not.
A No, I don't recall that.
Q Can you recall that it was not just the Hamiltonian Hotel number that you gave her, but her own personal number?
MR. MIRAGLIA: Objection, asked and answered.
THE WITNESS: I would have given a number that was provided by her on her business card. The number that I would have used when I would reach her. So it would have been her business number. But I do not recall the specific number, or if there were multiple numbers.



BY MR. DOGGETT:
Q But the best of your recollection is the number that you were giving out was from her business card, the phone number.
A That's the best I could recall, that it would have been a business number.
Q Now, do you recall Tim saying to you that he had been told that this number was given to some people, like Herb Markham being one of them. You don't remember him mentioning Herb Markham?
A I don't remember. That was over two years ago.
Q He may have, but you don't remember.
A I don't remember that.
Q I'm saying, it's either I deny he said that or I don't know whether he said it or not.
MR. MIRAGLIA: Objection asked and answered.
THE WITNESS: Yeah. I do not deny he said that; I don't recall that he said that.
BY MR. DOGGETT:
Q I've been through this many times, where you have to distinguish between I don't remember being I don't remember it or not.
So she said -- I'm satisfied with her answer.
Now, do you recall that, at that time, that you told -- that Tim wanted to tell everybody or get the word



out about people to call that number?
A I don't recall that. I just don't recall the elements of that conversation.
Q Okay. Do you further recall -- just to refresh your recollection -- that Tim told you people were told they could call that number and tell Smart Papers they didn't want a job?
A That's possible, but I don't recall that.
Q Isn't that what you -- the reason you gave it to supervisors, so they could give it to employees? I may have misunderstood you.
MR. MIRAGLIA: Objection, mischaracterization of prior testimony, but go ahead.
THE WITNESS: I'm sorry, I didn't understand your objection.
MR. MIRAGLIA: Mischaracterization of prior testimony.
MR. DOGGETT: I'll withdraw the question.
BY MR. DOGGETT:
Q Why did you give Mary Rita Weissman's numbers to supervisors?
A Because employees of the supervisors were expressing questions or concerns about whether they accurately reflected in the interview their interest in employment. Therefore, there was nothing, as International



Paper employees, that we could do about that; we had to make sure that if people had questions or concerns, they had to contact Smart Papers.
Q All right. Isn't it a fact that this was -- that Mary Rita Weissman's number and that calling that number to tell Smart whether or not the person wanted a job or not was not openly broadcast to every hourly employee?
There was no publication or notice, if you don't want a job with Smart, call this number; that was not done, was it?
A Every hourly employee was scheduled for a personal interview with Smart Papers. At which time -- and they had to complete an application. At which time, either on the application they could have indicated they did not want a job, and during the interview that each employee was afforded, they could have indicated that they did not want a job.
Q I think the fault must lie with my -- form of my question, so I'll try it...
Isn't it a fact that there was no general publication to hourly employees by International Paper that, if you don't want a job with Smart, call this number?
A That was not a part of the employment process. There would have been no reason to publish such a number.
Q Now, with your -- with the problems in recalling

A And I remember -- and I don't know whether it was that week or later, following another week -- I don't recall the specific timing of that -- that he phoned and asked that the letter be rescinded. And I told him I would take the information down. He said, I'm not coming to work. And I said that's fine, no one's requiring you to accept the job offer. But at this point, the job offer stands.

Q You told him that?

A Yeah. Yeah.

And so then I think I received a phone call from an attorney representing him, and then I received a fax. I think it was a fax from an attorney representing him, or maybe it was a letter, I'm not sure.

Q To refresh your recollection, was that attorney his brother, Clayton Napier?

A People since then have told me that. At that moment in time, I did not know that.

Q Okay. But you --

A Not that it would have mattered, frankly.

Q And the phone call and the fax from the attorney, what did that -- what was that communication by the attorney?

A That -- I don't remember the specifics. Generally speaking, it was stating that Mr. Napier did not want the position, therefore he should not have been offered the



position. Generally, along those lines.

And again, that was one of many questions, concerns, that were expressed during that first several weeks of employment with Smart Papers.

Q Did you learn, by whatever means you might have done it, that Hubert Napier did get severance pay from IP?

A I don't know that -- I don't know whether or not he got severance pay. I do recall that we rescinded his offer, or something to that effect.

Q Say that again. He rescinded his offer?

A No.

Q Oh, IP -- Smart did?

A Smart Paper rescinded the offer as it was investigated, going back and looking at all of the documentation of Smart Papers during the interview process, it was very clearly documented by Mr. Napier during his interview, during the application process, during all of that, that he clearly stated he did not want a job offer.

I don't know why he then was delivered a job offer. There was no -- Smart Papers, when they received that information, we're not required not to give somebody a job offer if they said they didn't want one. Smart Papers still, of course, could give them a job offer if they wanted it. But it was my understanding, you know, kind of later, after I was a Smart Paper employee, talking to those people



who made the decisions that, generally speaking, they weren't making job offers to people who didn't want to work there.

That would make sense as an employer.

Q Do you know that some employees had stated they did not want a job, were offered a job, refused it and were denied severance pay? Do you know that?

A No, I do not know that.

Q But you don't deny that that's possible, do you, that that happened?

A Anything's possible. But I do not know that that happened. I do not know that.

Q Do you -- isn't it a fact that you know that just because an employee said they didn't want a job offer with Smart to the Smart people, that they nevertheless got a job offer?

A I was not involved in that process. So I do know what I stated about when I investigated the conditions around Mr. Napier.

Q All right. Here's what you know. That Mr. Napier had said in the interview he didn't want to work -- a job at Smart, right?

A That's correct.

Q And you also know that, nevertheless, Smart offered him a job.



A That's correct.

Q You also know that, after that, you told Mr. Napier the job offer stands.

A On the day that I delivered him the job offer, the answer, that's correct. Yeah.

Because his dilemma was, What am I putting at risk there if I do or don't show up for a day of work? I can't answer that question for him. The only thing I could say is, at that point in time, the job offer stood.

Q Now, did you know -- before today, did you know that Milton Lewis was processing and signing agreements for employees to withdraw their acceptance of the job offer from Smart? Did you know that before today by any means?

A No.

Q You didn't hear it -- you didn't know what he was doing?

A That's correct.

Q And you deny you told him to do these things.

A Oh, yes.

Q Let's see. Who you know about would include Hubert Napier, you know he was offered a job by Smart, and then that was rescinded after he objected; isn't that right?

A That's the one example that I know of and was involved with its --

Q Yeah. Now, you were also, to that extent, which