**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                  WESTERN DIVISION

 3

 4  PACE Local Union 5-1067,      :
    et. al.,                      :   Case No. C-1-02-301
 5                                :   (CONFIDENTIAL)
         Plaintiffs,              :
 6                                :
    vs.                           :   Cincinnati, Ohio
 7                                :   December 18, 2002
    INTERNATIONAL PAPER CO.,      :
 8                                :
         Defendant.               :
 9

10

11

12

13         Deposition of MILTON LEWIS, a

14  witness herein, taken as upon cross-examination by the

15  Plaintiffs, and pursuant to the Federal Rules of

16  Civil Procedure, agreement of counsel, and stipulations

17  hereinafter set forth, at the offices of Robert I. Doggett,

18  Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

19  45202, on the 18th day of December, 2002, at 3:05 p.m.,

20  before Julie A. Patrick, a Notary Public for the State of

21  Ohio.

22

23      TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

24             95 S. FOURTH STREET
               BATAVIA, OHIO 45103
25               (513) 732-1477
```

**Page 2**

```
 1  APPEARANCES:

 2          On behalf of PACE Local Union:
            ROBERT I. DOGGETT, ESQ.
 3          215 E. Ninth Street, 6th Floor
            Cincinnati, Ohio  45202
 4
            On behalf of International Paper:
 5          VINCENT J. MIRAGLIA, Esq.
            W. CARTER YOUNGER, Esq.
 6          McGuire Woods, LLP
            One James Center
 7          901 East Cary Street
            Richmond, VA  23219-4030
 8
            On behalf of Smart Paper:
 9          STANLEY F. LECHNER, ESQ.
            Morgan, Lewis & Bockius, LLP
10          1111 Pennsylvania Avenue, NW
            Washington, DC  20004
11
            Also present:     Timothy D. Bray
12                            Ron Schweitzer

13

14          S T I P U L A T I O N S

15          It is stipulated and agreed by and amongst

16  counsel for the respective parties that the deposition of

17  MILTON LEWIS, a witness herein, called as upon

18  cross-examination by the Plaintiffs, may be taken at this

19  time and place pursuant to the Federal Rules of Civil

20  Procedure, agreement of counsel; that the deposition may be

21  recorded in stenotype by the Notary Public, Julie A.

22  Patrick, who is also the court reporter, and transcribed out

23  of the presence of the witness; and that signature of the

24  deponent was requested and shall be affixed outside the

25  presence of the Notary Public.
```

**Page 3**

```
 1                    I N D E X

 2

 3  WITNESS         DIRECT  CROSS  REDIRECT  RECROSS

 4  MILTON LEWIS

 5    by Mr. Doggett:            4              45

 6    by Mr. Younger:           27

 7

 8

 9

10  PLAINTIFFS' EXHIBITS        MARKED

11  1:                            8

12  1-A - 1-H:                    9

13  2:                           16

14  3:                           17

15  4:                           22

16  5:                           24

17  6:                           26

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1                  MILTON LEWIS,

 2  a witness herein, being of lawful age, after having been

 3  duly cautioned and sworn, was examined and deposed as

 4  follows:

 5                  CROSS-EXAMINATION

 6  BY MR. DOGGETT:

 7      Q.   Would you state your name and address, sir.

 8      A.   My name is Milton E. Lewis, L-E-W-I-S.

 9           MR. LECHNER:  Mr. Doggett, before we get

10  started with the deposition, I would like to say that Smart

11  Papers and Mr. Lewis received a subpoena ducus tecum

12  regarding this deposition, and various documents were

13  requested.  Smart Paper has objected to the subpoena.  You

14  responded by narrowing the request.  We received your

15  letter, and in response to that, we have documents today

16  that we are producing to you.  They're Bates labeled SPU

17  from 1 through 34.  And I would like the record to reflect

18  that I'm handing a copy to you and counsel for International

19  Paper.

20           MR. DOGGETT:  Okay.

21           MR. LECHNER:  I would also note that I believe

22  everyone is in agreement here, I just want to confirm it,

23  that the documents are confidential.  They're stamped

24  "confidential".  And that means that they're subject to the

25  protective order in this case.  I want to make sure that
```

5

1 that's clear, especially because, towards the latter part of
2 these documents, there are confidential agreements that are
3 attached starting on pages 28 through 34.

4         MR. YOUNGER:  That's fine.

5         MR. DOGGETT:  I might add, we don't mind them
6 being confidential, although the Union acquired them other
7 than by confidential agreement.

8         (Off-the-record discussion.)

9       Q.  I was going to ask you for your name.  You've
10 given your name.  Your address, please.

11       A.  7300 Michael, as in Michael Road, Middletown,
12 Ohio.

13       Q.  And would you describe your employment, both
14 with Champion International, International Papers, and Smart
15 Papers.

16       A.  I was employed by Champion International on
17 March 13, 1999, I think was the year.  Time flies.  I worked
18 for International Paper until it sold the Hamilton
19 facilities to International Paper in 2000.  And I was
20 employed on 2/10/01 with Smart Papers.

21       Q.  Now, more recently with International Paper, I
22 think it's been established that International Paper Company
23 bought the Champion mill, took it over by whatever
24 acquisition was involved, in late June of 2000; does that
25 sounds about right?

6

1       A.  That sounds about right, yes.

2       Q.  Now, what did you do for International Papers
3 in those several months that International Papers operated
4 the Hamilton mill?

5       A.  I was the supervisor of employee relations.

6       Q.  And who did you report to?

7       A.  Annetta Johnson.

8       Q.  Did you work, also, with a lady named Barbara
9 Adams?

10       A.  Yes, I did.

11       Q.  What was her position?

12       A.  I think Barb's position was HR leader.

13       Q.  HR?

14       A.  Leader, L-E-A-D-E-R.

15       Q.  Oh, leader.  Okay.  Now then, you were still
16 an employee of International Paper when -- how did that
17 work?  According to the testimony of Ms. Weissman, she was a
18 Smart employee and then ceased to be.  When were you -- when
19 you were an I.P. employee and ceased to be an I.P. employee?

20       A.  I ceased to have been an I.P. employee on
21 February 9th, I think it was, of 2001.

22       Q.  And became a Smart employee the next day?

23       A.  I became a Smart employee the same night.

24       Q.  The same night?

25       A.  Yes.

7

1       Q.  It was something like 11:00 or something?

2       A.  Well, I think the meeting started around 8:00.

3       Q.  So you ceased I.P. employment about 8:00 on
4 that night?  Would that have been the 9th or 10th?  The
5 9th?

6       A.  It's the 9th.

7       Q.  Okay.  Now, were you involved in the decision
8 by Smart as to who they would offer jobs to and who they
9 would not at the very initial point?

10       A.  No, I was not.

11       Q.  Who did that?

12       A.  I have no idea.

13         MR. DOGGETT:  I've got my 2001 calendar.

14       Q.  Did you know -- were you aware that it was on
15 Saturday, February 10th, 2001, that employees -- former I.P.
16 employees technically ceased to be employees a few hours
17 earlier and were called and told whether they had a job with
18 Smart or not?

19       A.  Yes.

20       Q.  And some were called to a meeting and told
21 they weren't being offered a job?

22       A.  That's correct.

23       Q.  And in the meeting -- did you attend any of
24 those meetings where employees were told whether they were
25 offered jobs or not?

8

1       A.  On the 10th, I attended one session in the
2 morning.

3       Q.  Would that have been when they were told they
4 were offered jobs or not offered job?

5       A.  Not offered jobs.

6         MR. DOGGETT:  I'm sorry, I've just got to have
7 my documents here.  Have you -- I'm sorry, I have to step
8 out a moment.  Wait a second, I've got it.  Off the record.

9         (Off-the-record discussion.)

10         MR. DOGGETT:  This would be Plaintiffs' Lewis
11 1.

12         (Plaintiffs' Lewis Exhibit 1 marked.)

13       Q.  Now, I would like --

14         MR. LECHNER:  Before you go ahead, Mr.
15 Doggett, could I just have a moment to look at these
16 documents?

17         MR. DOGGETT:  Sure.

18       Q.  Now, Mr. Lewis, Plaintiffs' Lewis 1 -- if I
19 may, I would like to give each page a letter suffix.  So I
20 want to mark the first page Plaintiffs' Lewis 1-A, which is
21 Joseph Born's response.

22         MR. LECHNER:  Bob, how are we going to do this
23 with the reporter?  If you verbalize it -- you want to take
24 it down and then mark them?

25         MR. DOGGETT:  Take those and just -- they're

**13**

1 through H, never did work for Smart, right?

2    A.    Yes, they did.

3    Q.    Oh, they did work for Smart?

4    A.    Yes.

5    Q.    A day or two or what?

6    A.    They were on the job.  I know the two people

7 that I contacted was in the area when I contacted them, Born

8 and Taylor.

9    Q.    So -- okay.  So they would have got some -- do

10 you know how long they stayed on the job, a day or two or a

11 week?

12    A.    It must have been a day or so.  It was the

13 13th -- if this was signed on the 13th, I think we got

14 started on the 12th or the 13th of February.  So they were

15 on the job.

16    Q.    Now, I wonder -- I would like to go back.  If

17 we can get out Plaintiffs' Weissman Exhibit 15?  Do you have

18 it?

19    A.    Yes.

20    Q.    I'll direct you -- down in the lower right

21 corner, are there page numbers?  It says IP-100119.

22    A.    You know, I have 110.  110 at the bottom of the

23 page.

24    Q.    Yeah.  I'm looking at the one that starts with

25 "I.P. hourly employees without job offers from Smart

**14**

1 Papers".

2    A.    I got it.

3    Q.    Do you see that?

4    A.    Yes.

5    Q.    Now, do you see down alphabetically, Born,

6 Joseph O., is on the list of I.P. hourly employees without

7 job offers from Smart Papers, right?

8    A.    Yes.

9    Q.    And over on page P-100121, three pages later,

10 do you see Jack Ratliff?

11    A.    Yes.

12    Q.    Jimmy Taylor and Michael Leroy Thomas, right?

13    A.    Right.

14    Q.    Now then, the -- that caption really is not

15 true, is it?

16    MR. LECHNER:  I object to the form of the

17 question.

18    MR. DOGGETT:  I stand on the question.

19    Q.    The caption says, "I.P. hourly employees

20 without job offers from Smart".  These people did get job

21 offers from Smart, did they not?

22    MR. LECHNER:  I object to the form of the

23 question.  You're mischaracterizing what the document says.

24 It says the following documents are current as of March 6,

25 '01.  As of March 6, '01.

**15**

1    MR. YOUNGER:  I'll make the same objection,

2 for the record.

3    Q.    Do you know who prepared these lists,

4 Mr. Lewis?

5    A.    No, I don't, Counselor.

6    Q.    Plaintiffs' Exhibit -- Weissman Exhibit 15,

7 you don't know who prepared those lists?

8    A.    No, I don't.

9    Q.    Now, do you know -- who communicated -- I

10 would like to ask you who communicated with International

11 Paper -- let me backtrack.  Whether this is current as of

12 3/6/01, do you know whether or not an earlier list had been

13 given to International Paper as the people who weren't

14 offered jobs?

15    A.    I have no knowledge of that.

16    Q.    Do you know why Annetta Johnson -- did she

17 explain to you why she wanted to offer these four people --

18 that Smart would rescind its job offer to them; do you know

19 why she wanted to do that?

20    A.    She never explained that to me.

21    Q.    You just carried out what she asked you to do,

22 right?

23    A.    Yes.

24    Q.    Now, do you know whether Hubert Napier was

25 offered a job by Smart Paper?

**16**

1    A.    No, I do not.

2    Q.    Did you ever become involved with, or were you

3 ever informed about Hubert claiming severance pay, that he

4 said I.P. would not pay him?

5    A.    I do recall something regarding Hubert Napier,

6 an attorney calling regarding severance, but I don't know --

7 I can't recall just the facts of that matter.

8    MR. DOGGETT:  I would like this marked

9 Plaintiffs' Lewis Exhibit 2.

10    (Plaintiffs' Lewis Exhibit 2 marked.)

11    Q.    Now --

12    MR. LECHNER:  Mr. Doggett, if you would just

13 give us a moment to look at the document, please?

14    MR. DOGGETT:  Sure.

15    MR. LECHNER:  Okay.  Thank you.

16    Q.    Well, now, I'm representing that Plaintiffs'

17 Lewis Exhibit 2, the first document is a letter to Smart

18 Papers, attention Annetta Johnson, dated February 21, 2001,

19 from Clayton G. Napier regarding Hubert Napier.  That the

20 next document is a letter dated March 15, 2001, to Smart

21 Papers, attention Milton Lewis from Clayton Napier, "As you

22 requested, please find enclosed executed release".  And the

23 third document is a release signed by Hubert Napier.  Now,

24 tell me all you know about these documents, will you,

25 please?

17

1   A.   I can only recall that I was directed by
2 Annetta to call this attorney and let him know that Smart
3 Papers would be willing to rescind this person's employment
4 offer, and that he would have to have his client execute a
5 release. And when that release was received by me, then we
6 would process his termination.
7   Q.   And do you know who prepared the release?
8   A.   It was prepared by a counselor, the counselor
9 to the plaintiff here.
10   Q.   The attorney?
11   A.   Yeah, the attorney, Mr. Napier.
12   Q.   So Napier prepared the release himself?
13   A.   Yes, he prepared it and sent it to me.
14   Q.   And that was satisfactory, then, I take it, to
15 you all?
16   A.   Yes.
17   Q.   Now, do you know --
18        MR. DOGGETT: I believe I would like to offer
19 this as the next document. This would be Plaintiffs' Lewis
20 Exhibit 3.
21        (Plaintiffs' Lewis Exhibit 3 marked.)
22   Q.   Mr. Lewis, this document was supplied to us by
23 Smart -- I'm sorry -- by International Papers because we
24 requested this -- discovery of this list of employees who
25 received severance pay. And I just want to call -- go down

18

1 the list of a couple of people we've already talked about.
2 Do you see Joseph Born on there? They're alphabetical. Do
3 you see Born?
4   A.   Yes.
5   Q.   Now, going on, do you see, under N for Napier,
6 do you see Hubert Napier on the next page, the third page?
7   A.   Yes.
8   Q.   And down below that, do you see Jack Ratliff?
9   A.   Yes.
10   Q.   And then down on the next page is Jimmy Taylor
11 -- the last page, Jimmy Taylor and Michael Thomas?
12   A.   Yes.
13   Q.   Now, do you recall having a discussion with
14 John Eichler about whether he wanted to work for Smart or
15 get severance pay?
16   A.   I don't recall. I may have, but I don't
17 recall. I can't recall John Eichler's -- who he is. I know
18 the name, but I don't know the person.
19   Q.   Did he go to work for Smart?
20   A.   I don't recall.
21   Q.   How about Randy Tackett?
22   A.   I know Randy Tackett.
23   Q.   Did you talk with him about whether he wanted
24 a job with Smart or severance pay?
25   A.   Yes.

19

1   Q.   Tell me what you and him talked about.
2   A.   The same thing that we talked about with the
3 other four, that, would he be willing to have Smart Papers
4 to rescind his offer.
5   Q.   But you don't remember saying the same thing
6 to Eichler?
7   A.   I could have. I'm not saying I didn't. I'm
8 just saying, I don't recall.
9   Q.   But wasn't it the choice, you can either keep
10 a job here or we can rescind the offer, wasn't that the
11 choice that you gave him?
12   A.   I told you that I don't recall talking to him.
13   Q.   Now, Tackett was working for Smart, wasn't
14 he, or was he?
15   A.   Yes, Tackett was.
16        MR. YOUNGER: Let me state an objection. I
17 don't know whether he's talking about Eichler or Tackett.
18        MR. DOGGETT: I'm talking Tackett now.
19   Q.   You testified, I believe, that Born, Taylor,
20 Ratliff, and Thomas actually went to work for Smart and then
21 decided that Smart could rescind its offer, right?
22   A.   Right.
23   Q.   Now, did Tackett actually go to work for Smart
24 or was this done before he went to work for Smart?
25   A.   I recollect that he went to work for Smart.

20

1   Q.   And he chose to let Smart rescind its offer,
2 right?
3   A.   Yes.
4   Q.   Now, how about Frances Spurlock; do you
5 remember her?
6   A.   Yes.
7   Q.   What happened with her?
8   A.   Frances came to Annetta and complained that
9 her original job had been eliminated and that she was placed
10 in a job making much less money than she would have been
11 making in the training job. And she wanted to be given the
12 chance to leave Smart Papers.
13   Q.   And do you know how long Frances worked there
14 before she left, at Smart Paper?
15   A.   Counselor, I think it was, maybe, the end of
16 March or in that area.
17   Q.   The end of March of 2001, I guess?
18   A.   2001.
19   Q.   Now, if you'll go back to Plaintiffs' Lewis
20 Exhibit 3, which is the list of people receiving severance
21 pay, do you see the name of the Frances Spurlock on there?
22   A.   Yes.
23   Q.   And down below that, do you see Randolph
24 Tackett?
25   A.   Yes.

21

1    Q.   By the way, was Henry Walker another one that
2 was offered -- that he could -- that Smart would rescind its
3 offer of employment to Henry?
4    A.   I think he was.
5    Q.   Huh?
6    A.   I think he was.  I think he was.
7    Q.   You didn't handle that necessarily?
8    A.   I may have, but I don't recall.
9         MR. DOGGETT:  I've just got to copy this.
10   Q.   I'm going to have, maybe -- I'm going to have
11 them copies made, but, do you remember Ray Asher, talking to
12 Ray Asher about staying or leaving?
13   A.   I know that Ray had come to our office
14 inquiring about whether he could leave or not, but I don't
15 recall specifically talking to him personally.
16   Q.   Now, how about Michael Yauger?
17   A.   I don't recall him at all.
18   Q.   Would you look back at -- just look back
19 through Plaintiffs' Lewis Exhibit 3, and do you see the name
20 on there of receiving severance pay, Raymond Asher?
21   A.   Yes.
22   Q.   Now, how long do you recall he worked for
23 Smart before he was released?
24   A.   I have no idea.
25   Q.   He did work for Smart, didn't he?

22

1    A.   I assume so.
2    Q.   But he came to see you while he worked for
3 Smart, didn't he?
4    A.   Yes, he did.  And I can't recall just what
5 time frame it was.
6    Q.   You remember that he was employed by Smart for
7 awhile, but you don't know how long?
8    A.   No, I do not.
9    Q.   Now, do you know what means of communication
10 Smart Papers had with International Paper about people who
11 Smart was saying, we've rescinded their offer of employment
12 or we're not employing them or they've been terminated
13 through no fault of their own; do you know who handled that
14 for Smart?
15   A.   Annetta.
16   Q.   Okay.  Other than --
17        MR. DOGGETT:  This is going to be Plaintiffs'
18 Lewis Exhibit 4.
19        (Plaintiffs' Lewis Exhibit 4 marked.)
20   Q.   Have you had a chance to look at that?
21   A.   Yes.
22   Q.   Now, this has got your name on it as a release
23 agreement with Raymond Asher?
24   A.   Yes.
25   Q.   Which you prepared, right?

23

1    A.   No.
2    Q.   Is that your signature on it?
3    A.   Yes.
4    Q.   Who prepared it?
5    A.   I have no idea.
6    Q.   Now, this says this is the 9th of May of 2001.
7 And Doris Hampton is the notary on there?
8    A.   Yes.
9    Q.   So does that refresh -- I'm not saying that
10 perhaps it helps you remember that Ray left around May the
11 9th of 2001?
12        MR. LECHNER:  Objection.  Mr. Doggett, the
13 document has --
14        MR. DOGGETT:  It's March, I'm sorry.
15        MR. LECHNER:  Well, it's got some different
16 dates that are inconsistent.  As a matter of fact, above the
17 signature, it says, "executed in multiple originals and
18 effective March 9, 2001."
19        MR. DOGGETT:  And the notary says May 9th.
20        MR. LECHNER:  And then the notary wrote May
21 9th.
22        MR. DOGGETT:  You're quite right.  Let's say
23 that -- okay.
24   Q.   Recognizing there's an inconsistency in dates,
25 you or someone else prepared this, you don't know who, but

24

1 you signed it, right?
2    A.   That's my signature, but, as I said before, I
3 don't recall Ray Asher.  It's my signature, of course.
4    Q.   Is it possible that -- let me just try to give
5 you a sequence of events.  Would Tom Jones, at that time,
6 have been Ray Asher's supervisor?
7    A.   I have no idea where this person worked.  I
8 can't recall Ray Asher.
9    Q.   Now, the next one is Plaintiffs' Lewis 5.
10        (Plaintiffs' Lewis Exhibit 5 marked.)
11   Q.   You know, I would state for the record that it
12 looks like, maybe, the -- I don't know what the notary did,
13 but on the two different documents -- I'm sure that, to me,
14 it doesn't matter a heck of a lot whether it's March or May,
15 but, in any event, do you recall signing a similar release
16 agreement for Michael Yauger?
17   A.   That is my signature, but, again, I can't
18 recall Mike Yauger.
19   Q.   Why would -- let me just -- in the position
20 you held, do you know of any reason why these documents
21 would have been prepared for you to sign for Smart, rather
22 than, say, like Annetta?
23   A.   The only thing that I can tell you, Counselor,
24 is that Annetta directed me to execute these releases for
25 her in her stead.

**SMART PAPERS, LLC**
**601 North B St.**
**Hamilton, Ohio  45013**


### RESPONSE


\_\_\_\_\_✓\_\_\_\_\_ I hereby accept the offer from Smart Papers at the terms and conditions of employment provided and explained to me.



\_\_\_\_\_✓\_\_\_\_\_ I hereby decline the offer from Smart Papers.



Name:(please print): *Joseph O. Born*

Signature: *Joseph O. Born*

Social security #: *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*




Please return signed and completed within 24 hours to the Human Resource Department of Smart Papers.




**PLAINTIFF'S EXHIBIT**

*Lewis 1-A*

February 13, 2001

## AGREEMENT

This is a Confidential Agreement between _Joseph D. Boen_ and Smart Papers; and in consideration of Smart Papers to allow Mr. _Boen_ to re- nd his acceptance of employment with Smart Papers, and be given a letter not offering employment with    nart Papers.

This Agreement binds Mr. _Boen_ to his promise not to disclose the conditions of this Agreement to anyone now or in the future. If such terms and conditions are disclosed by Mr. _Boen_, he will be subject to legal process by Smart Papers, including court costs and attorney fees.

_Joseph D. Boen_
Employee

_[signature]_
Smart Papers

PLAINTIFF'S
EXHIBIT

Lewis  1-B

**SMART PAPERS, LLC**
601 North B St.
Hamilton, Ohio  45013

### RESPONSE

_____✓_____ I hereby accept the offer from Smart Papers at the terms and conditions of employment provided and explained to me.

_____I hereby decline the offer from Smart Papers.

Name:(please print): _Michael L. Thomas_

Signature: _Michael L. Thomas_

Social security #: _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_

Please return signed and completed within 24 hours to the Human Resource Department of Smart Papers.



PLAINTIFF'S EXHIBIT
Lewis 1-G

February 13, 2001

## AGREEMENT

This is a Confidential Agreement between _[signature]_ and Smart Papers; and in consideration of Smart Papers to allow Mr. _[signature]_ to rescind his acceptance of employment with Smart Papers, and be given a letter not offering employment with Smart Papers.

This Agreement binds Mr. _[signature]_ to his promise not to disclose the conditions of this Agreement to anyone now or in the future. If such terms and conditions are disclosed by Mr. _[signature]_, he will be subject to legal process by Smart Papers, including court costs and attorney fees.

_[signature]_
Employee

_[signature]_
Smart Papers

PLAINTIFF'S
EXHIBIT

Lewis 1-H

**SMART PAPERS, LLC**
601 North B St.
Hamilton, Ohio 45013

**RESPONSE**

Under protest because my department was ~~done~~ done away with and I was in maintenance for 29 years. We would have been better off with a severence!!

_____✓_____ I hereby accept the offer from Smart Papers at the terms and conditions of employment provided and explained to me.

_____ I hereby decline the offer from Smart Papers.

Name:(please print): *Jimmy L. Taylor*

Signature: *Jimmy L. Taylor*

Social security #: *271·48·4503*

Please return signed and completed within 24 hours to the Human Resource Department of Smart Papers.


PLAINTIFF'S EXHIBIT
*Lewis 1-E*

February 13, 2001

## AGREEMENT

This is a Confidential Agreement between _____ and Smart Papers; and in consideration of Smart Papers to allow Mr. _____ to re-____ nd his acceptance of employment with Smart Papers, and be given a letter not offering employment with Smart Papers.

This Agreement binds Mr. _____ to his promise not to disclose the conditions of this Agreement to anyone now or in the future. If such terms and conditions are disclosed by Mr. _____, he will be subject to legal process by Smart Papers, including court costs and attorney fees.

_Jimmy L. Taylor_
Employee

_[signature]_
Smart Papers

**PLAINTIFF'S EXHIBIT**

_Lewis 1-F_

**SMART PAPERS, LLC**
**601 North B St.**
**Hamilton, Ohio 45013**

### RESPONSE

_____✓ I hereby accept the offer from Smart Papers at the terms and conditions of employment provided and explained to me. i will be looking for other employment while there, as the $8.80 reduction in my pay rate after 42 loyal years of service is devastating to my family.

_____I hereby decline the offer from Smart Papers.

Name:(please print): _Jack R Ratliff_

Signature: __Jack R Ratliff_

Social security #: _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_

Please return signed and completed within 24 hours to the Human Resource Department of Smart Papers.



**PLAINTIFF'S EXHIBIT**
Lewis 1-C

February 13, 2001

## AGREEMENT

This is a Confidential Agreement between ___Jack Ratliff___ and Smart Papers; and in consideration of Smart Papers to allow Mr. ___R. Hoff___ to res- nd his acceptance of employment with Smart Papers, and be given a letter not offering employment with Smart Papers.

This Agreement binds Mr. ___Ratliff___ to his promise not to disclose the conditions of this Agreement to anyone now or in the future. If such terms and conditions are disclosed by Mr. ___Ratliff___ he will be subject to legal process by Smart Papers, including court costs and attorney fees.

_____        _____
Employee                        Smart Papers

PLAINTIFF'S EXHIBIT

Lewis  1-D



# CLAYTON G. NAPIER, CO., L.P.A.

29 North "D" Street
Hamilton, Ohio 45013
513 868-8229

February 21, 2001

Smart Papers
601 North "B" Street
Hamilton, Ohio 45011

     **ATTN:**     Annetta Johnson

     **RE:**     Hubert O. Naper
     **SSN:**     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

Dear Ms. Johnson:

     This will reference the conversation on the phone February 21, 2001 in regard to Mr. Napier's employment with Smart Papers. As you know, he had made repeated indications to you that he did not wish to work for Smart Papers at reduced rates of pay and reduced benefits. Despite the representations that were made to you and Smart Paper, you chose to take the avenue of offering him employment which you knew would force him to be in a position where he would lose his severance package in the event that he did not accept your unacceptable offer. Under the circumstances, and given the circumstances with respect to the severance package, it is clear that there is collusion between Smart Paper's Corporation and International Paper with respect to employees who did not wish to work for Smart Paper so as to preclude them from receiving severance packages upon termination of their employment with International Paper. We believe that there are possible actionable claims against yourself and Mr. Phillips personally since you were both directly told of the problem and chose to take the avenue that you did.

     Given the circumstances, it is apparent that there are actionable contractual interference claims against Smart Paper which relate to the tortuous interference with Mr. Napier's receiving his severance package. Further, there is the other issue surrounding the agreement between International Paper and Smart Paper Corporation regarding the structuring of offers to various employees which may very well amount to illegal collusion to deprive employees of their severance benefits.



**PLAINTIFF'S EXHIBIT**

*Lewis 2*   *gp*

Smart Papers
Page 2
February 21, 2001

We write this letter in the hope that we can resolve this matter short of litigation and request that you rescind this offer of employment at this time so as to avoid the litigation which must necessarily follow in the event that we are unable to resolve this matter. The basis of my phone conversation of this date with you was to see if there was some possibility of resolution but your arrogate and arbitrary attitude has forced us to take this position. You are not running a cotton plantation; these people are not your slaves.

I suggest you take this up with your superiors. Otherwise, I have authority to file suit 10 days from the date hereof.

Best regards,

Clayton G. Napier
Attorney at Law

CGN/dt

# CLAYTON G. NAPIER, CO., L.P.A.

29 North "D" Street
Hamilton, Ohio  45013
513 868-8229

March 15, 2001

Smart Paper Corporation
601 North "B" Street
Hamilton, Ohio  45013

     **ATTN:**    Milton Lewis

     **RE:**    Hubert O. Napier

Dear Mr. Lewis:

     As you requested please find enclosed the executed release signed by my client, Hubert O. Napier regarding his severance package.

     Thank you for your attention to this matter and if you have any questions or need anything further please do not hesitate to contact my office.

Best regards,

Clayton G. Napier
Attorney at Law

CGN/dt



## RELEASE

March 15, 2001

Know by all these present, that I, Hubert O. Napier, for and in consideration of receipt of my employee severance package provided through International Paper Corporation, effective upon receipt of said severance package benefits, do hereby release Smart paper Corporation, its employees and assigns, from any and all liability arising from termination of my employment with International Paper Corporation and employment offers made to me by and through Smart Paper Corporation and its employees.

It is expressly understood and agreed that this release shall not waive any rights of Hubert O. Napier to any continuing retirement benefits or health insurance benefits to which he may otherwise be entitled as a result of his employment with International Paper Corporation and Champion Paper Corporation.

03-15-01
Date

Hubert O. Napier

ATTACHMENT "A"

# FORMER INTERNATIONAL PAPER EMPLOYEES WHO RECEIVED SEVERANCE UNDER THE JANUARY 26, 2001 EFFECTS BARGAINING AGREEMENT

| Employee Name | Severance Amount |
|---|---|
| ABNER,  THOMAS K | $ 46,012.33 |
| ADAMS,  DONNIE C | $ 37,208.81 |
| ASHER,  BEN D | $ 35,667.84 |
| ASHER,  RAYMOND | $ 35,100.18 |
| BAKER,  DONALD L | $ 39,057.84 |
| BARRETT,  LUTHER A | $ 33,503.98 |
| BAYLOR,  CHARLES T | $ 32,348.17 |
| BENNETT,  THOMAS D | $ 31,415.14 |
| BENNETT,  WAYNE M | $ 38,391.91 |
| BISHOP,  PHILIP A | $ 29,760.84 |
| BLEVINS,  EARL T | $ 41,683.20 |
| BLOWER,  LAWRENCE B. | $ 20,829.98 |
| BORN,  JOSEPH O | $ 54,013.44 |
| BRACKNEY,  DONALD C | $ 35,827.85 |
| BRADLEY,  CHARLES E. | $ 17,986.94 |
| BRANDENBURG,  LARRY | $ 40,269.31 |
| BREHM,  ROBERT ALLEN | $ 37,649.64 |
| BROOKS,  JAMES S | $ 35,834.22 |
| BROUGHTON,  LARRY | $ 31,102.14 |
| BULLIO,  PHILIP M | $ 29,672.71 |
| CAMPBELL,  CHARLES B | $ 26,717.90 |
| CAMPBELL,  DOYLE F | $ 36,055.11 |
| CHASTEEN,  ROBERT D | $ 37,177.75 |
| CHEEK,  BOYD J | $ 38,882.72 |
| CHUHAK,  MARK A | $ 19,208.77 |
| CLAIR JR,  THOMAS R | $ 37,188.10 |
| CLEAR JR,  JAMES M | $ 38,621.89 |
| COFFMAN,  PAUL W | $ 22,297.75 |
| COLLETT,  DANIEL H. | $ 28,267.46 |
| COMBS,  JED | $ 39,312.00 |
| COMBS,  JERRY L | $ 39,229.20 |
| COMBS,  JOSHUA E | $ 39,736.32 |
| COOK,  GARRY L | $ 17,676.58 |
| CRANE,  MARLA SUE | $ 30,802.90 |
| CRESS,  JOHN M | $ 44,739.53 |
| CROOK,  ROBERT | $ 30,553.15 |
| CRYSEL JR,  RONALD | $ 20,398.54 |
| CURTIS,  WILLIAM | $ 20,771.60 |
| DAVIS,  JOE E | $ 34,956.48 |



PLAINTIFF'S EXHIBIT

Lewis 3



| | |
|---|---|
| DETHERAGE, GREGORY | $ 22,870.19 |
| DOYLE, CLYDE D | $ 35,193.56 |
| DUNCAN, TERRY W | $ 29,747.56 |
| DURBIN, PATRICK STE | $ 46,121.82 |
| EATON, MENDOL CLEVE | $ 43,644.65 |
| EIKELBERGER, GERALD | $ 21,007.56 |
| EPPERSON, GREGORY R | $ 37,128.00 |
| FANT, CHARLES | $ 20,738.69 |
| FIGG, JEFFREY L | $ 18,453.33 |
| FISHER, KENNETH C | $ 33,353.16 |
| FISHWICK, DAN B. | $ 21,261.38 |
| FOUTS, JAY | $ 55,189.07 |
| FOWLER, MICHAEL | $ 24,580.66 |
| FOWLER, TERRELL K | $ 35,827.92 |
| FREEMAN, CHARLES W | $ 35,153.28 |
| GARDNER, HENRY D | $ 53,072.64 |
| GENTRY, D S | $ 23,807.87 |
| GENTRY, MARSHALL L | $ 29,193.58 |
| GILL, EVERETT W | $ 36,338.36 |
| GREGORY, JOHN A | $ 34,684.33 |
| GRUBB, GARY | $ 34,272.00 |
| GUMM, JOHN | $ 37,158.23 |
| HALSTEAD, JOHN R | $ 28,180.17 |
| HAMBLIN, DOUGLAS | $ 29,575.56 |
| HARDIX, PAUL W | $ 35,724.89 |
| HARRIS, JOHN F | $ 2,342.86 |
| HARRISON JR, HARRY | $ 30,906.23 |
| HATTON, DANIEL L | $ 39,207.82 |
| HAYNES, WILLIAM H | $ 35,001.88 |
| HEINRICH, DENNIS A | $ 30,224.92 |
| HEINRICH, TINA M. | $ 17,959.80 |
| HENSLEY, EDWARD R | $ 31,055.89 |
| HICKS, PEARL | $ 47,855.41 |
| HIXSON JR, DONALD | $ 39,214.84 |
| HOLLAND, MELVIN | $ 37,181.53 |
| HORN, ROGER D | $ 36,114.12 |
| HOWARD, GARY C. | $ 23,741.53 |
| HOWARD, JOHN M. | $ 22,591.38 |
| HUFF, LAWRENCE | $ 18,647.48 |
| HUFFMAN, THOMAS D | $ 33,672.48 |
| HUNTINGTON, RICK L | $ 32,926.25 |
| HYDEN JR, EMANUEL | $ 28,529.21 |
| ISREAL, JEROME | $ 29,564.05 |
| ITALIANO, PAUL P. | $ 19,853.64 |
| JACKMAN, RANDALL | $ 21,750.48 |
| JACKSON, GEORGE D. | $ 24,697.31 |

| Name | Amount |
|---|---|
| JEFFRIES,  JACK A | $ 22,644.00 |
| JOHNSON,  CHESTER R | $ 34,632.00 |
| JONES,  KEVIN E | $ 31,017.43 |
| KETCHAM,  JAMES L | $ 42,680.88 |
| KIMBRELL,  ANTHONY | $ 30,166.96 |
| KNODEL,  STANLEY C | $ 39,312.00 |
| LAKES,  JAMES R | $ 33,140.02 |
| LAUMAN,  RICHARD A. | $ 21,714.78 |
| LEDFORD,  JEFFREY H | $ 19,359.03 |
| MANN,  STEVEN J | $ 28,507.26 |
| MARCUM,  HERBERT | $ 37,784.88 |
| MARCUM,  LARRY E | $ 31,163.04 |
| MARSEE,  LINDA B | $ 30,464.79 |
| MCCREARY,  LARRY WAY | $ 30,584.47 |
| MCGUIRE,  CRAIG W | $ 39,258.72 |
| MCKAY,  ROSS | $ 36,255.74 |
| MCNABB,  LARRY L | $ 2,206.98 |
| MESSER,  TROY | $ 25,257.31 |
| MILLER,  DAVID M | $ 22,027.54 |
| MUELLER,  MICHAEL D | $ 40,342.77 |
| NAPIER,  HUBERT O | $ 46,012.33 |
| NUNN,  TIMOTHY | $ 2,444.55 |
| OGG,  FREDERICK S | $ 30,183.98 |
| PARSLEY,  JOHN R. | $ 23,784.34 |
| PAXTON,  DOUGLAS G | $ 40,965.58 |
| PELSOR,  RONALD L. | $ 20,259.38 |
| PENNINGTON,  JEWELS | $ 40,716.90 |
| PENNINGTON,  RON EUG | $ 30,009.93 |
| PONDER,  MICHAEL D | $ 37,702.08 |
| QUINN,  ANTHONY A | $ 32,389.22 |
| RAPIEN,  ROGER J | $ 1,780.06 |
| RATLIFF,  DAVID | $ 37,050.48 |
| RATLIFF,  JACK R | $ 52,640.64 |
| RATLIFF,  RICHARD R | $ 31,704.54 |
| REEVES,  RANDALL E | $ 30,950.37 |
| REIF,  JOHN W. | $ 18,103.10 |
| RENNER JR,  DONALD R | $ 2,360.70 |
| RICHARDS,  DONALD D | $ 37,833.84 |
| RICHARDSON,  STEVEN | $ 21,070.87 |
| ROBERTSON,  DAVID E | $ 38,201.28 |
| ROBINSON,  STEVEN C | $ 17,623.44 |
| RODGERS,  JAMES B | $ 36,112.37 |
| SANDLIN,  BARNEY | $ 29,625.65 |
| SANDLIN,  IRVIN F. | $ 22,340.29 |
| SHOCKEY,  LADD W | $ 30,056.62 |
| SIMPSON,  MICHAEL D. | $ 23,153.51 |

| | |
|---|---|
| SMITH,  RONALD D | $ 30,619.56 |
| SMITH,  SHARON K. | $ 19,241.26 |
| SORRELL,  MERRILL CH | $ 46,913.18 |
| SPADA,  PETER A. | $ 21,203.44 |
| SPURLOCK,  FRANCES Y | $ 25,307.90 |
| STANIFER,  TERRY L | $ 34,136.72 |
| STEWART, LEONARD | $ 44,395.29 |
| STOUT,  MARK P. | $ 19,992.18 |
| TACKETT,  RANDOLPH G | $ 37,879.48 |
| TARTER,  GARY DALE | $ 33,832.92 |
| TAULBEE,  EVERETT D | $ 37,216.67 |
| TAYLOR,  JIMMY LOU | $ 41,907.84 |
| THOMAS,  MICHAEL LER | $ 43,517.76 |
| THOMAS,  ROBERT W | $ 36,003.94 |
| TIBBETTS,  DENNIS | $ 51,714.00 |
| TOLBERT,  THERESA D | $ 29,882.66 |
| TURLEY,  JERRY R | $ 27,894.29 |
| TURNER,  BRIAN D | $ 22,763.86 |
| TURNER,  RONALD E | $ 39,535.20 |
| VOLZ,  FRANCIS A | $ 38,750.40 |
| WALKER,  HENRY L | $ 27,630.36 |
| WASHINGTON,  COLEY | $ 20,355.32 |
| WEATHERS,  GREGORY O | $ 20,977.94 |
| WEBB,  TERI L. | $ 20,921.71 |
| WELLS,  CHRIS | $ 26,055.11 |
| WHITAKER,  DANIEL L. | $ 21,612.02 |
| WHITAKER,  JAMES D | $ 26,091.66 |
| WILKINS,  ROBERT S | $ 32,221.62 |
| WILLIAMS,  LARRY A | $ 27,075.61 |
| WILLIS,  JAMES M | $ 41,435.92 |
| WOEBKENBERG,  ROBERT | $ 28,414.19 |
| YORK,  JOHN | $ 31,487.74 |

# RELEASE AGREEMENT

This release Agreement is entered into by Smart Papers LLC ("Employer"), and Raymond Asher ("Employee").

Whereas, in order to allow the "Employee" to apply for a severance package from former employer, International Paper, "Employer" Smart Papers LLC agrees to lay-off "Employee" Raymond Asher, without cause, effective March 7, 2001.

In consideration of the promise by "Employer", "Employee" promises and covenant in this agreement, the receipt of which is acknowledged, Asher, himself, his assigns, heirs, executors, administrators and legal representatives, agree to release and forever hold "Employer" harmless , and each of its respective successors, assigns, current and past employees, officers and legal representatives from any and all claims, demands, damages, actions, causes of actions, or suits in equity, of whatsoever kind or nature, whether heretofore or hereafter relating to "Employee's" employment with "Employer" or his departure from Smart Papers' employment, either directly or indirectly.

"Employee" warrants that he has read this Agreement and fully understands it to be a release of all claims, known, present or future against "Employer".

Executed in multiple originals and effective March 9, 2001.

AGREED AS TO FORM AND
CONTENT:

"Employee"                          Smart Papers LLC

_Raymond Asher_                     _Milton E. Lewis_
Raymond Asher                       Milton E. Lewis

NOTARY PUBLIC

Sworn to attested in my presence this 9th day
of May, 2001

Doris Hampton
Notary Public

**DORIS HAMPTON**
**NOTARY PUBLIC**
**IN AND FOR THE STATE OF OHIO**
**MY COMMISSION EXPIRES OCT. 22, 2002**

**PLAINTIFF'S EXHIBIT**

_Lewis 4_

# RELEASE AGREEMENT

This release Agreement is entered into by Smart Papers LLC ("Employer"), and Mike Yauger ("Employee").

Whereas, in order to allow the "Employee" to receive a severance package from former employer, International Paper, "Employer" Smart Papers LLC agrees to lay-off "Employee" Mike Yauger, without cause, effective March 9, 2001.

In consideration of the promise by "Employer", Mike Yauger, "Employee" promises and covenant in this agreement, the receipt of which is acknowledged, Yauger, himself, his assigns, heirs, executors, administrators and legal representatives, agree to release and forever discharge "Employer", and each of its respective successors, assigns, current and past employees, officers and legal representatives from any and all claims, demands, damages, actions, causes of actions, or suits in equity, of whatsoever kind or nature, whether heretofore or hereafter relating to "Employee's" employment with "Employer" or his departure from Smart Papers' employment, either directly or indirectly.

"Employee" warrants that he has read this Agreement and fully understands it to be a release of all claims, known, present or future against "Employer".

Executed in multiple originals and effective March 9, 2001.

AGREED AS TO FORM AND
CONTENT:

"Employee"                          Smart Papers LLC

_Mike Yauger_                       _Milton E. Lewis_
Mike Yauger                         Milton E. Lewis

NOTARY PUBLIC

Sworn to attested in my presence this 9th day March, 2001.

_Doris Hampton_
Notary Public

Doris Hampton
Notary Public
In and for the State of Ohio
My Commission expires October 22, 2002



PLAINTIFF'S
EXHIBIT
Lewis 5

SPU-0034
CONFIDENTIAL

3

February 13, 2001

## AGREEMENT

This is a Confidential Agreement between _Randy Tackett_ and Smart Papers; and in consideration of Smart Papers to allow Mr. _Tackett_ to resc nd his acceptance of employment with Smart Papers, and be given a letter not offering employment with S art Papers.

This Agreement binds Mr. _Tackett_ to his promise not to disclose the conditions of this Agreement to anyone now or in the future. If such terms and conditions are disclosed by Mr. _Tackett_, he will be subject to legal process by Smart Papers, including court costs and attorney fees.

_Randolph A Tackett_                    _signature_
Employee                                Smart Papers



PLAINTIFF'S EXHIBIT

_Lewis 6_ 900

SPU-0031
CONFIDENTIAL