PACE Local Union 5-1967, et al. vs. International Paper

Case 1:01-cv-00301-HJW-JS   Document 39-4   Filed 01/15/2004   Page 1 of 22

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF OHIO
                     WESTERN DIVISION
3

4  PACE Local Union 5-1967,    :
   et al.,                     :
5                              :   Case No. C-1-02-301
              Plaintiffs,      :   (CONFIDENTIAL)
6                              :
   vs.                         :
7                              :   Cincinnati, Ohio
   INTERNATIONAL PAPER CO.,    :   February 28, 2003
8                              :
              Defendant.       :
9

10

11

12

13            Deposition of DANIEL J. MAHEU, a

14  witness herein, taken as upon cross-examination by the

15  Plaintiffs, and pursuant to the Federal Rules of

16  Civil Procedure, agreement of counsel, and stipulations

17  hereinafter set forth, at the offices of Robert I. Doggett,

18  Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

19  45202, on the 28th day of February, 2003, at 2:00 p.m.,

20  before Julie A. Patrick, a Notary Public for the State of

21  Ohio.

22

23      TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

24                  95 S. FOURTH STREET
                    BATAVIA, OHIO 45103
25                    (513) 732-1477
```

**Page 3**

```
1                    I N D E X

2

3  WITNESS            DIRECT  CROSS  REDIRECT  RECROSS

4  DANIEL J. MAHEU

5    by Mr. Doggett:            4              29

6    by Mr. Miraglia:          28

7

8

9

10

11

12

13

14

15

16

17                     - - -

18

19  PLAINTIFFS' EXHIBITS    MARKED

20  1:                        11

21  2:                        11

22  3:                        17

23  4:                        21

24

25
```

**Page 2**

```
1  APPEARANCES:

2        On behalf of PACE Local Union:
          ROBERT I. DOGGETT, ESQ.
3         215 E. Ninth Street, 6th Floor
          Cincinnati, Ohio  45202
4
          On behalf of International Paper:
5         VINCENT J. MIRAGLIA, Esq.
          McGuire Woods, LLP
6         One James Center
          901 East Cary Street
7         Richmond, VA  23219-4030

8         On behalf of Smart Papers:
          LAINE S. POSEL, ESQ.
9         Morgan, Lewis & Bockius, LLP
          1111 Pennsylvania Avenue, NW
10        Washington, DC  20004

11        Also present:
          Ron Schweitzer
12

13

14           S T I P U L A T I O N S

15           It is stipulated and agreed by and amongst

16  counsel for the respective parties that the deposition of

17  DANIEL J. MAHEU, a witness herein, called as upon

18  cross-examination by the Plaintiffs, may be taken at this

19  time and place pursuant to the Federal Rules of Civil

20  Procedure, agreement of counsel; that the deposition may be

21  recorded in stenotype by the Notary Public, Julie A.

22  Patrick, who is also the court reporter, and transcribed out

23  of the presence of the witness; and that signature of the

24  deponent was requested and shall be affixed outside the

25  presence of the Notary Public.
```

**Page 4**

```
1                DANIEL J. MAHEU,

2  a witness herein, being of lawful age, after having been

3  duly cautioned and sworn, was examined and deposed as

4  follows:

5                CROSS-EXAMINATION

6  BY MR. DOGGETT:

7        Q.  Would you please state your name and business

8  address.

9        A.  My name is Daniel J. Maheu, 601 North B

10  Street, Hamilton, Ohio, 45013.

11       Q.  And that's with Smart Papers?

12       A.  That's with Smart Papers, yes.

13       Q.  And could you just give me a brief background

14  of your professional experience with jobs and what have you.

15       A.  Well, I'm a degreed engineer, mechanical

16  engineer from Cornell University, and I've worked all of my

17  life in the paper industry.  I started with Scott and worked

18  on through from engineering into manufacturing and then into

19  mill operations.  And now I'm the executive vice-president

20  and chief operating officer for Smart Papers.

21       Q.  Now, could you just give us a brief statement

22  who was -- could you give us the management, and I don't

23  mean like floor managers or whatever, but your management at

24  the Hamilton mill under International Paper, like, what was

25  your management?  Who were your management people?
```

**13**

1 any of those administrative actions on like who was going

2 to pay who?  Were you involved in any discussions of those

3 with your HR people?

4        A.    No, not about who was going to pay who.

5 You're talking about whether I P was paying or Smart was

6 paying?

7        Q.    Yeah.

8        A.    The answer is, no, not about whether I P was

9 paying or Smart was paying.  The only place where we were

10 is, what was the liability that Smart had.  As chief

11 operating officer, I'm responsible for all funds that go out

12 of Smart Papers.

13        Q.    Now, we've been told by a number of witnesses

14 in depositions that the only way International Paper found

15 out anything about who was entitled to severance pay or who

16 wasn't or, in this case, who should pay vacation pay, I P or

17 Smart, was because except that Smart reported to them, because

18 Smart knew who it had hired and so on.

19        MR. MIRAGLIA:  Objection to the extent you're

20 mischaracterizing prior testimony.  Go ahead.

21        So my question is, wasn't it necessary for

22 your Smart staff to tell I P or inform I P of, like, who they

23 paid vacation pay to?

24        A.    No.

25        Q.    How did I P find out?

**14**

1        A.    I P had their payroll records and we had our

2 payroll records.  We didn't tell I P who to pay what.

3        Q.    Who paid -- if a former I P employee was hired

4 by Smart and went to work for Smart, who was supposed to pay

5 his unused I P vacation pay, International Paper or Smart?

6        A.    That was -- you'd have to go -- that's a term

7 of the condition of closing of the sale agreement.  You're

8 talking about a laps of -- or you're talking about, what's

9 the closing point of the sale?  I don't know what was in the

10 deal about what funds were advanced to seller or what funds

11 were paid by buyer.  Who cuts what check -- you know, we

12 paid people when they took vacation as Smart employees.

13        Q.    That's what I mean.

14        A.    We paid people when they took vacation as

15 Smart employees.  The source of those funds, I have no

16 knowledge of.

17        Q.    Yeah, my question was not so much the source

18 of the funds, but who cut the checks.

19        A.    We cut the checks for people for Smart Paper

20 vacation and for Smart Paper pay.  When I say "we cut the

21 check", we authorized it.  In the very beginning, I p's -- we

22 had to use I P's payroll system because we didn't get our own

23 until the end of March, our own private.

24        Q.    Now, Smart paid no vacation pay to I P

25 employees that it did not hire, did it?

**15**

1        A.    That's correct.

2        Q.    Now, my question is, if I P was going to pay

3 its employees that Smart did not hire and Smart did not pay

4 them for their unused vacation, how was I P to find out who

5 to pay?

6        A.    Rephrase your question.

7        Q.    How was I P to find out who to pay?  In other

8 words, who was not hired by Smart, how were they supposed to

9 find that out?

10        A.    Who was not hired by Smart?

11        Q.    Yeah.

12        A.    We had communications about who we hired.

13 That's what they were communicated with, who we hired to put

14 them on the payroll system.

15        Q.    And was that communication sent to I P then,

16 was it not?

17        A.    The communications went to the payroll

18 department at Knightsbridge.

19        Q.    And when was that done?

20        A.    Well, I think the first payroll that had to be

21 made was the 15th of -- if I recall correctly, I P paid on

22 the 15th and 30th, or the 15th and the 1st, so the first

23 payroll had to be made on the 15th of February.

24        Q.    The 15th of February of 2001?

25        A.    Right.  So we had to report to them any hours

**16**

1 worked by Smart Paper employees, who they were and what they

2 worked.

3        Q.    Now, I'm showing my ignorance.  A lot of this

4 stuff these days is done by wire or something.  Do you know

5 what the transmittal form was?

6        A.    I'm not sure what the transmittal is.  I think

7 it's electronic.

8        Q.    Electronic, yeah.  Now, we have that exhibit

9 that's been marked Plaintiffs' Exhibit 1 in the Maheu

10 deposition.  That's the one that you have your hand on.

11        A.    Right here.  Okay.

12        Q.    Now, whether you actually prepared all of

13 these names or this was done under your supervision, can you

14 explain how that was done and who did it?

15        A.    This was done under my supervision.  The

16 records of the data -- much of the data came from the

17 Weissman Group for all of the employees, because some of the

18 distinctions I wouldn't have known.

19        Q.    You mean the Weiss Group?

20        A.    The Weissman Group.

21        Q.    The Weissman Group participated in helping

22 make up --

23        A.    Just in general -- the data filed around these

24 various splits or classifications, obviously I know who had

25 job offers and who was offered and who accepted, but then

**17**

1 this classification was done with the assistance of Morgan

2 Lewis because this was, from my understanding, the specific

3 requirements of the purchase agreement about how this had to

4 be reported, and that it had to be reported as of the 6th of

5 March.

6     Q.   And Morgan Lewis are the attorneys for Smart

7 Papers in this case, correct?

8     A.   Yes, I believe that's correct.  I mean, yeah,

9 I guess.

10         MR. DOGGETT:  Off the record.

11         (Off-the-record discussion.)

12         (Plaintiffs' Exhibit 3 marked.)

13     Q.   I'm not sure how much you know about the

14 exhibit we had marked Plaintiffs' Exhibit 3.  It's from

15 Laine Posel to me and it's just a bunch of employment

16 documents showing like W-2s on Raymond Asher, Fern Gadd,

17 Frances Spurlock, Michael Yauger, and then employment offers

18 to Joseph Born, Jack Ratliff, Randolph Tackett, and Jimmy

19 Lee Taylor, and Michael Thomas.  Let me just ask.  I take it

20 you knew that all of these people listed that I've just

21 talked about were offered jobs by Smart?

22     A.   They all received -- they received these -- to

23 the best of my knowledge, received these letters.

24     Q.   Huh?

25     A.   To the best of my knowledge, they received

**18**

1 these letters.

2     Q.   Sure.  And the people that got W-2s obviously

3 got --

4     A.   We paid these.

5     Q.   Sure.  Because they would have got job offers

6 because they got Smart W-2s, right?

7     A.   Right.

8     Q.   And the other people have letters from Smart.

9 Now, Clarence (Bud) Terry, I'm sorry, I kind of missed that

10 with my poor hearing, but is Clarence (Bud) Terry, what is

11 his position with Smart, or was it at the time?

12     A.   At the time, he was the chief executive

13 officer at Smart.

14     Q.   And you reported to him or something?

15     A.   Yes.  Well, as a consultant.  The date on

16 February 9th, as a consultant, you know, I was -- reported.

17 When I became an employee of Smart, then I reported to him.

18     Q.   Now, do you recall, in the processes of making

19 these job offers -- this one is dated February the 9th,

20 2001.  The job offer letters, as like to Ratliff, for

21 example, that was the day that Smart took over, wasn't it,

22 Friday, February the 9th?

23     A.   Friday, February 9th, yes.

24     Q.   Now, was the identity of who was going to

25 receive job offers transmitted from Smart to I P at that

**19**

1 time?

2     A.   No.

3     Q.   How was that handled that -- you know, we

4 were -- didn't every employee at I P, when they were being

5 terminated, get a letter saying that they were supposed to

6 attend one meeting or the other, to your knowledge?

7     A.   Yes, Smart Papers gave them -- or those

8 letters came from Smart Papers to them.

9     Q.   And those were -- were they not, if you might

10 still find that they're still -- was that not done while

11 they were still I P employees?

12     A.   I don't know the exact timing of when that was

13 done, whether that was handed out as they were leaving the

14 premises.  That was -- I don't know exactly when they

15 received the scheduling they had to go to.

16     Q.   Let me just say that, on behalf of all of us

17 that don't have these dates pinned down for a good reason,

18 do you recall that there were meetings on Saturday, February

19 the 10th?

20     A.   Yes.

21     Q.   And I think Sunday as well, the 11th of 2001,

22 where employees, in some meetings, were told, you're not

23 getting a job, and in other meetings they were told, you are

24 getting a job?

25     A.   Yes, there were meetings on those two days.

**20**

1     Q.   Now, all of those employees had to know then

2 before Saturday what meeting to attend, did they not?

3     A.   Yes.

4     Q.   And that was handled on the I P side, was it

5 not, to furnish these people with those notice letters?

6     A.   I don't recall.  The letters were from Smart

7 Papers, not from I P, they were from Smart Papers.

8     Q.   The letters were from Smart Papers, but they

9 were given to employees who were still, in the last moments

10 of their work, still I P employees, were they not?

11         MS. POSEL:  Objection, asked and answered.  A

12 mischaracterization of prior testimony.

13     Q.   You may answer the question.

14     A.   Ask it again.

15     Q.   In order for them to be notified that they

16 were invited to attend a -- invited to attend a meeting on

17 Saturday, February the 10th, they were given this notice

18 before they left work for I P, were they not?

19     A.   I don't know if they were given it before or

20 as they were leaving.

21     Q.   So they were given them as they were leaving?

22     A.   Yeah, as you were leaving.  When you left for

23 your last shift, by the letter from I P, you were finished

24 with I P.

25     Q.   Okay.  So, like, in that split moment, you're

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of December 29, 2000, between CHAMPION INTERNATIONAL CORPORATION, a New York corporation ("*Seller*") and SMART PAPERS LLC, a Delaware limited liability company ("*Buyer*").

Seller owns and operates a paper mill located in Hamilton, Ohio at which Seller engages in the manufacture of certain premium cast-coated and uncoated papers (the "*Business*"). Buyer desires to purchase, and Seller desires to sell, the Business as a going concern and substantially all of the assets related to the Business located at the Facility upon the terms and conditions set forth herein.

Accordingly, in consideration of the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I. DEFINED TERMS

1.1     Defined Terms. As used in this Agreement, the following terms have the meanings indicated:

"*Benefit Plans*" means, with respect to Seller, each employee benefit plan, program, arrangement and contract (including, without limitation, any "employee benefit plan", as defined in Section 3(3) of ERISA, and any bonus, incentive, deferred compensation, stock bonus, stock purchase, restricted stock, stock option, employment, termination, stay agreement or bonus, change in control and severance plan, program, arrangement and contract) in effect on the date of this Agreement to which Seller or any ERISA Affiliate of Seller is a party and which is maintained or contributed to by Seller or any ERISA Affiliate of Seller in which present or former employees of Seller who are or were employed in the Business participate.

PLAINTIFF'S EXHIBIT

IP-P100009

*fen P2*

Act, and Seller recognizes and agrees (i) that Buyer will not be assuming the collective bargaining agreement in effect between Seller and the Paperworkers Union or any of Seller's liabilities or obligations to the Paperworkers Union, other than any obligation to bargain with the Paperworkers Union that may be imposed by law, and (ii) that Buyer will not be responsible for any strike or strike-related conduct by employees or the Paperworkers Union against Seller arising out of or relating to such consultations. Further, in respect of notices and payments relating to events occurring on or prior to the Closing, Seller shall be responsible and assume all liability for any and all notices, payments, fines or assessments due to any government authority, pursuant to any applicable federal, state or local law, common law, statute, rule or regulation with respect to the employment, discharge or layoff of employees by the Seller as of or before the Closing, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (the "*WARN Act*"). Likewise, in respect of notices and payments relating to events occurring after the Closing, Buyer shall be responsible and assume all liability for any and all notices, payments, fines or assessments due to any government authority, pursuant to any applicable federal, state or local law, common law, statute, rule or regulation, including but not limited to the WARN Act, with respect to the employment, discharge or layoff of employees employed by the Buyer after the Closing.

(b) <u>Benefits</u>. With respect to all claims by current and former employees of Seller who are or were employed in the Business ("*Seller Employees*") arising prior to or as of the Closing under any Benefit Plans, whether insured or otherwise (including, but not limited to, life insurance, medical and disability programs), Seller shall, at its own expense, honor or cause its insurance carriers to honor such claims, whether made before or after the Closing, in accordance with the terms and conditions of such Benefit Plans without regard to the employment by Buyer of any such Seller Employees after the Closing.

(c) <u>Wages, Vacation Pay</u>.

(i) As soon as practicable after the Closing Date, Seller shall pay or cause to be paid to all Seller Employees the amount of (y) all wages, bonuses, commissions and other compensation, and (z) to the extent any Seller Employee is not hired by Buyer, the aggregate dollar value of any unused vacation time, if any, as such Seller Employee shall have earned under Seller's vacation plan in effect for such Seller Employee as of the Closing, in each case due in respect of periods ending prior to and as of the Closing.

(ii) To the extent Seller Employees become Hired Employees of the Buyer (including those employees hired as Temporary Employees), Buyer (x) shall be responsible for all earned but unused vacation for Hired Employees as each such Hired Employee shall have earned under Seller's vacation plan in effect for such Hired Employee as of the Closing (it being understood that a corresponding dollar-for-dollar accrual for such liability shall be made on the Closing Balance Sheet), (y) shall permit all such Hired Employees time off for such vacation days at reasonable times as approved by Buyer's managers, and (z) shall pay each such Hired Employee vacation pay for the time taken off at the rate that such Hired

17

IP-P100012

Employee would have received as of the day prior to the Closing Date for accrued unused vacation earned prior to the Closing, but not after the Closing; *provided, however,* that the provisions of this Section 4.1(c) shall not affect Buyer's right to establish a new vacation policy for all Hired Employees for vacation time earned after the Closing.

      (d)    <u>Benefit Plans</u>.  Except as otherwise expressly provided in this Section 4.1, Buyer shall not assume or be responsible for any liability or obligation whatsoever with respect to the Benefit Plans, and Buyer shall provide such benefits to those Seller Employees who become employees of Buyer as of or after the Closing as Buyer, in its sole discretion, shall determine.  Seller shall indemnify, defend and hold harmless Buyer from and against any and all liabilities or obligations relating to Seller Employees under the Benefit Plans prior to the Closing, except for those liabilities and obligations assumed by Buyer pursuant to this Section 4.1.

      (e)    <u>Union Agreement and Union Obligations</u>.  Buyer shall not assume the collective bargaining agreement in effect (the "*Union Agreement*") between Seller and the United Paperworkers International Union, Local 1967, or their successors (the "*Paperworkers Union*") and shall have no liability thereunder to Seller or to any Seller Employees for any obligation of Seller under the Union Agreement, including, without limitation, obligations with respect to the payment of wages, pensions or other benefits which may have accrued, vested or been earned prior to the Closing or any other term or condition of employment in effect as of or prior to the Closing relating to employees of Seller covered by the Union Agreement.  Seller shall indemnify, defend and hold harmless Buyer from and against all liabilities or obligations (i) accrued by Seller Employees or the Paperworkers Union under the Union Agreement, and (ii) to the extent arising as a result of Seller's conduct or actions, under the National Labor Relations Act or the Labor-Management Relations Act, in each case as of or prior to the Closing.

      (f)    <u>Severance Benefits</u>.

      (i)    (A)    In the event that Buyer fails to offer employment to more than two hundred and nineteen (219) (the "*Union Severance Target Number*") Seller Employees who are covered by the Union Agreement and are employed by Seller immediately prior to the Closing Date (the "*Union Employees*") (1) to whom Seller is obligated to pay severance pursuant to any severance plans or programs established by Seller in the course of "effects" bargaining with the Paperworkers Union with respect to the Union Employees (collectively, the "*Union Severance Plan*"), and (2) who have not failed a drug test administered by or on behalf of Buyer, Buyer shall reimburse Seller for an amount equal to:

      the product of (x) (a) the actual number of Union Employees not made offers of employment by Buyer to whom Seller is obligated to pay severance and who have not failed a drug-test minus the Union Severance Target Number, divided by (b) the total number of Union Employees to whom Seller is obligated to pay severance under the Union Severance Plan, and (y) the total dollar amount of the cash portion of the severance paid to Union Employees pursuant to the Union Severance Plan;

IP-P100013

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
 2               WESTERN DIVISION

 3

 4 PACE Local Union 5-1967,      :
   et al.,                       :   Case No. C-1-02-301
 5                               :   (CONFIDENTIAL)
           Plaintiffs,           :
 6                               :
   vs.                           :
 7                               :   Cincinnati, Ohio
   INTERNATIONAL PAPER CO.,      :   February 28, 2003
 8                               :
           Defendant.            :
 9

10

11

12

13          Deposition of GEORGE E. PAYTON, a

14 witness herein, taken as upon cross-examination by the

15 Plaintiffs, and pursuant to the Federal Rules of

16 Civil Procedure, agreement of counsel, and stipulations

17 hereinafter set forth, at the offices of Robert I. Doggett,

18 Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

19 45202, on the 28th day of February, 2003, at 10:00 a.m.,

20 before Julie A. Patrick, a Notary Public for the State of

21 Ohio.

22

23      TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

24              95 S. FOURTH STREET
                BATAVIA, OHIO 45103
25                (513) 732-1477
```

**Page 2**

```
 1 APPEARANCES:

 2          On behalf of PACE Local Union:
            ROBERT I. DOGGETT, ESQ.
 3          215 E. Ninth Street, 6th Floor
            Cincinnati, Ohio  45202
 4
            On behalf of International Paper:
 5          VINCENT J. MIRAGLIA, Esq.
            McGuire Woods, LLP
 6          One James Center
            901 East Cary Street
 7          Richmond, VA  23219-4030

 8

 9          Also present:
            Ron Schweitzer
10

11

12          S T I P U L A T I O N S

13

14          It is stipulated and agreed by and between

15 counsel for the respective parties that the deposition of

16 GEORGE E. PAYTON, a witness herein, may be taken at this

17 cross-examination by the Plaintiffs, may be taken at this

18 time and place pursuant to the Federal Rules of Civil

19 Procedure, agreement of counsel; that the deposition may be

20 recorded in stenotype by the Notary Public, Julie A.

21 Patrick, who is also the court reporter, and transcribed out

22 of the presence of the witness; and that signature of the

23 deponent was requested and shall be affixed outside the

24 presence of the Notary Public.

25
```

**Page 3**

```
 1               I N D E X

 2

 3 WITNESS           DIRECT  CROSS  REDIRECT  RECROSS

 4 GEORGE E. PAYTON

 5   by Mr. Doggett:              4

 6

 7

 8

 9

10

11

12

13               - - -

14

15 PLAINTIFFS' EXHIBITS    MARKED

16 1:                       8

17 2:                      11

18 3:                      12

19 4:                      14

20 5:                      19

21 6:                      21

22 7:                      23   (withdrawn)

23 8:                      24

24

25
```

**Page 4**

```
 1               GEORGE E. PAYTON,

 2 a witness herein, being of lawful age, after having been

 3 duly cautioned and sworn, was examined and deposed as

 4 follows:

 5               CROSS-EXAMINATION

 6 BY MR. DOGGETT:

 7   Q.   Would you state your name, sir.

 8   A.   George Payton.

 9   Q.   And what is your business address?

10   A.   6420 Poplar Avenue, Memphis, Tennessee.

11   Q.   And is that for International Paper?

12   A.   Yes.

13   Q.   What's the Zip on that?

14   A.   38197.

15   Q.   Mr. Payton, could you give us your personal

16 background as far as your professional work.

17   A.   I graduated from college in 1974, December the

18 13th.  I started work for International Paper January the

19 13th, 1975.

20   Q.   Been with them ever since?

21   A.   Been with them ever since.

22   Q.   And what positions have you held there?

23   A.   I've worked at the Pine Bluff mill, the

24 Texarkana mill, Mobile, Georgetown, and now Memphis.

25   Q.   Is Memphis a mill or is it --
```

Local Union 5-1967, et al vs. International Paper

Case 1:01-cv-00301-HJW-JS    Document 59-4    Filed 01/15/2004    Page 8 of 22

19

/payroll. In this memo here of March the 8th, it

in here that "Knightsbridge will be handling these

issues until the facility closes." We had plans on not

/keeping Knightsbridge open. Knightsbridge was not going to

continue, we knew that. Exactly when it was going to close

was yet to be determined. But yet we wanted to give people

7 a sense of timing, and the target date that we had set was

8 January 1st of 2002, that was a target date set. So in this

9 reference where you see "Knightsbridge will be handling

10 these issues until the facility is closed", that was my

11 understanding of what this memo was referring to.

12        Q.    Yes. And then after that, "we'll be looking

13 for direction from George Payton in Memphis as to who will

14 administer these issues"?

15        A.    Correct, but that didn't take place in the way

16 in which Annetta Johnson's March 8th memo is outlined here.

17        Q.    How did it take place then?

18        A.    We ended up -- the administration of the

19 awarding of severance eligibility was picked up by the

20 Memphis office in March of 2001.

21        Q.    Correct. Because you were already

22 communicating on Larry Combs -- well, I'm wrong on that.

23 No, Tom Stewart was already working on severance pay in

24 April of 2001 with Govan Begley, right?

25        A.    But the transition took place -- from my

---

18

1 memory, Mr. Doggett, it was March of 2001.

2        Q.    So it was much earlier than -- in other words,

3 taking it away from Knightsbridge and having it done in

4 Memphis was done much earlier than it had been thought it

5 would be?

6        A.    The decision making process as to who would be

7 paid, the eligibility, was moved to Memphis in March of

8 2001. The execution of that, the actual payment process,

9 was still being done at Knightsbridge.

10        Q.    I got you. And when you say "who would be

11 paid", you mean severance pay; do you know?

12        A.    That's correct.

13        Q.    And can you then confirm -- just simply in

14 Plaintiffs' Exhibit 4, as a representative of International

15 Paper, you confirm the authenticity of all of these

16 documents in Plaintiffs' Exhibit 4?

17        A.    Yes.

18        Q.    Now, I've requested information on the

19 following employees by name and you've already answered as

20 to Hubert Napier. I think -- I'll just go through these and

21 ask if you were involved in the decisions on their severance

22 pay. And that was Frances Spurlock?

23        A.    No.

24        Q.    Fern Gadd?

25        A.    Wait a minute.

---

(Discussion with counsel.)

2        Q.    You see the names there in Exhibit A,

3 paragraph two? Were you involved in any of those decisions

4 on severance pay?

5        MR. MIRAGLIA: Exhibit A, paragraph two, of

6 your 30(b)(6) deposition notice?

7        MR. DOGGETT: Yes. Right.

8        A.    On or about March the 6th of 2001,

9 International Paper Company was officially notified from

10 Smart Papers as to those employees who did not receive

11 offers. And based upon that document, she did not -- she

12 was stated as not receiving an offer. Let me correct that.

13 Based on those documents, it was hourly employees who were

14 offered a job, accepted jobs with Smart, but who was

15 subsequently terminated without fault of her own,

16 Ms. Spurlock was on that list and, based upon that, she was

17 paid severance.

18        Q.    Yeah.

19        MR. DOGGETT: I have failed to bring that up

20 here, and it's not just running next door. I would like to

21 just take a real short recess because I want to get those

22 lists.

23        MR. MIRAGLIA: Sure.

24        (Break taken.)

25        (Plaintiffs' Exhibit 5 marked.)

---

20

1        A.    Okay.

2        Q.    Okay. You could check these over -- I don't

3 know if I have them in the same numerical order that it was

4 received, but basically are these the lists that Smart Paper

5 sent to IP on who was offered jobs, who wasn't, and things

6 like that?

7        A.    Yes.

8        Q.    On this one list, which is -- you can look for

9 that. I think it's the second to last list. It's P100127.

10 It's, IP employees offered and accepted jobs with smart

11 paper, who are subsequently terminated without fault Of

12 Employee. I think that's the second to the last document.

13        A.    Yes.

14        Q.    Let me go through this with you now. Now, if

15 you had a job, but you decided to leave Smart, you weren't

16 entitled to severance pay, were you?

17        A.    Voluntary resignation?

18        Q.    Yes.

19        A.    You weren't entitled to. Do you have the

20 Effects Bargaining Agreement?

21        Q.    Yeah. I know that, but what I'm trying to get

22 at --

23        A.    No, I'm saying, if I had it, I could refer to

24 it.

25        Q.    I've got about 30 dozen of them somewhere. I

---

# International
# Paper

International Paper

Phone:
FAX:
email:

Friday, April 13, 2001

Govan F. Begley
3113 Leakwood Dr.
Hamilton , Ohio  45011

Dear Mr. Begley :

Thank you for your recent letter regarding your concern over having not received a "severance package" from International Paper. These severance benefits were based on a negotiated agreement between the PACE International union and it's Local Union 1967 and International Paper. This agreement specifically states "Employees who do receive an employment offer from Smart Papers will not be entitled to severance pay unless terminated from Smart Papers , through no fault of their own , within eighteen (18) months of the sale date". As you stated in your letter , you did receive an employment offer from Smart Papers , consequently you would not be eligible for severance benefits under the agreement between International Paper and PACE. For this reason , Mr. Begley, you are not entitled to receive the severance package as you request.

Sincerely,

J. T. Stewart
Employee Relations Consultant



IP-P100092

Apr. 1, 2001

To Whom it May Concern:

**SEVERANCE PACKAGE**

I, Govan F. Begley, am writing this letter to you, asking why I cannot receive the "Severance Package" given to all the employees, that were retired or fired, (with lot less years than I have) from International Paper? I have been an employe at Champion & I P for the past 35 years, as of Feb. 28, 2001.

On Jan 15, 2001, I had my interview with Smart Papers[1] I tried, at this time, to make it very clear, that due to my "Open Heart Surgery", which was performed in 1992, and my being a border-line diabetic, that I did not feel that I needed to be put into a job or position that I could not, or may not be able to handle, and needed to get out of the work force.

Then on Feb. 15, 2001, @ 8ᴬᴹ there was a meeting held at the Hamiltonian Hotel, here in Hamilton, Ohio, where we were to be told the outcome of our jobs. I was scheduled to be there at 8 AM. When I arrived and was waiting my turn, a lady by the name of Annetta Johnson, ejected me from my appointment, only to tell me later, that I was being retained at Smart Papers LLC, all because of my knowledge. On the job I did at I.P. I was making $19.18 per hour. I had to take a pay cut of $7.18 an hour.

I have been a faithful, loyal employee to this company for many, many years, and I do feel that I was treated very unfairly in this matter. There were many people who lost their

IP-P100093

...itions) for different reasons). Most of them was granted a severance package, which was due them, and which I feel was only right.

After I have figgured my income now at $12.00 an our, I decided that it would be better, or I would come out with as much money, being retired, as I would if I continued working. So on Mar. 16, 2001, I handed in my resigination to Smart Papers LLC. As of Mar. 30, 2001, I am now retired.

I sincerely think, or believe or Know, that I should be granted the same rate of servance pay that my fellow employees received.

Also I might add, that there was employees with lot less senority than I had, was put into positions making more on the hour than me. I do not feel this was right, as their "age" and senority was much less than mine.

I would also like to add that I will persue this to the deepest extent of the matter I feel as I was treated very unfairly.

I ask you to check my work record for the past 35 years. I'm sure it will speak for itself. Any thing you can do to help me receive the "Severance Package" - will be appreciated. I - ope we can end it once and for all, and in a timely matter.

Thank You

Govan F Begley 4-01-01

IP-P100094

If you care to, or tend to reply:

Please send to:

Govan F. Begley
3113 Teakwood Dr.
Hamilton, Ohio 45011

Phone 513-726-5556

Govan F. Begley  4-01-01

IP-P100095

 **INTERNATIONAL PAPER**

**GEORGE E. PAYTON**
HR PROJECT MANAGER
MERGERS, ACQUISITIONS & DIVESTITURES

6400 POPLAR AVENUE
MEMPHIS TN 38197-0001

T 901 419 7255
F 901 419 7281
C 901 606 3432
george.payton@ipaper.com

July 11, 2002

Mr. Larry Combs
5769 Levy Drive
Fairfield, OH 45014

Cc: Bob Florio

Subject: Request for Severance Benefits

Dear Mr. Combs,

On Thursday, June 27, 2002 you verbally conveyed to me via telephone your intentions
to voluntarily resign from Smart Papers, with Friday, July 5, 2002 being your last day to
work. Further, you requested severance benefits to be paid to you because of your
separation from International Paper in February 2001 with the divestiture of the Hamilton
"B" Street Mill.

In follow up to processing your request for severance benefits, I was informed today that
your request must be submitted in writing to Mr. Bob Florio, Plan Administrator,
International Paper, 6400 Poplar Ave., Tower II, Room 08-01, Memphis, TN 38197,
outlining your request and your reasons why you believe severance benefits should be
paid.

If you have any questions, please feel free to contact me here at my office by calling the
telephone number listed above.

Sincerely,

*George Payton*

George E. Payton



IP-P100079

McGuireWoods LLP
Washington Square
1050 Connecticut Avenue N.W.
Suite 1200
Washington, DC 20036-5317
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

Vincent J. Miraglia
Direct: 202.857.1704

## McGUIREWOODS

August 14, 2002

Mark Byrne, Esq.
Jacobs, Kleinman, Seibel & McNally
2200 Kroger Building
1014 Vine Street
Cincinatti, Ohio 45202

      Re:   <u>Severance Claim of Larry Combs</u>

Dear Mr. Byrne:

      This letter is sent to confirm our telephone conversation of earlier this week in which we discussed the severance claim of your client, Larry Combs. As we discussed, Mr. Combs filed a claim for severance benefits on August 2, 2002 arising out of the sale of the Hamilton Mill to Smart Papers LLC and his subsequent resignation from Smart Papers.

      For the reasons we have set forth in our motion to dismiss in the <u>Angel v. International Paper</u> case, Mr. Combs is not entitled to severance under the effects bargaining agreement. Furthermore, as set forth in his claim for benefits, Mr. Combs voluntarily resigned his position with Smart Papers. Therefore, he was not "terminated through no fault of his own" and is thus still not entitled to benefits.

      Please do not hesitate to contact me if you have any questions.

            Very truly yours,

            Vincent J. Miraglia

IP-P100026

LAB: 340839 v. 1

CONFIDENTIAL

PAGE 1

## ATTACHMENT "A"

### FORMER INTERNATIONAL PAPER EMPLOYEES WHO RECEIVED SEVERANCE UNDER THE JANUARY 26, 2001 EFFECTS BARGAINING AGREEMENT

| Employee Name | Severance Amount |
|---|---|
| ABNER, THOMAS K | $ 46,012.33 |
| ADAMS, DONNIE C | $ 37,208.81 |
| ASHER, BEN D | $ 35,667.84 |
| ASHER, RAYMOND | $ 35,100.18 |
| BAKER, DONALD L | $ 39,057.84 |
| BARRETT, LUTHER A | $ 33,503.98 |
| BAYLOR, CHARLES T | $ 32,348.17 |
| BENNETT, THOMAS D | $ 31,415.14 |
| BENNETT, WAYNE M | $ 38,391.91 |
| BISHOP, PHILIP A | $ 29,760.84 |
| BLEVINS, EARL T | $ 41,683.20 |
| BLOWER, LAWRENCE B. | $ 20,829.98 |
| BORN, JOSEPH O | $ 54,013.44 |
| BRACKNEY, DONALD C | $ 35,827.85 |
| BRADLEY, CHARLES E. | $ 17,986.94 |
| BRANDENBURG, LARRY | $ 40,269.31 |
| BREHM, ROBERT ALLEN | $ 37,649.64 |
| BROOKS, JAMES S | $ 35,834.22 |
| BROUGHTON, LARRY | $ 31,102.14 |
| BULLIO, PHILIP M | $ 29,672.71 |
| CAMPBELL, CHARLES B | $ 26,717.90 |
| CAMPBELL, DOYLE F | $ 36,055.11 |
| CHASTEEN, ROBERT D | $ 37,177.75 |
| CHEEK, BOYD J | $ 38,882.72 |
| CHUHAK, MARK A | $ 19,208.77 |
| CLAIR JR, THOMAS R | $ 37,188.10 |
| CLEAR JR, JAMES M | $ 38,621.89 |
| COFFMAN, PAUL W | $ 22,297.75 |
| COLLETT, DANIEL H. | $ 28,267.46 |
| COMBS, JED | $ 39,312.00 |
| COMBS, JERRY L | $ 39,229.20 |
| COMBS, JOSHUA E | $ 39,736.32 |
| COOK, GARRY L | $ 17,676.58 |
| CRANE, MARLA SUE | $ 30,802.90 |
| CRESS, JOHN M | $ 44,739.53 |
| CROOK, ROBERT | $ 30,553.15 |
| CRYSEL JR, RONALD | $ 20,398.54 |
| CURTIS, WILLIAM | $ 20,771.60 |
| DAVIS, JOE E | $ 34,956.48 |


PLAINTIFF'S EXHIBIT



CONFIDENTIAL

| Name | Amount |
|---|---|
| DETHERAGE, GREGORY | $ 22,870.19 |
| DOYLE, CLYDE D | $ 35,193.56 |
| DUNCAN, TERRY W | $ 29,747.56 |
| DURBIN, PATRICK STE | $ 46,121.82 |
| EATON, MENDOL CLEVE | $ 43,644.65 |
| EIKELBERGER, GERALD | $ 21,007.56 |
| EPPERSON, GREGORY R | $ 37,128.00 |
| FANT, CHARLES | $ 20,738.69 |
| FIGG, JEFFREY L | $ 18,453.33 |
| FISHER, KENNETH C | $ 33,353.16 |
| FISHWICK, DAN B. | $ 21,261.38 |
| FOUTS, JAY | $ 55,189.07 |
| FOWLER, MICHAEL | $ 24,580.66 |
| FOWLER, TERRELL K | $ 35,827.92 |
| FREEMAN, CHARLES W | $ 35,153.28 |
| GARDNER, HENRY D | $ 53,072.64 |
| GENTRY, D S | $ 23,807.87 |
| GENTRY, MARSHALL L | $ 29,193.58 |
| GILL, EVERETT W | $ 36,338.36 |
| GREGORY, JOHN A | $ 34,684.33 |
| GRUBB, GARY | $ 34,272.00 |
| GUMM, JOHN | $ 37,158.23 |
| HALSTEAD, JOHN R | $ 28,180.17 |
| HAMBLIN, DOUGLAS | $ 29,575.56 |
| HARDIX, PAUL W | $ 35,724.89 |
| HARRIS, JOHN F | $ 2,342.86 |
| HARRISON JR, HARRY | $ 30,906.23 |
| HATTON, DANIEL L | $ 39,207.82 |
| HAYNES, WILLIAM H | $ 35,001.88 |
| HEINRICH, DENNIS A | $ 30,224.92 |
| HEINRICH, TINA M. | $ 17,959.80 |
| HENSLEY, EDWARD R | $ 31,055.89 |
| HICKS, PEARL | $ 47,855.41 |
| HIXSON JR, DONALD | $ 39,214.84 |
| HOLLAND, MELVIN | $ 37,181.53 |
| HORN, ROGER D | $ 36,114.12 |
| HOWARD, GARY C. | $ 23,741.53 |
| HOWARD, JOHN M. | $ 22,591.38 |
| HUFF, LAWRENCE | $ 18,647.48 |
| HUFFMAN, THOMAS D | $ 33,672.48 |
| HUNTINGTON, RICK L | $ 32,926.25 |
| HYDEN JR, EMANUEL | $ 28,529.21 |
| ISREAL, JEROME | $ 29,564.05 |
| ITALIANO, PAUL P. | $ 19,853.64 |
| JACKMAN, RANDALL | $ 21,750.48 |
| JACKSON, GEORGE D. | $ 24,697.31 |

IP-P100006

CONFIDENTIAL

| | |
|---|---|
| JEFFRIES, JACK A | $ 22,644.00 |
| JOHNSON, CHESTER R | $ 34,632.00 |
| JONES, KEVIN E | $ 31,017.43 |
| KETCHAM, JAMES L | $ 42,680.88 |
| KIMBRELL, ANTHONY | $ 30,166.96 |
| KNODEL, STANLEY C | $ 39,312.00 |
| LAKES, JAMES R | $ 33,140.02 |
| LAUMAN, RICHARD A. | $ 21,714.78 |
| LEDFORD, JEFFREY H | $ 19,359.03 |
| MANN, STEVEN J | $ 28,507.26 |
| MARCUM, HERBERT | $ 37,784.88 |
| MARCUM, LARRY E | $ 31,163.04 |
| MARSEE, LINDA B | $ 30,464.79 |
| MCCREARY, LARRY WAY | $ 30,584.47 |
| MCGUIRE, CRAIG W | $ 39,258.72 |
| MCKAY, ROSS | $ 36,255.74 |
| MCNABB, LARRY L | $ 2,206.98 |
| MESSER, TROY | $ 25,257.31 |
| MILLER, DAVID M | $ 22,027.54 |
| MUELLER, MICHAEL D | $ 40,342.77 |
| NAPIER, HUBERT O | $ 46,012.33 |
| NUNN, TIMOTHY | $ 2,444.55 |
| OGG, FREDERICK S | $ 30,183.98 |
| PARSLEY, JOHN R. | $ 23,784.34 |
| PAXTON, DOUGLAS G | $ 40,965.58 |
| PELSOR, RONALD L. | $ 20,259.38 |
| PENNINGTON, JEWELS | $ 40,716.90 |
| PENNINGTON, RON EUG | $ 30,009.93 |
| PONDER, MICHAEL D | $ 37,702.08 |
| QUINN, ANTHONY A | $ 32,389.22 |
| RAPIEN, ROGER J | $ 1,780.06 |
| RATLIFF, DAVID | $ 37,050.48 |
| RATLIFF, JACK R | $ 52,640.64 |
| RATLIFF, RICHARD R | $ 31,704.54 |
| REEVES, RANDALL E | $ 30,950.37 |
| REIF, JOHN W. | $ 18,103.10 |
| RENNER JR, DONALD R | $ 2,360.70 |
| RICHARDS, DONALD D | $ 37,833.84 |
| RICHARDSON, STEVEN | $ 21,070.87 |
| ROBERTSON, DAVID E | $ 38,201.28 |
| ROBINSON, STEVEN C | $ 17,623.44 |
| RODGERS, JAMES B | $ 36,112.37 |
| SANDLIN, BARNEY | $ 29,625.65 |
| SANDLIN, IRVIN F. | $ 22,340.29 |
| SHOCKEY, LADD W | $ 30,056.62 |
| SIMPSON, MICHAEL D. | $ 23,153.51 |

CONFIDENTIAL

PAGE 4

| | |
|---|---|
| SMITH,  RONALD D | $ 30,619.56 |
| SMITH,  SHARON K. | $ 19,241.26 |
| SORRELL,  MERRILL CH | $ 46,913.18 |
| SPADA,  PETER A. | $ 21,203.44 |
| SPURLOCK,  FRANCES Y | $ 25,307.90 |
| STANIFER,  TERRY L | $ 34,136.72 |
| STEWART,  LEONARD | $ 44,395.29 |
| STOUT,  MARK P. | $ 19,992.18 |
| TACKETT,  RANDOLPH G | $ 37,879.48 |
| TARTER,  GARY DALE | $ 33,832.92 |
| TAULBEE,  EVERETT D | $ 37,216.67 |
| TAYLOR,  JIMMY LOU | $ 41,907.84 |
| THOMAS,  MICHAEL LER | $ 43,517.76 |
| THOMAS,  ROBERT W | $ 36,003.94 |
| TIBBETTS,  DENNIS | $ 51,714.00 |
| TOLBERT,  THERESA D | $ 29,882.66 |
| TURLEY,  JERRY R | $ 27,894.29 |
| TURNER,  BRIAN D | $ 22,763.86 |
| TURNER,  RONALD E | $ 39,535.20 |
| VOLZ,  FRANCIS A | $ 38,750.40 |
| WALKER,  HENRY L | $ 27,630.36 |
| WASHINGTON,  COLEY | $ 20,355.32 |
| WEATHERS,  GREGORY O | $ 20,977.94 |
| WEBB,  TERI L. | $ 20,921.71 |
| WELLS,  CHRIS | $ 26,055.11 |
| WHITAKER,  DANIEL L. | $ 21,612.02 |
| WHITAKER,  JAMES D | $ 26,091.66 |
| WILKINS,  ROBERT S | $ 32,221.62 |
| WILLIAMS,  LARRY A | $ 27,075.61 |
| WILLIS,  JAMES M | $ 41,435.92 |
| WOEBKENBERG,  ROBERT | $ 28,414.19 |
| YORK,  JOHN | $ 31,487.74 |

IP-P100008



---

1
IN THE UNITED STATES DISTRICT COURT

2
FOR THE SOUTHERN DISTRICT OF OHIO

3
WESTERN DIVISION

4

5

6    ..................................

7    PACE LOCAL UNION 5-1967, et al..

8            Plaintiffs,

9        vs.                          CASE NO.
                                      C-1-01-301
10   INTERNATIONAL PAPER COMPANY,

11           Defendant.

12   ..................................

13

14

15   DEPOSITION OF:     ~~WILLIAM C. RUMPLER~~

16   TAKEN:             By the Defendant
                        Pursuant to Notice
17
18   DATE:              November 20, 2002

19   TIME:              Commencing at 4:25 p.m.

20   PLACE:             Offices of:
                        Graydon, Head & Ritchey
21                      1900 Fifth Third Center
                        511 Walnut Street
22                      Cincinnati, Ohio  45202

23   BEFORE:            Sharon A. Helfrich,
                        Notary Public · State of Ohio
24

---

1   APPEARANCES:

2

3        On behalf of the plaintiffs:

4            Robert L. Doggett, Esq.
             215 East Ninth Street
5            Suite 630
             Cincinnati, Ohio  45202-2139

6        On behalf of the defendant:

7            Vincent J. Miraglia, Esq.
                       of
8            McGuireWoods, L.L.P.
             Washington Square
9            1050 Connecticut Avenue N.W.
             Suite 1200
10           Washington, D.C. 20036-5317

11       Also present:

12           Mr. Kenneth C. Stanifer
             Mr. Timothy D. Bray
13           Mr. Ron Schweitzer
             Mr. J. Thomas Stewart
14

15                    · · ·

16

17

18

19

20

21

22

23

24

---

1                    I N D E X

2    WILLIAM C. RUMPLER                            PAGE

3      Cross-Examination by Mr. Miraglia            4
       Examination by Mr. Doggett                  23
4

5    EXHIBITS                       MARKED   REFERENCED

6      Defendant's Exhibit 11         19        19
7      Defendant's Exhibit 12         20        20

8

9                    · · ·

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

1                 WILLIAM C. RUMPLER

2   of lawful age, a witness herein, being first duly sworn as

3   hereinafter certified, was examined and deposed as follows:

4                    CROSS-EXAMINATION

5   BY MR. MIRAGLIA:

6        Q.   Hi, Mr. Rumpler.  My name is Vincent Miraglia

7   and I represent International Paper in the lawsuit that you

8   and a few others have filed against the company.

9             And, first of all, if you can identify

10  yourself.

11       A.   William Rumpler.

12       Q.   Do you have a middle name?

13       A.   C.

14       Q.   What's the C. stand for?

15       A.   Coleman.

16       Q.   Can you spell that?

17       A.   C-o-l-e-m-a-n.

18       Q.   We're going to take your deposition here today.

19  The court reporter will take down your responses and,

20  because of that, you need to respond verbally.  She can't

21  understand nods of the head or uh-huh or uh-uh.  So if you

22  could, simply verbalize your responses.  Okay?

23       A.   Okay.

24       Q.   Also, I'm going to assume that you understand

---

**17**

1    A.    Yes.

2    Q.    To what was he referring?

3    A.    Well, Jesse Lane was in our group of 50 people

4  and he said he heard there was a number that we could have

5  called and got the severance pay. And Hocutt Phillips said,

6  that's right, yes. And then he said, why didn't we get it

7  then? Why didn't we get that number? And Hocutt Phillips

8  said, because we promised Smart Papers a work force.

9    Q.    Now, you said you were hired by Smart Papers

10  into the header position, or header department, correct?

11    A.    Well, the header. We wrapped rolls, is what we

12  did.

13    Q.    Had you told anybody, prior to being offered

14  that job, that you didn't want a job at Smart Papers?

15    A.    Yeah, I told a bunch of people.

16    Q.    Who did you tell?

17    A.    I told Hocutt Phillips.

18    Q.    When did you tell him that?

19    A.    Before. I said, if you can get me that, get me

20  that severance pay. I told Art Schutte (phonetic), one of

21  my bosses, I told him to get ahold of Randy Butz and tell

22  him.

23    Q.    Did you tell anybody at Smart Papers?

24    A.    They was Smart Papers. Randy Butz and Art

**18**

1  Schutte and Hocutt Phillips at that time. That's before. I

2  was asking if I could get it.

3    Q.    Mr. Phillips worked for Smart Papers at the

4  time you asked him?

5    A.    Hocutt Phillips. He was working for Smart

6  Papers at the time he got up at that hotel, when he said, we

7  promised them a work force. If he said "we," I figured it

8  was me and who else.

9    Q.    So Mr. Phillips was working for Smart and Mr.

10  Schutte and Mr. Butz were working for Smart; is that

11  correct?

12    A.    Randy Butz, yeah.

13    Q.    Did you tell the young woman that you

14  interviewed with that you didn't want a job with Smart?

15    A.    Yes.

16    Q.    What did you tell her?

17    A.    I told her I preferred to have the package and

18  get out.

19    Q.    Did you write that on your application?

20    A.    No. See, I was under the impression that you

21  had to do this. If you didn't, you didn't get nothing. If

22  you didn't fill nothing out and just left, you wasn't

23  entitled to nothing.

24    Q.    You were required to fill out the application?

**19**

1    A.    Yeah, that's what I was told.

2    MR. MIRAGLIA: I will ask the court reporter to

3  mark this as International Paper Exhibit 11.

4    (Defendant's (IP) Exhibit 11 was marked for

5    identification.)

6    Q.    And I'll show a copy to your counsel and I'll

7  ask you if you recognize that letter.

8    A.    Yeah, that's me.

9    Q.    Okay.

10    A.    That's mine.

11    Q.    And that's your signature at the bottom?

12    A.    Yes.

13    Q.    And you sent this on or about April of 2001; is

14  that correct?

15    A.    Well, I'm not for sure. I should have dated

16  it, I guess. I don't know when I sent it, but I sent it.

17    Q.    Was it after you had been hired by Smart

18  Papers?

19    A.    Yeah, I think. Yeah.

20    Q.    And in this document you state that you were

21  hired by Smart Papers -- I'm sorry. First of all, at the

22  bottom of this document there's a P.S. which says, please

23  let me know if you received this.

24    A.    Yes.

**20**

1    Q.    Is that your writing?

2    A.    Yes.

3    Q.    It has different writing than the rest of the

4  document, doesn't it?

5    A.    I printed that. Yes, it is. I wrote the

6  other. That's printed.

7    Q.    But that's all in your writing?

8    A.    That's me. That's all me.

9    Q.    Okay.

10    (Defendant's (IP) Exhibit 12 was marked for

11    identification.)

12    Q.    Can you tell me if you recognize that document?

13    A.    Yes.

14    Q.    Can you tell me what that document is?

15    A.    That was from the guy I wrote.

16    Q.    And that's a letter written August 10th, to

17  you, from Mr. Stewart; is that correct?

18    A.    Yeah.

19    Q.    And Mr. Stewart told you that your severance

20  request was denied; is that correct?

21    A.    Yes.

22    Q.    And he told you it was denied because you had

23  received and accepted an employment offer from Smart Papers;

24  is that correct?



**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - -

PACE LOCAL UNION 5-1967, et al.,

    Plaintiffs,

  vs.              CASE NO.
                    C-1-01-301

INTERNATIONAL PAPER COMPANY,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF:    KENNETH C. STANIFER

TAKEN:        By the Defendant
             Pursuant to Notice

DATE:         November 20, 2002

TIME:         Commencing at 9:20 a.m.

PLACE:        Offices of:
             Graydon, Head & Ritchey
             1900 Fifth Third Center
             511 Walnut Street
             Cincinnati, Ohio  45202

BEFORE:       Sharon A. Helfrich,
             Notary Public - State of Ohio

---

**Page 2**

APPEARANCES:

  On behalf of the plaintiffs:

      Robert L. Doggett, Esq.
      215 East Ninth Street
      Suite 630
      Cincinnati, Ohio  45202-2139

  On behalf of the defendant:

      Vincent J. Miraglia, Esq.
        of
      McGuireWoods, L.L.P.
      Washington Square
      1050 Connecticut Avenue N.W.
      Suite 1200
      Washington, D.C.  20036-5317

  Also present:

      Mr. Timothy Bray
      Mr. Ron Schweitzer
      Mr. J. Thomas Stewart

      - - -

---

**Page 3**

I N D E X

KENNETH C. STANIFER
                                 PAGE

  Cross-Examination by Mr. Miraglia        4
  Examination by Mr. Doggett             37
  Further Cross-Examination by Mr. Miraglia  43

EXHIBITS               MARKED   REFERENCED

  Defendant's Exhibit  1         15       16
  Defendant's Exhibit  2         16       16
  Defendant's Exhibit  3         26       27

                    . . .

---

**Page 4**

KENNETH C. STANIFER

of lawful age, a witness herein, being first duly sworn as

hereinafter certified, was examined and deposed as follows:

               CROSS-EXAMINATION

BY MR. MIRAGLIA:

    Q.    You can identify yourself.

    A.    Kenneth C. Stanifer.

    Q.    And who do you work for?

    A.    Pace International Union.

    Q.    What is your position?

    A.    I'm the international representative.

    Q.    We're taking your deposition today.  I want to

give you kind of a couple of ground rules, primarily for the

court reporter's benefit.

        If I ask you a question, please respond

verbally with either a yes or no response.  She can't

understand head nods or uh-huh or uh-uh.  So if you can

respond verbally I would appreciate it.

        If you need a break at any time during our

time, let me know and at an appropriate time we'll be happy

do that.  All right?

    A.    Sure.

    Q.    I'll be asking you several questions today.  If

you don't understand the question, please let me know.  If

37

1    A.    I guess if you can show me a signed document,
2 it would.
3    Q.    And you're not sure if you even signed it.
4    A.    I'm not sure. I don't recall. Like I said,
5 the files I leave with the local, and I don't know, I can't
6 recall. I don't recall.
7    Q.    Okay.
8         MR. MIRAGLIA:  No further questions at this
9 time.
10        MR. DOGGETT:  Okay. Just a minute.
11        (Off the record.)
12        MR. DOGGETT:  I have a few questions of Mr.
13 Stanifer.
14              EXAMINATION
15 BY MR. DOGGETT:
16    Q.    Ken, in what is marked International Paper's
17 Exhibit 2, the Effects Bargaining Package, I want to ask you
18 who drafted all the language in that paper?
19    A.    International Paper.
20    Q.    Did the union have any part in the selection of
21 any of the wording of that contract?
22    A.    No, sir.
23    Q.    Now, finally I wanted to ask you, you were
24 asked about, you know, if someone didn't get severance pay,

38

1 could they file a grievance. And I think you said they
2 could file a grievance.
3         Could you explain that, please?
4    A.    Yes. Well, the document itself has no
5 mechanism of resolution of dispute. Under this one, you may
6 file a grievance to bring it to the attention of the
7 employer, but the severance pay and the severance document
8 itself was not part and parcel of the Collective Bargaining
9 Agreement. It was a stand-alone agreement.
10    Q.    Are there any provisions in there for the
11 arbitration of a dispute?
12    A.    There's no mention whatsoever of resolving
13 issues. That's why we're in court as we are, because there
14 is no mechanism.
15    Q.    Now, I want to ask you this: You were also
16 asked about the employee's permanent -- current permanent
17 classification and that the words in the Collective
18 Bargaining Agreement do not appear in what International
19 Paper drafted.
20    A.    That's correct.
21    Q.    How would one find out Joe Born's -- a name
22 that's come up -- permanent classification and the rate? How
23 would one find that?
24    A.    From the Employee Action Form.

39

1    Q.    What's that?
2    A.    That's kept in personnel. It states the
3 employee's position and rate of pay and so forth.
4    Q.    One could not look to the Collective Bargaining
5 Agreement and find a particular individual's rate of
6 classification?  I mean, could one look at the Collective
7 Bargaining Agreement and find Joseph Born's name and
8 classification?
9    A.    No. Absolutely not.
10    Q.    And you said that's an Employee Action Form?
11    A.    Yes.
12    Q.    Is that like a personnel card or --
13    A.    A personal card or history of job movement.
14    Q.    In fact, if one looked in the former Collective
15 Bargaining Agreement, are there discrepancies in rate
16 histories in or against the permanent regular rate of a
17 particular employee?
18    A.    Yes, because of provisions of the Labor
19 Agreement, Section 30. Rate adjustments gained through
20 Section 30 are not reflected in the Labor Agreement, so
21 one's rate may be higher on the Employee Action Form.
22    Q.    Would that be his permanent classification
23 rate as it developed?
24    A.    Yes.

40

1    Q.    Okay. Now, would Tim Bray likely know more
2 details of that than you would?
3    A.    Yes. Yes. Tim participated in the meeting and
4 rate adjustments and --
5    Q.    And what did you call it, Section 30?
6    A.    Section 30 of the Labor Agreement.
7    Q.    Okay. Let me see if I can approach the
8 bargaining on the Effects Bargaining Package from a
9 different direction.
10        How long, in terms of hours or days, were there
11 meetings with IP to fashion what came out as the Effects
12 Bargaining Package?
13    A.    Over the two-day period -- and this is just an
14 estimate, maybe eight hours.
15    Q.    A total of eight hours?
16    A.    Yes. Over the two-day period there were
17 caucuses by the company and so forth.
18    Q.    Uh-huh. Now, you recall what the union talked
19 about as items, for example, that they did not want in the
20 agreement and items that they wanted different in the
21 agreement?
22    A.    We generally discussed the employer's proposal
23 in response to the general topics of discussion.
24    Q.    As I understand it, they did not have a paper