**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PACE Local Union 5-1067,     :
et. al.,                     :
                             :    Case No. C-1-02-301
        Plaintiffs,          :    (CONFIDENTIAL)
                             :
vs.                          :    Cincinnati, Ohio
                             :    December 18, 2002
INTERNATIONAL PAPER CO.,     :
                             :
        Defendant.           :

        Deposition of MARY RITA WEISSMAN, a

witness herein, taken as upon cross-examination by the

Defendant, and pursuant to the Federal Rules of

Civil Procedure, agreement of counsel, and stipulations

hereinafter set forth, at the offices of Robert I. Doggett,

Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

45202, on the 18th day of December, 2002, at 11:10 a.m.,

before Julie A. Patrick, a Notary Public for the State of

Ohio.

        TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

                95 S. FOURTH STREET
                BATAVIA, OHIO 45103
                (513) 732-1477

---

**Page 2**

APPEARANCES:

        On behalf of PACE Local 5-1967:
        ROBERT I. DOGGETT, ESQ.
        215 E. Ninth Street, 6th Floor
        Cincinnati, Ohio  45202

        On behalf of International Paper:
        VINCENT J. MIRAGLIA, Esq.
        W. CARTER YOUNGER, Esq.
        McGuire Woods, LLP
        One James Center
        901 East Cary Street
        Richmond, VA  23219-4030

        On behalf of Smart Paper:
        STANLEY F. LECHNER, ESQ.
        Morgan, Lewis & Bockius, LLP
        1111 Pennsylvania Avenue, NW
        Washington, DC  20004

        Also present:   Timothy D. Bray
                        Ron Schweitzer

        S T I P U L A T I O N S

        It is stipulated and agreed by and amongst

counsel for the respective parties that the deposition of

MARY RITA WEISSMAN, a witness herein, called as upon

cross-examination by the Defendant, may be taken at this

time and place pursuant to the Federal Rules of Civil

Procedure, agreement of counsel; that the deposition may be

recorded in stenotype by the Notary Public, Julie A.

Patrick, who is also the court reporter, and transcribed out

of the presence of the witness; and that signature of the

deponent was requested and shall be affixed outside the

presence of the Notary Public.

---

**Page 3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARY RITA WEISSMAN | | | | |
| by Mr. Younger: | | 5 | | 70 |
| by Mr. Doggett: | | 61 | | |

---

**Page 4**

| DEFENDANT'S WEISSMAN EXHIBITS | MARKED |
|---|---|
| 1: | 13 |
| 2: | 36 |
| 3: | 39 |
| 4: | 41 |
| 5: | 43 |
| 6: | 45 |
| 7: | 46 |
| 8: | 48 |
| 9: | 49 |
| 10: | 51 |
| 11-A - 11-K: | 54 |
| 12-A - 12-H: | 56 |
| 13-A - 13-E: | 56 |
| 14-A - 14-K: | 57 |

| PLAINTIFFS' EXHIBITS | |
|---|---|
| 15: | 64 |
| 16: | 68 |
| 17: | 69 |
| 18: | 70 |

5

1       MARY RITA WEISSMAN,

2 a witness herein, being of lawful age, after having been

3 duly cautioned and sworn, was examined and deposed as

4 follows:

CROSS-EXAMINATION

6 BY MR. YOUNGER:

7       Q.    Would you state your full name, please.

8       A.    Mary Rita Weissman, W-E-I-S-S-M-A-N.

9       Q.    Ms. Weissman, my name is Carter Younger, and

10 with me is Vincent Miraglia, and we represent International

11 Paper in the litigation involving PACE International Union

12 and some former employees that arises out of the Hamilton

13 Street sale. Are you aware of that?

14      A.    Yes.

15      Q.    Now, have you ever had your deposition taken

16 before?

17      A.    Many times.

18      Q.    So you know the drill and the procedure?

19      A.    I do.

20      Q.    But, if during the course of the time, you

21 would like to take a break or something, just let us know.

22 Ms. Weissman, at some point we sent a subpoena for some

23 documents, and then your counsel and we had a discussion

24 about the documents. Are you aware of that?

25      A.    I'm aware that you sent the request for

6

1 documents and that you had a conversation and that I was

2 told I didn't need to bring anything.

3       Q.    That's correct. And we have copies of some

4 documents, which I'm going to give a set to Mr. Doggett,

5 that we have obtained through Smart's counsel. And I'll

6 give you a set of all of the ones that we've been able to

7 collect so far. And I'll ask you some questions about those

8 later. And I believe these were documents that were

9 generated in the course of some work that you did for Smart?

10      A.    Correct.

11      Q.    Would you tell me what your occupation is,

12 ma'am?

13      A.    Management consultant.

14      Q.    And where do you work; where is your office?

15      A.    I work at The Weissman Group, 353 Regency,

16 R-E-G-E-N-C-Y, Ridge Drive, Dayton, Ohio, 45459.

17      Q.    Would you tell me a little bit about what The

18 Weissman Group does?

19      A.    Yes, we have three kinds of business. We do

20 labor relations, we do what we call human resources, which

21 is the category into which this particular work falls, and

22 we do organizational design and redesign. As part of human

23 resources, we act as the out source of the human resource

24 department for small to medium-sized companies, companies

25 that don't have their own human resource department on a

7

1 temporary basis, as was the case here, and also do special

2 projects for larger companies, including selection projects.

3       Q.    And how long has The Weissman Group been in

4 existence?

5       A.    It will be 23 years in February.

6       Q.    Have you been the owner of the group

7 throughout that time?

8       A.    My husband and I are in partnership. I joined

9 the firm on a full-time basis in 1989 after a career of 17

10 years with Mead Corporation. Off the record. I started

11 when I was 10.

12      Q.    I knew that. I actually didn't even have to

13 ask that. Let me go back in time a little bit and just ask

14 you to summarize your educational background, college, and

15 then up from there.

16      A.    An undergraduate degree from Loyola

17 University, a bachelor of science, and I have an MBA from

18 the University of Dayton. And I have some law school and

19 other graduate school course work.

20      Q.    Did you have a particular specialty at Loyola?

21      A.    Yes, pre-med. It prepared me well for this

22 work.

23      Q.    There's more than one Loyola, which --

24      A.    Chicago.

25      Q.    And the University of Dayton, what -- did you

8

1 have a specialty in the MBA?

2       A.    No, just general business.

3       Q.    After the University of -- and did you go

4 straight through school or did you work in between?

5       A.    I graduated from college, went to work, and

6 did my graduate work while working full-time.

7       Q.    And where did you go to work after college?

8       A.    I taught school for a little over two years,

9 and then I worked for the Mead Corporation.

10      Q.    And you worked for the Mead Corporation

11 throughout your career until you joined The Weissman Group

12 full-time?

13      A.    Correct.

14      Q.    Tell me, just summarize your history with the

15 Mead Corporation, what you did.

16      A.    I began as a labor relations associate having

17 responsibility for labor relations for multiple plants in

18 the container division. And also became a specialist in new

19 organizational start-ups, so I was involved in the start up

20 of paper mills, box plants, and other facilities with Mead.

21 I ended my career with the Mead Corporation as

22 vice-president of human resources and administration for

23 Mead Imagining, which was a high-tech division that was

24 developing and marketing a new technology.

25      Q.    And where was that located, your last

9

1 position?

2    A.    In Dayton.

3    Q.    It sounds like you had responsibilities over
4 operations in other locations, as well?

5    A.    For human resources, yes, absolutely, Atlanta;
6 Covington, Georgia; and, of course, I had facilities
7 throughout the United States when I was with the box plant.
8 As vice-president of human resources for the -- a paper
9 division, I had four mills in Michigan, the Atlanta area,
10 and also in Virginia.

11    Q.    During your time at Mead, did you -- in
12 addition to your MBA, did you take any other sorts of
13 classes, human resource type classes?

14    A.    Every place I was, I took courses, yes.  While
15 in Atlanta, I went to law school full-time in the evening,
16 and then I was transferred from there, and I started my
17 degree in psychology in Cincinnati, and then I was
18 transferred from there, and I went to a couple of MBA
19 programs at various places and finished my MBA in Dayton.

20    Q.    So you have both law training and psychology
21 training, as well as the MBA?

22    A.    I have credits towards my masters in
23 education, as well.

24    Q.    Have you ever done any work for International
25 Paper?

10

1    A.    No.

2    Q.    And I'm going to ask you about the Hamilton B
3 Street thing.  But, other than that, have you ever done any
4 work for Smart Papers or Smart Capital?

5    A.    No.

6    Q.    Or Sun Capital?

7    A.    No.

8    Q.    When did you first have any involvement with
9 the Hamilton B Street facility?

10    A.    I was contacted by -- the gentleman's name
11 I've forgotten now, who was familiar with me from a
12 acquisition project that I did in Deferiet, New York.  And
13 he contacted me and said that Sun Capital might be
14 interested in working with us on an acquisition they were
15 making.

16    Q.    And after that initial contact, just sort of
17 tell me the sequence of events.

18    A.    They -- I spoke with people at the law firm at
19 Sun Capital.  We then -- they then made a decision they did
20 not want to hire us as consultants, but wanted to retain me
21 and three of my employees as employees for this project and
22 that we would then be responsible to hire additional
23 personnel as temporary employees to do the work that they
24 needed to have done in order to staff the mill that they
25 were purchasing in Hamilton.

11

1    Q.    Do you remember when these contacts occurred?

2    A.    My recollection was that it was late 2000.

3    Q.    Sometime in the winter?

4    A.    (Affirmative head shake.)

5    Q.    And you said they were going to retain you.
6 Did they give you a title?

7    A.    Yes, director of human resources.

8    Q.    And did they send you an employment agreement
9 or anything of that type?

10    A.    Yes.

11    Q.    And did it have a limited duration?

12    A.    It was for one year, although they terminated
13 it before the end of that year.

14    Q.    It can be terminated within the year, under
15 some process?

16    A.    Right.

17    Q.    And do you remember when you actually became
18 the director of human resources?

19    A.    No, I don't.  It was shortly after that.  From
20 first contact until the retention, it probably wasn't more
21 than three months.

22    Q.    So sometime, probably, early 2001?

23    A.    (Affirmative head shake.)

24    Q.    And before the sale occurred, I take it?

25    A.    Yes, definitely.

12

1    Q.    What did you then do?  You were hired, you and
2 your -- three of your, I guess, existing employees?

3    A.    Right.

4    Q.    And what did you then do to implement this?

5    A.    We talked with the people at Smart.  We
6 developed a profile of characteristics that we would be
7 seeking data about to determine whether candidates would be
8 eligible for employment with Smart.  We developed all of the
9 associated instruments necessary to measure candidates
10 against those characteristics, and set up a process whereby
11 candidates would have the opportunity to complete the
12 various documents, we would be able to evaluate them,
13 scheduled candidates for interviews and drug tests, and did
14 all of the work necessary to have that happen.

15    Q.    Did International Paper have any input into
16 the process you set up, the documents that you chose to use?

17    A.    None whatsoever.

18    Q.    Now, once you had created sort of the
19 documents and the process, what did you then do to implement
20 that to actually hire people?

21    A.    International Paper indicated a willingness,
22 as part of their out-placement effort, to make those -- the
23 application packets available to employees and then to make
24 a process available whereby those packets could be collected
25 from employees willing to -- International employees willing

**13**

1 to apply and then deliver those packets to us.

2      Q.   Did you have any other communication with the
3 employees at International Paper who were prospective
4 applicants for Smart, other than just whatever this packet
5 was?  Was that it?

6      A.   That was it.

7      Q.   And I'm going to show you one of the
8 application sets in just a minute.  Was there anything in
9 addition to the application forms themselves, such as an
10 introduction for Smart, or this is, you know, what we're
11 doing, that type of thing?

12      A.   If so, it would have been in that packet.

13      Q.   And were there any presentations to employees
14 or things of that type?

15      A.   I didn't make any.

16      Q.   And you're not aware of anybody on behalf of
17 Smart making any?

18      A.   I'm not aware of that.

19      Q.   Let me show you one of the packets and see if
20 we can identify that.

21          MR. LECHNER:  Off the record.

22          MR. YOUNGER:  Let me ask the court reporter to
23 mark this exhibit, our first document, Weissman 1.

24          (Defendant's Exhibit Weissman 1 marked.)

25      Q.   Ms. Weissman, I had the court reporter hand

**14**

1 you a document marked as Weissman Exhibit 1.  I would like
2 you to tell me if you can identify that.

3      A.   Well, this is an application that has been
4 created by a candidate named Raymond Harper Arthur, that's
5 the first two pages.  The next page is an internal tracking
6 sheet that we used to ensure that every applicant file had
7 all of the documents that we needed to make a decision.  The
8 next page is the assessment sheet of the interview that we
9 conducted, how we scored it.  The next is a completed
10 reference check.  One of my -- one of the individuals who
11 worked for me completed this based on the information given
12 to them by this man's supervisor.  The next one is the notes
13 that my interviewer took of the interview that occurred.
14 The next one is another assessment sheet.  I don't know why
15 there are two of those, but, anyway, that's what it is.  The
16 pre-employment survey is a document that an applicant filled
17 out that we used as part of the data collection process.
18 The next is the authorization and release completed by this
19 applicant.  A consent to drug screen completed by the
20 applicant.  Investigative Consumer Report disclosure.  A
21 response, which is not part of the documents that I created.
22 And a notice of Investigative Consumer Report, which we gave
23 out to applicants so that they had a copy, as required under
24 the law.

25      Q.   Now, the one that you said was not something

**15**

1 that you created in this packet, it's called "Response"; is
2 that right?

3      A.   Yes.

4      Q.   And it has a number at the bottom SPP-00016?

5      A.   Right.

6      Q.   Have you ever seen that before, that document?

7      A.   No.

8      Q.   So you don't know who created that?

9      A.   No, I don't.

10      Q.   Do you know, what was the procedure by which
11 employees would communicate whether or not they accepted the
12 offer?

13      A.   I don't know.  At that point in the process,
14 Smart Paper had hired someone else as HR manager and that
15 person handled the offers themselves.

16      Q.   Do you remember who that was?

17      A.   I believe it was Annetta.

18      Q.   Now, other than the document that -- called
19 "Response" which you mentioned, the rest of these documents
20 are the ones that you created and used as part of your
21 hiring process?

22      A.   Yes, with the exception of the application,
23 which I created in cooperation with counsel.  It wasn't
24 solely mine.

25      Q.   Counsel for Smart?

**16**

1      A.   For Smart.

2      Q.   And, again, International Paper didn't have
3 anything to do with the creation of these?

4      A.   Absolutely nothing.

5      Q.   Are these -- were these documents, then, that
6 you created as Smart's human resources director?

7      A.   Yes.

8      Q.   And they were done in the ordinary course of
9 business for Smart?

10      A.   Yes.

11      Q.   Would you consider those business records of
12 Smart Paper?

13      A.   Yes.

14      Q.   And they were created and maintained under
15 your direction and control?

16      A.   Yes.

17      Q.   And they were relied on by you or Smart for
18 making decisions as to who to hire and not to hire; is that
19 correct?

20      A.   They were relied on -- the data that we
21 provided, and then they hired an operation's manager who
22 made the ultimate decision.

23      Q.   But these were made available for that
24 process, these documents?

25      A.   Yes.

17

```
 1       Q.   And were these documents used by you or
 2  somebody in your organization in making recommendations
 3  about who to hire?
 4       A.   Yes.
 5       Q.   Now, let's just kind of walk through the
 6  process by which this was done.  Other than the form that's
 7  called "Response" which you've mentioned, which of these
 8  documents were given in the packet to employees and which
 9  ones were retained as part of your organization's process?
10       A.   The application was in the packet.  The
11  tracking sheet was not.  The interview assessment sheet was
12  not.  The reference check was not.  The documentation score
13  sheet was not.  The pre-employment survey was in the packet,
14  as was the authorization release, the consent to drug
15  screening, and the Investigative Consumer Report disclosure
16  notice.  And the -- this little, small sheet was given to
17  the employee at the time of the interview.
18       Q.   The Fair Credit Reporting Act notice?
19       A.   (Affirmative head shake.)
20       Q.   Under the procedure, then, this packet was
21  handed out at International Paper, and, then, what were the
22  employees to do with the packet once they got it?
23       A.   As I understand it, they were to return it to
24  a box in the HR office, and then, that information, we put
25  into files that we used as an interviewee came in.
```

18

```
 1       Q.   And how were the interviews -- where were the
 2  interviews held?
 3       A.   The Hamiltonian Hotel.
 4       Q.   And when were they held?
 5       A.   I don't know.  I don't remember.
 6       Q.   Did you have some sort of a suite of rooms or
 7  something?
 8       A.   We had a very, very large, what I would call a
 9  ballroom, with tables set up, a dozen or so tables, and the
10  interviews were conducted there.  There was also a room for
11  the hair sample for the drug screen to be taken and then a
12  room in which we worked with our files and making sure that
13  we had all of the data that we needed organized to make
14  decisions.
15       Q.   And so, the procedure would be the employee
16  would come in -- was there a scheduled time for each
17  employee?
18       A.   Yes, the employee would come in, and we had
19  chairs set up outside of the ballroom, and as an
20  interview -- as an interviewer finished one interview, they
21  would go to the box of the scheduled interviews, pull the
22  file, and call the next interview.
23       Q.   How were the interviews scheduled, did the
24  employee call and schedule it?  How was that done?
25       A.   I believe someone in the HR department of
```

19

```
 1  I.P., as a part of their out-placement effort, made those
 2  schedules based on time slots we gave them.  We said, here's
 3  when we will need to interview people.  There were, you
 4  know, lines next to each time.  They filled in the name.
 5  Now, I don't know what the process itself was, because it
 6  was part of the out-placement effort.
 7       Q.   If there was a problem with somebody's
 8  schedule or something, could they be notified and you
 9  reschedule?
10       A.   They could call the Hamiltonian and
11  reschedule, yes.
12       Q.   And over what period of time were these
13  interviews conducted?
14       A.   A week.
15       Q.   So you had a whole week that you were at the
16  Hamiltonian?
17       A.   (Affirmative head shake.)
18       Q.   How far away from the mill is that?
19       A.   A mile.
20       Q.   It's not hard for an employee to come down
21  there and --
22       A.   No, not at all.
23       Q.   So the employee would -- so you would have
24  these scheduled interviews with the employee who would come
25  in at the designated time.  And as soon as you had a time
```

20

```
 1  available, one of your people would meet with the employee?
 2       A.   Right.
 3       Q.   Was there any system as to who would meet with
 4  the employee, or just whoever was available?
 5       A.   What we did was schedule -- however many
 6  interviewers we had, we scheduled that number of candidates
 7  for that particular time slot, and then those files would be
 8  placed at the front of the room and it didn't matter.  The
 9  only exception is, I did the -- I and another interviewer
10  did almost all of the management interviews.
11       Q.   In terms of the hourly Union work force, it
12  was, then, anybody was fair game for that?
13       A.   Right.
14       Q.   And so, when they would -- during the
15  interview, they would have already filled out the
16  application for the employment, which would include the
17  employment history?
18       A.   Correct.
19       Q.   And --
20       A.   The pre-employment survey.
21       Q.   Right.
22       A.   And all of the authorizations.
23       Q.   And did the interviewer, then, go over this to
24  make sure it was complete?
25       A.   Yeah, just -- that's what that tracking sheet
```

**21**

1 was intended, to remind the interviewer to make sure that we

2 had the application, FCRA notice, and drug screen

3 authorization.

4     Q.    And so, this one for Mr. Arthur, which is

5 Weissman Exhibit 1, would indicate that, on January 16th, he

6 came in with --

7     A.    Right.

8     Q.    -- with the application. Or the application

9 form was there and he was interviewed?

10     A.    Correct.

11     Q.    Now, was there any instruction or restriction

12 as to what the employee could fill out on this form? For

13 example, I'm looking at the second page of Weissman 1 and

14 it asks several questions. At the end, it says, "Any other

15 information you feel appropriate", was there any restriction

16 on what the employee could put down?

17     A.    No.

18     Q.    And then, on the other sheet they filled out,

19 the pre-employment survey, it had these three questions.

20 And that's page 00012.

21     A.    Uh-huh.

22     Q.    Any -- other than just the questions here, is

23 there any restrictions on what they could put down there?

24     A.    No.

25     Q.    What happened during the interview part?

**22**

1 There's an interview sheet, I think, here.

2     A.    Yes.

3     Q.    Could you tell me what was done there?

4     A.    Yes. We had developed specific past

5 performance related questions intended to solicit data from

6 the candidate about specific behavioral characteristics

7 that we were looking for. We asked candidates those

8 questions, or a sufficient number of them necessary to get

9 the data that we needed, and then we documented their

10 answers, made an assessment of how those answers qualified

11 the person, either as meeting the qualifications, not

12 meeting the qualifications, or exceeding the qualifications,

13 behavioral qualifications, and then we would make a

14 decision based upon -- the interviewer would make a decision

15 based upon the data that he collected or she collected as to

16 whether or not the candidate fit the position and was

17 interested in the position.

18     Q.    Okay. Well, I was just noticing on this --

19 Mr. Arthur's sheet, on the second page of his, it looks

20 like, interview form, which is page 00010, he gets a 1 on

21 "overall interest in and fit for the position", could you

22 explain that category?

23     A.    Well, my interviewer -- and I don't know if

24 you can note that she had rated him differently, I guess,

25 before she got some additional data and then changed her

**23**

1 rating to 1 because, clearly, this final question, "Hope

2 someone else has a job. What about the effect on his

3 retirement?", made her decide that, based upon the data she

4 had in the interview itself, that he did not meet the

5 characteristics that we were looking for.

6     Q.    So, in terms of "overall interest in and fit

7 for the position", he was not the kind of person you were

8 looking for?

9     A.    Yeah, that was her collective assessment of

10 the entire interview.

11     Q.    And that is reflected on the interview

12 assessment form, which is page 00011, where he gets a 1?

13     A.    Right.

14     Q.    All right. And so, this interview assessment

15 form, 00011, is sort of a compilation of the information

16 that comes off of the production/maintenance documentation

17 score sheet?

18     A.    That is correct.

19     Q.    And then, tell me about the -- there's a

20 document which, I think, is the reference check, which is

21 page 00007 through 08, I think. When was this done as part

22 of the process?

23     A.    The following week. This particular one was

24 done on the 26th. We met with the supervisor of this

25 candidate and asked questions, collected data, made

**24**

1 assessments about the individual's past performance from the

2 perspective of the supervisor.

3     Q.    And this reflects the supervisor's comments

4 with respect to Mr. Arthur?

5     A.    Correct, and our measurement of what those --

6 how those comments translated into our needs as Smart Paper.

7     Q.    At the very end of that document, there's a,

8 "Do you recommend candidate", and that says "yes".

9     A.    Correct.

10     Q.    And that would be the comment of the

11 supervisor; is that right?

12     A.    Yes, that is the comment of the supervisor.

13 If our consultant or employee disagreed with the

14 supervisor's assessment, it was his or her responsibility to

15 make their own assessment, and that was what was

16 determinative.

17     Q.    Right. It looks like a "G" here in this circle

18     A.    Green.

19     Q.    What does green mean?

20     A.    Green means this candidate exceeded

21 expectations -- was a candidate that we were going to

22 recommend.

23     Q.    And were there other color codes, as well?

24     A.    Yes, yellow meant, they met the expectations,

25 but we don't know for sure if -- essentially, what it means

**25**

1 is, they meet our expectations, but they don't have us
2 dancing on the table. So if we need a person, this is a
3 person that --

4  Q.  Potentially dips down into yellow.

5  A.  And then red means the person didn't meet
6 expectations.

7  MR. DOGGETT: I'm sorry, I've lost where the
8 color codes are.

9  MR. YOUNGER: She's just describing them. On
10 this document there's a "G" in a circle.

11  MR. DOGGETT: What page is that?

12  MR. YOUNGER: Page 00008.

13  MR. DOGGETT: Okay.

14  Q.  Now, the handwritten notes on this, are these
15 notes of your person, the interviewer?

16  A.  Yes.

17  MR. DOGGETT: The "G" at the bottom is green?

18  A.  Yes.

19  MR. DOGGETT: Okay.

20  Q.  And, again, these are notes made by your
21 interviewer --

22  A.  Correct.

23  Q.  -- based on talking to the supervisor?

24  A.  Correct.

25  Q.  And then, you mentioned earlier the hair

**26**

1 sample drug test process. What was that process?

2  A.  We -- every candidate, in order to be eligible
3 for hire at Smart Paper, had to have a negative result of a
4 drug screen. And so, we used the hair sample method of drug
5 screening. And we -- those individuals were arranged for by
6 Annetta. We got the results; we managed the process; but we
7 did not hire the people who actually physically took the
8 hair sample.

9  Q.  Okay. So -- but they were right there in the
10 Hamiltonian also?

11  A.  Right, in a room where they cut their hair.

12  Q.  Okay. Do you remember about how many people
13 did not pass the drug screen?

14  A.  No.

15  Q.  I think it was 50 some. Does that --

16  A.  No, no, no, it wasn't anywhere close to that.
17 I believe, among the hourly work force, it was something
18 under 10 percent, and I don't remember how big the hourly
19 work force was.

20  Q.  And then, there was a consumer report
21 disclosure notice form. Was there any additional consumer
22 report done on these people?

23  A.  No.

24  Q.  Just the interviews of the supervisors?

25  A.  (Affirmative head shake.)

**27**

1  Q.  All right. So, after gathering this
2 information, which would be the drug test and the other
3 data, what would the interviewer part of your human
4 resources group do?

5  A.  The interviewer's responsibility was for the
6 interview alone. Not always, but at a different time,
7 someone else did the reference check. In some cases, the
8 interviewer was the reference checker, but that was
9 happenstance. It wasn't scheduled that way. All of that
10 information was put into a file, which I, then, reviewed and
11 made a decision. And then, a panel of two other employees
12 and I from my firm reviewed every single file to finalize
13 our recommendation to Smart.

14  Q.  Did any employee of International Paper have
15 any input in that process?

16  A.  Absolutely not.

17  Q.  Now, look at the -- look back for just a
18 second at the document that has the number at the bottom
19 00006, which is the interview assessment document.

20  A.  Yes.

21  Q.  This has a note. I don't know whether you can
22 interpret it or not. It says, "Candidate is giving up job,
23 looking forward to retirement." Do you have any
24 understanding of what that means?

25  A.  Yes, this candidate did not want the job that

**28**

1 Smart was offering because he wanted to retire.

2  Q.  And then, if you'll look at the applicant
3 tracking sheet, which ends in 05, who filled in the other
4 information here, which would be the reference check and the
5 recommendation; who filled that in?

6  A.  Amy Sand is the interviewer who did the
7 reference check and made the recommendation. She was not
8 one of the three people that made the final determination,
9 but, obviously, we didn't change her recommendation.

10  Q.  Right, because she recommended green?

11  A.  Right, and we didn't change that.

12  Q.  Even though Mr. Arthur said he really didn't
13 want a job?

14  A.  The individual's desire to have a job or not
15 have a job was one factor among many that we considered in
16 making our final decisions.

17  Q.  Did you ever have any understanding or
18 agreement with anybody at International Paper that, if
19 somebody didn't want a job, they wouldn't get an offer?

20  A.  Absolutely not. I never had any conversation
21 with International Paper.

22  Q.  Nothing from Annetta Johnson?

23  A.  No.

24  Q.  And nobody at Smart Paper has told you that,
25 if somebody came in and didn't want a job offer, not to give

**29**

1 them an offer?

2    A.    No.  I was -- there wasn't a Smart Paper at

3 that time.

4    Q.    You were Smart Paper?

5    A.    (Affirmative head shake.)

6    Q.    Once you had made your -- you had gone through

7 the process, you've collected the documents, and you say you

8 sat down -- you and some other people sat down and -- were

9 you involved in each decision on these people?

10    A.    Absolutely, every decision.

11    Q.    So you, personally, made recommendations to

12 Smart or to somebody for each applicant?

13    A.    Yes, I reviewed every decision made by any

14 individual, and then I ran those decisions by this group of

15 three people to ensure consistency across all applicants, so

16 that the individual interviewer -- of course, they collected

17 the data and made the recommendation, but we wanted to make

18 sure that, whatever the characteristics were, whatever we

19 were marking, it was consistent across all applicants.

20    Q.    International Paper had no involvement in that

21 process, did they?

22    A.    No.

23    Q.    Now, when you finished that process, where you

24 decided green, yellow, red, did you then submit that to

25 someone?

**30**

1    A.    Yes, Dan Maheu.

2    Q.    And what position did Mr. Maheu have at the

3 time that you submitted that to him?

4    A.    He had been hired by Smart as the operations

5 manager or general manager, I'm not sure which.  But he was

6 the gentleman in charge of the mill hired by Smart.

7    Q.    And in what form did you communicate to him

8 the recommendation about green, yellow, and red?

9    A.    We had a chart that we gave him, plus he came

10 to our offices and we explained each candidate to him

11 because he had some knowledge of some of these candidates.

12 And I imagine the ones that he specifically asked us about,

13 he may have had some questions about why we recommended them

14 that may have been different than how he thought it might

15 have turned out.

16    Q.    So you had a discussion with him, and then he

17 -- did he make the final decision?

18    A.    Yes.

19    Q.    With input and discussion with you and your

20 group?

21    A.    Yes.

22    Q.    Did he disagree with you on some?

23    A.    I wouldn't characterize it as disagree.  He

24 had some questions about a number of them.

25    Q.    And then, at the end, he made the decision?

**31**

1    A.    Yes.

2    Q.    To your knowledge, did International Paper

3 have any involvement with that process?

4    A.    No.

5    Q.    Now then, after you had that session with

6 Mr. Maheu and he was making the final decision, what

7 happened next in the process?

8    A.    He asked me to have the offer letters and

9 rejection letters prepared by my administrative staff and

10 delivered to Smart after the close of the sale in the wee

11 hours of the night.

12    Q.    And do you remember the date on that?  I think

13 the sale closed on the 9th of February or something like

14 that.

15    A.    Yeah, it was at 11:00 that evening, and at

16 various shift ending times throughout the subsequent 24

17 hours.

18    Q.    So 11:00 p.m. on the evening of the sale's

19 closing?

20    A.    Yes.

21    Q.    And then, what was the process by which these

22 offer letters were actually put in the hands of employees?

23    A.    We delivered them -- the boxes of letters, as

24 the employees were scheduled to the Hamiltonian, and then we

25 left.  But my understanding is, they were delivered to the

**32**

1 employees and contained either an offer letter or something

2 else.

3    Q.    And after you left, did you have any other

4 input into the hiring process?

5    A.    No.

6    Q.    Did that end your role as human resources

7 director?

8    A.    Yes.

9    Q.    And did someone pick that role up from you, to

10 your knowledge?

11    A.    It's my understanding that it was Annetta.

12    Q.    And was she a Smart Paper employee at that

13 point?

14    A.    Yes.

15    Q.    That's Annetta Johnson?

16    A.    Yes.

17    Q.    And until that point when Annetta Johnson took

18 over as human resources director and you stopped being human

19 resources director, other than that, had Annetta Johnson had

20 any role in the process, other than to hand out the

21 application packet?

22    A.    And collect them.

23    Q.    And collect them?

24    A.    She did respond to specific information

25 requests that we made for data about a individual's

33

1 disciplinary history and attendance history.

2          Q.    Would that be reflected on these documents or

3 just if you had some questions?

4          A.    Just if we had questions.

5          Q.    In providing that information, did she make

6 any recommendation about the hiring or not hiring?

7          A.    No.  No.

8          Q.    At some point during this process, did you

9 have occasion to talk with Mr. Tim Bray, who was a Union

10 official?

11         A.    Yes.

12         Q.    Do you remember what Mr. Bray's position was?

13         A.    I mean, he was being interviewed for a

14 position with Smart Papers.  And I believe I was the

15 interviewer in that case.

16         Q.    And I believe he was given an offer and was

17 hired; is that correct?

18         A.    Yes.

19         Q.    That's your recollection?

20         A.    Well, my recollection is that we recommended

21 that he be given an offer.

22         Q.    And after that, you were gone?

23         A.    Yeah.  And did prepare an offer letter.

24         Q.    Do you recall getting any sort of a cell phone

25 call from Mr. Bray at some point?

34

1          A.    Yes.

2          Q.    Do you remember when that happened?

3          A.    It was after the interviews were completed and

4 while we were in the process of getting reference check data

5 from the supervisors, so it was sometime in the week

6 following the -- I believe it was the 19th was the first day

7 of interviews, so it was sometime the week of the 26th.  I

8 may have my dates wrong, but wherever those dates occur, it

9 was that week.

10         Q.    After the interviews were completed?

11         A.    Yes.

12         Q.    What do you remember about that telephone

13 call; what was said?

14         A.    The only thing I recall is that he was asking

15 about, if people didn't want to go to work for Smart Paper,

16 would I be interested in knowing that.  And my response was

17 that, you know, normally that would come out in the

18 interview, but if people wanted to make absolutely certain

19 we had that information, they should tell us.

20         Q.    And that's information such as Mr. Arthur put

21 on this Weissman 1?

22         A.    Uh-huh.

23         Q.    Now, on Weissman 1, although Mr. Arthur

24 communicated his desire not to have a job, he ended up

25 getting an offer letter anyway; is that correct?

35

1          A.    He ended up being recommended.

2          Q.    Right, recommended.  Was there any agreement

3 or understanding on your part that, if somebody did not want

4 a job offer, they wouldn't get one?

5          A.    Absolutely not.

6          Q.    Now, Mr. Arthur, obviously, communicated that

7 he didn't want a job offer.  Were there other employees, to

8 your knowledge, who communicated that?

9          A.    Sure.

10         Q.    And would you communicate that on the

11 application form, if you wanted to, where it says "any other

12 information, feel appropriate"?

13         A.    Sure.

14         Q.    Could you communicate that during the

15 interview?

16         A.    Absolutely.  We had a question at the end

17 that said, is there anything else that we haven't asked you

18 but you think it's important for us to know as we are making

19 a decision about your employment with Smart?  It was the

20 final question of every interview.  Many people, in response

21 to that, said, I don't want to work for you guys.

22         Q.    And could you -- I guess they could put it on

23 the pre-employment survey, as well?

24         A.    Certainly.

25         Q.    Let me see the application.

36

1          (Off-the-record discussion.)

2          Q.    I'm going to, it may take a few minutes, but I

3 would just like to introduce some applications that I think

4 may bear on the questions I just asked you about ways that

5 individuals, if they wanted to communicate a lack of

6 interest in an offer, could do so.  And I may ask you

7 questions about them and see if that is what you had in

8 mind.  The first document is a document dealing with Herbert

9 Marcum and a set of materials.

10         MR. YOUNGER:    I would ask that that be marked.

11         (Defendant's Weissman Exhibit 2 marked.)

12         Q.    Now, if you look through this document, at

13 page 00874, on the Applicant Tracking Sheet, there's a

14 statement, "Called, said he is not interested in a job

15 offer"?

16         A.    Yes.

17         Q.    And then, it looks like there's also a

18 reference under reference check just above that says, "Does

19 not want a job".  Do you know who made those notations?

20         A.    Well, let's see.

21         MR. DOGGETT:    Who did she say?

22         MR. YOUNGER:    She hasn't answered.  She's

23 looking at it.

24         A.    Yeah, that was one of our interviewers,

25 Roberta Griffin made that note, and it looks like her

---

**37**

1 handwriting that made the note in the tracking sheet as

2 well.

3          Q.     And then, on the document that ends with the

4 digits 883, which is part of an interview form, the second

5 page, it says, "Do you recommend candidate?"  And it says,

6 "Doesn't want a job"; do you see that?

7          A.     "Doesn't want a job", yes.

8          Q.     And then it says GR, so that would be green?

9          A.     Green, above average.

10          Q.     So there was a supervisor, I guess,

11 communicating that this individual, to his knowledge, did

12 not want a job?

13          A.     Right.

14          Q.     But yet the interviewer, at that point, rated

15 the person green anyway?

16          A.     Correct.  Rated the reference green.

17          Q.     So it was a good reference, although

18 communicating the employee does not want a job?

19          A.     Right.

20          Q.     Now, looking back at the applicant tracking

21 sheet, the employee is marked red, do you see that, under

22 "Recommendation"?  And that's the mark of the person who's

23 filling out this sheet?

24          A.     Correct.

25          Q.     Was there any understanding or agreement that

---

**38**

1 Mr. Marcum, because he said he didn't want a job,

2 wouldn't get an offer?

3          A.     No.

4          Q.     So red is simply the recommendation of this

5 person filling out the sheet?

6          A.     Correct.

7          Q.     So that's not binding on you and your team

8 that reviewed the --

9          A.     No.

10          Q.     And on Mr. Arthur, he said he didn't want a

11 job and he was green, and this gentleman says he didn't want

12 a job and he was red, or at least by the person that filled

13 this out?

14          A.     Right.

15          Q.     Was either one of those binding on you and

16 your team in any way?

17          A.     Obviously, these were people who worked for us

18 who collected data and made a determination.  Ultimately,

19 the decision was made by myself and these two other

20 consultants helping me for consistency purposes.

21          Q.     Right.  But the fact that Mr. Marcum didn't

22 want a job, as you said earlier, was just a factor as part

23 of your --

24          A.     One of many.

25          Q.     I'll give you one for Mr. Pelsor, which is

---

**39**

1 00795 is the first page, and ask that that be marked

2 Weissman 3.

3          (Defendant's Exhibit Weissman 3 marked.)

4          Q.     Now, Mr. Pelsor's document page 00799, which

5 was the Applicant Tracking Sheet, he's rated, it looks like,

6 yellow -- it looks like both yellow and red?

7          A.     He was rated green on the interview, yellow on

8 the reference check.  The candidate -- I mean, the

9 interviewer -- or the reviewer of the data rated him yellow.

10 This is my writing that made him a red.  And one of the

11 factors was attendance, reference check, and the other was

12 -- and DNWO means "does not want offer".

13          Q.     Now, there's a little note, if you look at

14 the interview form at page 00806, "Overall Interest",

15 there's something that says "Candidate on phone 2/5/01 said

16 I do not want" something?

17          A.     "Job offer."  "I do not want job offer."  That'

18 my handwriting.

19          Q.     Do you know how you came to get that

20 information?

21          A.     He either called me at the Hamiltonian or on

22 my cell phone.

23          Q.     Now, was the Hamiltonian phone number

24 available to people if they wanted to call there?

25          A.     In the Yellow Pages.

---

**40**

1          Q.     How about your cell phone, do you know, was

2 that --

3          A.     ~~~~~~~~~~~~~ got my cell phone

4 number.  I cer~~~~~~~~~~ give it to them.

5          Q.     And did you give your cell phone number to

6 anybody at International Paper and say, if you want people

7 to call me, call this number, or anything like that?

8          ~~~~~~~~~~~~~

9          Q.     So it's not a number that you gave to somebody

10 at International Paper for the purpose of giving to

11 employees to call you on your cell phone?

12          A.     Absolutely not.  Why -- no.  I have to pay

13 when somebody calls me on my cell phone.  I certainly had no

14 intention of people calling me on my cell phone, but several

15 people did.

16          Q.     But you don't know how they got your number?

17          A.     I have no clue.

18          Q.     You then rated Mr. Pelsor a red.  Was that

19 pursuant to any agreement that you had with somebody that

20 you would not give an offer?

21          A.     No.

22          Q.     That was just your analysis of Mr. Pelsor?

23          A.     The whole thing.

24          Q.     Let's do Mr. Ronald D. Smith.  And his Bates

25 number starts 00825.

---

41

1  (Defendant's Weissman Exhibit 4 marked.

2       Q.   You've been handed what's marked as Weissman

3  Number 4.

4            MR. DOGGETT:  I apologize for interrupting.

5  My copy on Pelsor SPP-00, I guess it's 806, the numbers --

6  yeah, down at the bottom, the printing is not -- didn't come

7  through on my copy.  "I do not want" something.

8       A.   "I do not want job offer."

9            MR. DOGGETT:  Job offer?

10           MR. YOUNGER:  Yeah, our copy is the same as

11  yours.

12           MR. DOGGETT:  But the missing words are, "I do

13  not want job offer"?

14           MR. YOUNGER:  Right.

15           MR. LECHNER:  This is a document that was

16  produced pursuant to a subpoena.  We can go back and find

17  the original and substitute it.

18           MR. DOGGETT:  That's okay.  If she remembers

19  that the missing words were "job offer", that's fine.

20      Q.   If you look at Weissman Number 4, on the first

21  page where it says "Employment Interests", this gentleman

22  says -- Mr. Ronald Smith says, "By getting a buy-out

23  package", that's how he can contribute to the company's

24  success.  And when it says "What are you looking for in a

25  position?"  It says, "For the door that leads to the parking

42

1  lot", exclamation point.  Do you have any interpretation of

2  what that means?

3            MR. DOGGETT:  I'm sorry, where were you

4  reading from?

5            MR. YOUNGER:  Page 00825.

6       A.   My interpretation was that the comments by

7  this gentleman were completely consistent with every other

8  piece of data that we collected on him.

9            MR. DOGGETT:  Who are we on now?

10           MR. YOUNGER:  Ronald D. Smith, Weissman

11  Exhibit Number 4, Bates 00825.

12      Q.   I guess you interpret Employment Interests to

13  be that he was not interested in working for Smart, would

14  that be correct?

15      A.   Yes.

16      Q.   And then, the second page of that document,

17  page two, where it says "Any other information you feel

18  appropriate", it says, quote, "I don't want to work for

19  Smart Papers, but, you require this app. to receive my

20  buy-out", exclamation point.  Is my reading of that correct?

21      A.   Yes.

22      Q.   Did that communicate anything to you?

23      A.   I didn't know what -- I mean, clearly the guy

24  didn't want to work there.  Clearly we didn't want him to

25  work there, so what he meant by that was really immaterial.

43

1  You see the page up here, it's an Applicant Ranking Sheet,

2  Mr. Smith gets Rs or red, I take it?

3       A.   Yes.  All candidates should be so easy to

4  decide upon.

5       Q.   And did this have anything to do with any

6  agreement with International Paper that Mr. Smith wouldn't

7  get an offer?

8       A.   Absolutely not.

9       Q.   Based totally on his own personal situation, I

10  take it?

11      A.   Yes.

12      Q.   I also note that, on page 00830, he gets a 1

13  for Overall Interest.

14      A.   Yeah.

15      Q.   It looks like somebody crossed out a 3 and put

16  a 1.  Do you know --

17      A.   Yeah, it was this interviewer, NB -- I don't

18  know what that stand for.  "Wants a buy-out."  The

19  interviewer obviously said that on Overall Interest in the

20  Position, because of what she heard from the candidate about

21  that matter, she scored him a 1, even though his

22  characteristics in the interview were "met expectations".

23      Q.   Look at Mr. Michael Mueller.

24           (Defendant's Weissman Exhibit 5 marked.

25      Q.   Weissman 5, which starts with Bates number

44

1  00810.  And Mr. Mueller, at page 00814, is rated red and

2  there are initials MRW.

3       A.   Right, that's mine.

4       Q.   Your initials.  And it says, "Does not want

5  offer.  Poor"--

6       A.   -- "performance.  Adversarial problem solving

7  approach".

8       Q.   And you rated him a 1 on the interview

9  assessment sheet, it looks like, under overall interest?.

10      A.   Right.

11      Q.   What did you base your conclusions on in this

12  document?

13      A.   Well, the interview --

14      Q.   Yeah, look at page 00821 maybe.

15      A.   The interview itself went reasonably well, and

16  the interviewer, based upon his declaration of not wanting

17  an offer, scored him a 1.  His pre-employment survey

18  revealed an individual who was a not-my-fault kind of guy,

19  which is one of the characteristics we wanted to avoid in

20  our new work force.  His adversarial approach of, here's

21  what I want, more money and benefits, all of the managers

22  terminated and all human resources people terminated, again,

23  revealed a candidate who, you know, it's everybody else's

24  fault.  I'm a good guy, everybody else is a bad guy.  Or

25  people who don't do what I do are bad guys.  And that was

**45**

1 consistent with what his supervisor said as well. "Low
2 production. Always against company. Sees the company and
3 management as the enemy. Always puts the company down.
4 Safety issues." Everything was consistent throughout his
5 process, and so we didn't recommend him.
6     Q.   And, I tell you, it looks like, on page 00821,
7 he specifically asked that you note he didn't want a job
8 offer.
9     A.   Yes, he did.
10     Q.   And that was during the interview itself?
11     A.   Yes.
12     Q.   All right.  Let me ask you to mark the packet
13 for Donald Richards.
14          (Defendant's Weissman Exhibit 6 marked.)
15     Q.   All right.  You've been handed Weissman Number
16 6, which starts with Bates Number 00840, which is -- this is
17 the package for Donald Richards; is that correct?
18     A.   Uh-huh.
19     Q.   Now, Mr. Richards' Applicant Tracking Sheet,
20 00844, shows that he's rated red in the interview and red on
21 recommendation.  And it says, "Candidate does not want
22 position"; do you see that?
23     A.   Right.
24     Q.   And he's also rated a 1 for "Overall Interest
25 and Fit for the Position"?

**46**

1     A.   Right.
2     Q.   And I notice on the page 00851, the interview
3 sheet, he's rated a 1.  It says, "Retiring in 13 months.
4 Not interested in position."  Is that something that came
5 out in the interview?
6     A.   Yes.
7     Q.   So he was not recommended for an offer; is
8 that right?
9     A.   That is correct.
10     Q.   All right.  Again, International Paper didn't
11 have anything to do with that?
12     A.   No.
13     Q.   And let's talk about Mr. Merrill, is it
14 S-O-V-R-E-L-L?
15          MR. DOGGETT:  -- R-R-E-L-L.
16     A.   Sorrell.
17     Q.   S-O-R-R-E-L-L.
18     A.   I remember.
19     Q.   You remember these names pretty well.
20          MR. YOUNGER:  Mark that.
21          (Defendant's Weissman Exhibit 7 marked.)
22          MR. LECHNER:  I think we don't have that one.
23          MR. YOUNGER:  You don't have it?
24          MR. MIRAGLIA:  I'm sorry.
25          MR. YOUNGER:  Have you got it?

**47**

1     Q.   This starts with 00855 and it's been marked as
2 Weissman Number 7.  Do you recognize that packet for
3 Mr. Sorrell?
4     A.   Yeah.
5     Q.   I notice on the Applicant Tracking Sheet,
6 00859, it looks like your initials?
7     A.   Right.
8     Q.   And then there's a notation, "Candidate called
9 the selection center and indicated that he did not want an
10 offer."  Can you explain that notation?
11     A.   I can't say with absolute certainty, but I
12 believe he called the Hamiltonian and said he didn't want an
13 offer.
14     Q.   So that would be -- because it says "selection
15 center", that selection center was what was going on at the
16 Hamiltonian?
17     A.   Yeah.
18     Q.   As opposed to calling your cell phone or some
19 other number, it was the general --
20     A.   Right.
21     Q.   And, again, was there any understanding or
22 agreement with International Paper that Mr. Sorrell wouldn't
23 get a job offer if he wanted one?
24     A.   No.  I think there seems to be some confusion.
25 I didn't have anything to do with I.P.  I was only Smart.

**48**

1     Q.   Well, the confusion is understandable, but we
2 have to make this clear.  The confusion is in the case
3 itself.
4     A.   Okay.
5     Q.   We're also confused.  Let's talk about
6 Mr. William Haynes, H-A-Y-N-E-S.
7          (Defendant's Weissman Exhibit 8 marked.)
8     Q.   You've been handed what's been marked as
9 Weissman Number 8, which begins with the Bates numbers
10 00765.  It's the packet for William Haynes; is that correct?
11     A.   Uh-huh.
12     Q.   Mr. Haynes, on the Applicant Tracking Sheet,
13 has a notation -- has indicated that he doesn't want a job
14 offer.  That's Bates number 00769.  Is that correct?
15     A.   Yes.
16     Q.   And if you look on the interview form at Bates
17 00776, at the Overall Interest and Fit for the Position, is
18 that where he communicated his lack of interest?
19     A.   Yes.
20     Q.   It's when he says, "The candidate is going
21 through the process in order to qualify for severance."  And
22 then, quote, "I'd rather have severance", end quote, and
23 those are the notes of the interviewer?"
24     A.   Right.
25     Q.   And then there's a notation on the interview

49

1  -- excuse me, on the reference check form at page 00778 --

2      A.  Right.

3      Q.  -- where it says, "Do you recommend this

4 candidate?"  And it says, "Has told Tom he doesn't want a

5 job."  Do you see that?

6      A.  Right.

7      Q.  That's the --

8      A.  Right.

9      Q.  -- interview of the supervisor?

10     A.  Right.

11     Q.  And, again, the decision to rate him a red was

12 made by Smart and not International Paper?

13     A.  Right.  Correct.

14     Q.  And I'm going to hand you one for Boyd J.

15 Cheek.  This will be Weissman Number 9.

16         (Defendant's Weissman Exhibit 9 marked.)

17     Q.  You've been handed Weissman Number 9, which

18 starts with Bates number 00780.  Can you identify this

19 package?

20     A.  Yes.

21     Q.  This is for Mr. Boyd Cheek?

22     A.  Right.

23     Q.  I notice on the first page where it says, "How

24 can you contribute to our company's success?"  He says, "Not

25 a thing."

50

1      A.  Yeah, I noticed that, too.

2      Q.  You noticed it initially, huh?  Okay.  And

3 I also note on the performance -- excuse me -- on the

4 interview sheet at Bates 00791, under Interest and Fit for

5 the Position --

6      A.  Right.

7      Q.  It says, "Not interested in the position."

8 Again, this reflects his statement to the interviewer; is

9 that correct?

10     A.  Correct.

11     Q.  And then, on the interview with the supervisor

12 reference check, it says, "Do you recommend this candidate?"

13 It says, "Would not offer him position"?

14     A.  Right.

15     Q.  And what was Smart Papers' decision with

16 respect to Mr. Cheek?

17     A.  We decided that we would give him his wish.

18     Q.  And not give him an offer?

19     A.  Not give him an offer.

20     Q.  And that was, again, Smart's decision?

21     A.  Yes.

22     Q.  International Paper didn't have anything --

23     A.  No.  It was really Smart's decision based upon

24 Mr. Cheek's data, nothing else.

25     Q.  I'm going to show you one for Donald

51

1 L. Whitaker, which begins with Bates 01393.

2         (Defendant's Weissman Exhibit 10 marked.)

3      Q.  You've been handed Exhibit Weissman Number 10.

4 It starts with 01393 for Donald Whitaker.  Can you identify

5 this packet?

6      A.  Yes.

7      Q.  Now, if you'll look at the interview sheet

8 with the supervisor, the reference sheet at page 01402 where

9 it says, "Do you recommend this candidate?"  It says, "Has

10 made comments that he doesn't want job offer"?

11     A.  Job offer.

12     Q.  And it looks like he got a Y or a yellow

13 rating; is that right?

14     A.  Yes.

15     Q.  And then, on the assessment -- excuse me --

16 the Applicant Tracking Sheet --

17     A.  Yes.

18     Q.  He gets a yellow rating?

19     A.  Yes.

20     Q.  And then, there's a notation "Offered

21 position".  So he would be a yellow that was a caution,

22 but --

23     A.  Other position.

24     Q.  What does that mean?

25     A.  That meant that we would not recommend him for

52

1 the position that he was in, but that we would recommend him

2 for another position.

3      Q.  So, even though it was reported he didn't want

4 a job, he still made it to yellow for another position?

5      A.  Right.

6      Q.  And then, there's a document in the response

7 here, again, I notice -- that's a document that occurred

8 after you --

9      A.  Right.

10     Q.  -- had left, but I notice there was an

11 acceptance of the offer --

12     A.  Right.

13     Q.  -- document?  01407.

14         MR. LECHNER:  Off the record.

15         (An off-the-record discussion.)

16         MR. YOUNGER:  Let's go back on.  We don't have

17 much more.

18     Q.  Yeah, you had talked earlier about some of

19 your people, you had a team of people who are already with

20 your consulting firm, and then did you add some more people,

21 temporaries or something?

22     A.  No, we have individuals who work for our

23 consulting firm on a part-time, regular basis.  So they come

24 in and out as we have projects like this.

25     Q.  Did any of the people who worked for you in

**53**

1 this process work for International Paper?

2 · A. Not in the last 10 years. We just go back 10

3 years when we're checking.

4 · Q. So you have no knowledge if any of them worked

before, but you know they didn't work in 10 years?

6 A. Yes.

7 Q. To your knowledge, did any of them work for

8 International Paper after this?

9 A. No.

10 Q. Now, let me see the documents. I'm going to

11 offer in as a group a series of packets. I've already

12 mentioned Mr. Arthur, who's already in evidence, and then

13 I'm going to offer the packets of John M. Barger, Sr.; Dale

14 F. Brashear, B-R-A-S-H-E-A-R; Susan D. Chupka, C-H-U-P-K-A;

15 George C. Embry, E-M-B-R-Y; Floyd Allen Geeding,

16 G-E-E-D-I-N-G; Alfred D. Holland; Harold G. Jamison,

17 J-A-M-I-S-O-N; Charles E. Lehman, L-E-H-M-A-N, Jr.; Roland

18 G. Sharp, S-H-A-R-P; Rodney H. Taylor, T-A-Y-L-O-R; and

19 Lawrence W. Wahl, W-A-H-L.

20          MR. DOGGETT: Off the record a moment.

21          (Off-the-record discussion.)

22          Q. I'm going to offer this packet as Exhibit 11,

23 and we will designate the individual packets within this

24 group as A, B, C, et cetera, under Exhibit 11, and just ask

25 the witness if she can identify these all as documents that

**54**

1 were generated by your -- by Smart Papers, with you as human

2 resources director, in the ordinary course of business as

3 part of the hiring process, that these records were

4 maintained under your supervision and control, and that

5 these were relied upon by your group in making the selection

6 or the offer decisions or recommendations for Smart?

7          MR. LECHNER: Off the record.

8          (Off-the-record discussion.)

9          A. In each case, with the exception of the

10 acceptance or declination of offer, all of the documents in

11 here were gathered by us in the process of making a decision

12 about who we would be hiring and not hiring or recommending

13 and not recommending.

14          Q. And your employees, as part of your process,

15 were expected to rely on the information contained in these

16 documents and in making your offer recommendations to Smart;

17 is that correct?

18          A. That is correct.

19          Q. And your interviewers were expected to

20 accurately note down the comments in the interviews -- or

21 information gathered in the process; is that correct?

22          A. Yes, for the specific purpose so that they

23 could justify to me why they rated a person one way or

24 another.

25          (Defendant's Weissman Exhibits 11-A through

**55**

1 11-K marked.)

2          Q. I'm going to read these into the record to

3 make sure we're all on the same page. Exhibit 11-A is John

4 Barger, 11-B is Dale Brashear, 11-C is Susan Chupka, 11-D is

5 George Embry, 11-E is Floyd Geeding, 11-F is Alfred Holland,

6 11-G is Harold Jamison, 11-H is Charles Lehman, 11-I is

7 Roland Sharp, 11-J is Rodney Taylor --

8          MR. LECHNER: Hold on a second.

9          Q. And 11-K is Lawrence Wahl, W-A-H-L. And I'm

10 going to propose that we -- well, we'll mark these as 12, I

11 guess. I've got a another series of applications and it's

12 going to be Exhibit 12, and I'll use the alphabetical

13 sequence for the names. And they are the packets for Govan

14 Begley, B-E-G-L-E-Y; Gary Glancy, G-L-A-N-C-Y; Jeffrey G.

15 Johnson, J-O-H-N-S-O-N; Douglas Howard --

16          MR. DOGGETT: Okay. Wait a minute now. I'm

17 sorry, you've got Glancy and then Johnson and then Howard?

18          MR. YOUNGER: Yep.

19          Q. And then Brian McQueen; and then, Richard

20 Riley; and Michael Yauger, Y-A-U-G-E-R; and then Douglas

21 Young, Y-O-U-N-G. And I'll ask Ms. Weissman the same

22 questions. Are these documents that were prepared by the

23 human resources department of Smart under your direction and

24 control and were they made and kept in the ordinary course

25 of business and were they were relied upon by the Smart

**56**

1 human resources department in making its recommendations

2 with respect to the offer of positions with Smart? And take

3 it down to -- except for the -- now, I understand that you

4 cannot identify the response document as one that was

5 created while you were still there.

6          MR. MIRAGLIA: Can we go off the record for a

7 minute?

8          (Off-the-record discussion.)

9          A. Yes, those are all the documents that we used

10 in the application selection process for Smart Papers,

11 prepared by us and used by us in the decision making.

12          Q. If you would go ahead and mark those.

13          (Defendant's Weissman Exhibits 12-A through

14 12-H marked.)

15          Q. I'm going to go through these again and make

16 sure we're all on the same page. The documents that have

17 been introduced as Weissman 12 are Weissman 12-A, which is

18 for Govan Begley, 12-B is Gary Glancy, 12-C is Jeffrey

19 Johnson, 12-D is Douglas Howard, 12-E is Brian McQueen,

20 12-F is Richard Riley, 12-G is Michael Yauger, 12-H is

21 Douglas Young.

22          MR. YOUNGER: I think, maybe, to go quicker,

23 let's go ahead and get you to mark them first.

24          (Defendant's Weissman Exhibits 13-A through

25 13-E marked.)

57

```
1       A.   Just so that you know, these are in a very
2  strange order, this stack.  The second page of the
3  application is the last page of the --
4            MR. MIRAGLIA:   They were folded over and
5  that's why.  So sometimes they're copied one way and
   sometimes another.
7       A.   Okay.
8       Q.   Take a look and then I'll ask you a question.
9  All right.  Ms. Weissman, I ask you to look at and identify
10 the following exhibits; Weissman 13-A, which is the
11 application packet for Luther Barrett, B-A-R-R-E-T-T;
12 13-B, Thomas Dale Bennett, B-E-N-N-E-T-T; 13-C, Charles
13 Campbell, C-A-M-P-B-E-L-L; 13-D, Linda Marsee, M-A-R-S-E-E;
14 13-E, Jimmy L. Taylor.  And, again, are these packets of
15 documents that were generated by Smart Papers' human
16 resources department in the ordinary course of business and
17 maintained and created under your control and used and
18 relied on for the purpose of making recommendations for
19 hiring by Smart Papers at the Hamilton mill?
20      A.   Yes.
21      Q.   Again, except for the response sheet.  One
22 last set of these.  And have these marked.
23           (Defendant's Weissman Exhibits 14-A through
24 14-K marked.)
25      Q.   Ms. Weissman, I have handed you a stack of
```

59

```
1  that protective order.
2            MR. LECHNER:   I would just like to say that
3  counsel for PACE so indicated that these documents were
4  subject to a protective order in a letter that was sent to
5  me within the last few days.  And International Paper also
6  indicated that these documents are subject to a protective
7  order in a letter received in the last few days.
8            MR. YOUNGER:   Right.
9       Q.   Let me ask a couple of other questions and
10 then I'll take a break for just a minute.  Now, just to be
11 clear about the process.  After you had met with Mr. Maheu
12 and you made recommendations, you then sort of left as human
13 resources director.  And Annetta Johnson, who by that time
14 was an employee of Smart Papers, took over that; is that
15 correct?
16      A.   Correct.
17      Q.   Did you have anything to do with the
18 transmittal of information to International Paper as to
19 which employees had actually received offers?
20      A.   No.
21      Q.   And did you have anything to do with any
22 recommendation or determination as to which employees would
23 or would not be eligible for severance pay by International
24 Paper?
25      A.   Absolutely not.
```

58

```
1  packets identified as Weissman 14.  Weissman 14-A is the
2  packet for Gary Buchanan; 14-B for Jerry Flick; 14-C, Sonja
3  Greene; 14-D James Johns; 14-E Donald P. Johnson; 14-F,
4  Maurice Kollstedt, K-O-L-L-S-T-E-D-T; 14-G, Jessiet (sic)
5  Lane, L-A-N-E; 14-H, Garrett Richard; 14-I, William Rumpler;
6  14-J, Carl Webb; 14-K, Eugene Weisbrod, W-E-I-S-B-R-O-D.
7  Ms. Weissman, are these all documents that were created by
8  the human resources department of Smart Papers under your
9  jurisdiction and control, and were they created and
10 maintained in the ordinary of course of business by Smart
11 Papers, and were they relied upon by you and your group in
12 making recommendations to Smart as to whom to hire for Smart
13 Papers, Hamilton B Street?
14      A.   Who to recommend, yes.
15      Q.   And, again, the one document in here that
16 would not be one that you developed was the response
17 document, correct?
18      A.   Correct.
19           MR. YOUNGER:   All right.  Now, all of these
20 documents, just for the record, were produced in response to
21 the subpoena that was issued by International Paper to Ms.
22 Weissman and Smart, and they are subject to a protective
23 order for confidentiality.  So those of you in this section
24 should understand that, that there are confidential
25 information statements in here, and everybody is subject to
```

60

```
1       Q.   So International Paper had no input, other
2  than the supervisory interviews here that are in these
3  documents, about who should or shouldn't receive offers by
4  Smart; is that correct?
5       A.   Yeah.  And they only had that input as
6  supervisors of the employees.  Who they worked for was
7  immaterial.
8       Q.   And, as I understand it, any communication you
9  got to be relied upon in making these offer decisions or
10 recommendations would be contained in these documents for
11 these individuals, correct?
12      A.   Yes, that is correct.
13      Q.   Okay.  Let me take just a brief break and then
14 we may be done.
15           (Break taken.)
16      Q.   Just real quickly.  There were two Plaintiffs
17 that we, at least not yet, have found an application for.
18 And I just don't know whether you have any recollection
19 about what may have happened with these people.  One of them
20 is named Keith Gabbard?
21           MR. LECHNER:   Could you spell it, please.
22      Q.   G-A-B-B-A-R-D.  And the other's name is
23 Richard Lipscomb, L-I-P-S-C-O-M-B.  As I understand, the
24 allegation is that these gentlemen withdrew their
25 applications somehow or other.  I don't know whether they
```

63

1 failed to participate in the process or what. Do you have

2 any recollection about them?

3      A.   No, I don't have any recollection of either of

4 them.

5      Q    And I have nothing to show you either.

       MR. YOUNGER:  We don't have any other

7 questions at this time.

8      MR. DOGGETT:  While we're on that, there was a

9 Ralph Flick that was in the group and you don't have

10 anything on him.

11     MR. YOUNGER:  There's a -- there was somebody

12 in there, wasn't there?  I forget what --

13     MR. MIRAGLIA:  There's a Jerry Flick.

14     MR. DOGGETT:  On the list that you went down,

15 you know this one here, you had everybody on there but Ralph

16 Flick.

17     MR. MIRAGLIA:  We don't have anything on him.

18     MR. LECHNER:  We can go back and look.  If you

19 can just identify these, we can go back and look again to

20 see whether there's something we missed.

21     MR. DOGGETT:  All right.

22              CROSS-EXAMINATION

23 BY MR. DOGGETT:

24     Q    Okay.  I only have a couple of questions.  Ms.

25 Weissman, is it true that your duties as temporary human

---

62

1 relations person for Smart were when they really hadn't

2 staffed -- in other words, there weren't people -- like,

3 Annetta Johnson was employed by I.P., and then she came over

4 to Smart after I.P. shut down; isn't that right?

5      A.   I don't know.  I mean, I know that she became

6 the HR director of Smart after the company was sold.

7      Q    But weren't you dealing with her for

8 information while she was still with International Paper?

9      A.   The only information I got from her was that

10 which I requested in order to make decisions about

11 candidates that had applied for --

12     Q    Yeah, we have an expression, wearing the hat,

13 or wearing two hats, or one hat, but, when you did that, she

14 was still -- she was an International Paper employee when

15 you were making those inquiries?

16     A.   That's correct.

17     Q    Now, however, whatever your ultimate

18 recommendations were, Smart -- someone at Smart made a

19 decision either to follow your recommendations or not; isn't

20 that true?

21     A.   That is correct.

22     Q    And who would that have been?

23     A.   Dan Maheu.

24     Q    Now, there is -- on these forms, I notice that

25 there is -- there's a block, I think you call that an

---

63

1 Applicant Tracking Sheet, there's a space on there

2 "Decision", and it's blank on just about all of them.  How

3 was that used; do you know?

4      A.   It was up to Smart whether they wanted to

5 record their decision on that or not.  We left it there for

6 them to record it or not, but --

7      Q    Okay.  And these are the finished forms?  What

8 I'm asking is this.  Is this just a form as far as you got

9 with it, or would this be the ultimate form that was handled

10 by Smart?

11     A.   That was the form that we handed off to Smart

12 with all of the records of the people after we were finished

13 making our recommendation.

14     Q    So someone else at Smart might have made

15 notations on this form that we don't know of?

16     A.   They might have.  I don't know.

17     Q    Now, I don't know -- after you left, were you

18 aware that Smart generated a list of employees that were

19 being given job offers?

20     A.   Yes, in fact, we generated --

21     Q    You generated the list?

22     A.   We generated a list, which we passed off in

23 file form to Smart, and they, then, either used that as the

24 list or they took people off and put people on.  So I'm

25 definitely aware of such a list existing and that it was

---

64

1 used by Smart after there were other employees besides us.

2      Q    Now, there are -- you know, I think I'm going

3 to cover this in -- I had planned to cover this in

4 Mr. Lewis' deposition, but -- and only just for the sake of

5 kind of keeping stuff in order.  But there is a list, one is

6 called "Hourly employees offered and accepted jobs with

7 Smart", and there's another list that says -- it's called, I

8 think it's "Hourly employees without job offers".  And then

9 there's a couple of other lists, too.  But, now, had you

10 prepared any of those or drafts of those lists?

11     MR. YOUNGER:  You might let the witness see

12 the list, because you're asking her of a list that you're

13 looking at and she's not even seen it.  So if you let her

14 see it.

15     MR. DOGGETT:  If we could just do this, then,

16 and maybe make this -- okay.  This is a list we planned to

17 make as Plaintiffs' Exhibit 1.

18          (Off-the-record discussion.)

19     (Plaintiffs' Weissman Exhibit 15 marked.)

20     A.   These are not what we gave Smart.

21     Q    Okay.  Someone else prepared these?

22     A.   Yes.  Ours were in Excel.

23     Q    No doubt the data on there was data you passed

24 on.  It says, like, "Employees who did not participate in

25 drug screen", you would have compiled that list, or likely

---

65

1 compiled a list of people who did not participate in the
2 drug screens?
3      A.   Well, what we would have compiled is a list of
4 people who participated in things, and any other data we
5 could generate from what we had.  But the non-participation,
6 we would have no way of knowing because, if they didn't
7 participate, we didn't know who they were.
8      Q.   Yeah.  And in the universal answer you gave
9 that, after you submitted all of this data, your duties
10 totally ended, I take it?
11     A.   With regard to this matter.
12     Q.   Right.  So that subsequent events in which
13 some people did get severance pay, you would not have been
14 involved in that?
15     A.   I don't know why Smart would be giving anybody
16 severance pay.  I only worked for Smart.
17     Q.   No, what I meant is I.P. gave the severance
18 pay to various people for various reasons, but you were not
19 involved in those decisions?
20     A.   I wasn't involved with I.P. in any manner,
21 way, shape or form.
22     Q.   So, even the decisions for I.P. who to offer
23 or not offer jobs to -- I mean -- I'm sorry.  The decision
24 of Smart who to put on the list of people offered jobs and
25 not offered jobs was not something you were involved with?

66

1           MR. YOUNGER:  I object to that.  I think it
2 does not state what her testimony was.  I object to the form
3 of the question.
4      Q.   Here's the point.  Plaintiffs' Weissman
5 Exhibit 15, I understand that you testified that you did not
6 prepare those lists?
7      A.   I did not.
8      Q.   Right?
9      A.   I did not.
10     Q.   Now, I want to just ask you about Weissman
11 Exhibit 2 on Herbert Marcum.  If you'll look at that,
12 please.
13     A.   Yes.
14     Q.   On the applicant tracking sheet, in the block
15 "reference check", Tom Weiser; do you see that?
16     A.   Yes.
17     Q.   And do you know who Tom Weiser is or was?
18     A.   The supervisor of Herbert Marcum.
19     Q.   Now, could you -- "does not want a job",
20 somebody wrote that?
21     A.   Yes.
22     Q.   Who wrote that?
23     A.   Roberta Griffin.
24     Q.   Okay.  Because that's her initials out there?
25     A.   Correct.

67

1      Q.   And then there's -- it looks like there's a
2 GR for green?
3      A.   Correct.
4      Q.   And then RD stricken out?
5      A.   Right.
6      Q.   Can you tell me what's that?
7      A.   Let me look at the reference check and I'll
8 tell you.
9           MR. DOGGETT:  Just let the record reflect this
10 is SPP-000874, that's a page of Weissman Exhibit 2.
11     A.   Roberta categorized the person a red based
12 upon Tom Weiser saying he wouldn't hire him because the guy
13 doesn't want a job, but we had to rate the reference check
14 based upon the data, not upon the person wanting or not
15 wanting a reference check -- it was a separate piece of data
16 from the reference check.
17     Q.   So, in that block, reference check was changed
18 from red to green?
19     A.   Correct.
20     Q.   Now, in the recommendation, it looks to me
21 like there was a GR for green that was scratched out?
22     A.   Yes.
23     Q.   And red was written in?
24     A.   Correct.
25     Q.   And then it says, "Called, said he is not

68

1 interested in a job offer"?
2      A.   That's correct.
3      Q.   Did he call you?
4      A.   That's not my handwriting.  That doesn't mean
5 he didn't call me, but he may have called the front desk.
6 I'm not sure whose handwriting that is.  It's not Roberta's
7      Q.   You say he may have called you and you may
8 have told somebody he doesn't want a job?
9      A.   Yeah, or he may have called someone else on my
10 staff who wrote this in there.  This is not my handwriting
11 and that's not Roberta's handwriting.
12     Q.   But you're not excluding the possibility that
13 he called you?
14     A.   No.
15     Q.   I'll kind of -- I'm missing -- I don't know if
16 they're in another pile.  Was there one on -- yeah.  I don't
17 have extra copies of these, but on Born, Radcliff, and
18 Thomas.  I don't know that I need those.  I guess I would
19 have to --
20           MR. DOGGETT:  Can I borrow these back, Ms.
21 Reporter?  I would like this marked, I guess, as Plaintiffs'
22 16, Plaintiffs' Weissman 16.
23           (Plaintiffs' Weissman Exhibit 16 marked.)
24     A.   It's Joseph O. Born?
25     Q.   Yes.  Can you --

69

1          MR. YOUNGER:  Born?

2          MR. DOGGETT:  Yeah.

3     Q.   Plaintiff's Weissman 16, what was the

4 recommendation on Born?

5     A.   Green.  Yes.

6     Q.   Green all of the way, wasn't it?

7     A.   Yeah.

8     Q.   From your own other documents here, can you

9 tell us what the rating was on Born, more particularly, why

10 he was green all of the way?

11     A.   He is an excellent worker, self-directed, he

12 responded well to corrective feedback, he has demonstrated

13 an ability to learn new things, good productivity, highly

14 dependable, and had a good interview.

15     Q.   Now, let's see.

16          MR. DOGGETT:  I would like, I guess, this one

17 marked Weissman -- Plaintiffs' Weissman Number 17.

18          (Plaintiffs' Weissman Exhibit 17 marked.)

19     Q.   Plaintiff's Weissman Exhibit 17, Ratliff was

20 also green all of the way, wasn't he?

21     A.   Yes.

22     Q.   And how did you evaluate Ratliff?

23     A.   His interview was excellent.  He was a good

24 employee all of the way through, no absentee problems, good

25 willingness and ability to learn.

70

1     Q.   And then, the next one is Plaintiffs' Weissman

2 Number 18.  It's Michael Thomas.

3          (Plaintiffs' Weissman Exhibit 18 marked.)

4     Q.   And would you comment on how he was ranked or

5 rated by you?

6     A.   He was recommended -- he was above standard in

7 the entire interview.

8     Q.   Let me ask you just, did you use green

9 markings on these or just a G for green?  One thing I'm not

10 clear on is your mechanics.

11     A.   No, we just put green on there.

12     Q.   You just used a G for green and a Y for

13 yellow?

14     A.   Yes.

15     Q.   And an R for red?

16     A.   In this project, yes.

17     Q.   All right.

18     A.   He got a slightly better than "meets

19 requirement" in all of his reference check categories.

20     Q.   Okay.  That's all of the questions that I

21 have.

22          MR. YOUNGER:  Just a couple.

23               RECROSS-EXAMINATION

24 BY MR. YOUNGER:

25     Q.   The Excel spreadsheet list you mentioned,

71

1 which is not the list that you were shown --

2     A.   Right.

3     Q.   Was that done while you were still the human

4 resources director for Smart?

5     A.   Right.

6     Q.   And you sent that to who, Mr. Maheu?

7     A.   Yeah.

8     Q.   And do you still have a copy of that

9 somewhere?

10     A.   No.

11     Q.   Do you know where one is?

12     A.   I think Mr. Maheu may have one, but he may not

13 have.

14     Q.   You don't know?

15     A.   I don't know.

16     Q.   And you were asked about -- I think, while

17 Annetta Johnson was still at International Paper, you were

18 asked some questions about getting some information from

19 her.  And, as I understood, your testimony is that the

20 information she gave you was really things like attendance

21 or statistical type data like that?

22     A.   It was only data about a person's performance

23 in a particular area, attendance, discipline.  That's it

24 attendance and discipline were the only two pieces of data.

25     Q.   And she didn't make any recommendations about

72

1 an offer or no offer?

2     A.   Absolutely not.

3          MR. YOUNGER:  I don't have any other

4 questions.  I think it would probably be good, because it

5 has been a long deposition with a lot of documents, for the

6 witness to read and sign the deposition.

7          MR. LECHNER:  We would like to read and sign.

8          MR. YOUNGER:  I thought you probably would,

9 and I prefer that, too.

10          (Deposition concluded at approximately 1:55

11 p.m.)

12

13

14          _____
               MARY RITA WEISSMAN

15

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

```
PACE Local Union 5-1067,        :
et. al.,                        :    Case No. C-1-02-301
                                :    (CONFIDENTIAL)
          Plaintiffs,           :
                                :
vs.                             :    Cincinnati, Ohio
                                :    December 18, 2002
INTERNATIONAL PAPER CO.,        :
                                :
          Defendant.            :    EXHIBITS I
```

Deposition of MARY RITA WEISSMAN, a

witness herein, taken as upon cross-examination by the

Defendant, and pursuant to the Federal Rules of

Civil Procedure, agreement of counsel, and stipulations

hereinafter set forth, at the offices of Robert I. Doggett,

Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

45202, on the 18th day of December, 2002, at 11:10 a.m.,

before Julie A. Patrick, a Notary Public for the State of

Ohio.

TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

95 S. FOURTH STREET
BATAVIA, OHIO 45103
(513) 732-1477

# SMART PAPERS LLC
## Application for Employment

**AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER**                Date *1-10-01*

    Before you begin: We appreciate your interest in Smart Papers LLC and will give your application serious attention. We provide equal employment opportunity to all persons regardless of age, race, color, national origin, religion, sex, marital status, handicap or disability, veteran status or any other legally protected status.

    Accuracy and completeness of this application and releases are important factors in determining acceptability for employment with our company. Please be neat in completing this form and do so in your own handwriting. Please ask us if you desire any assistance or accommodation because of a disability. Smart Papers LLC provides reasonable accommodations consistent with the law.

    If you complete the application documents fully and submit them prior to the deadline, you will be provided an interview. You may be requested to complete additional forms, undergo a drug screen, submit additional references, participate in additional interviews and supply any other relevant information needed for us to make an informed decision on your application for employment.

    This application will remain active for a period of 6 months. If you wish to be considered for employment beyond that period, a new application must be completed.

USE A SEPARATE SHEET OF PAPER IF YOU NEED ADDITIONAL SPACE TO ANSWER ANY QUESTION COMPLETELY.

## PERSONAL INFORMATION

NAME *Herbert Marcum*        SOCIAL SECURITY # *2/03-50-30240*

ADDRESS *220 Urban St        Hamilton        Ohio        45015*
    (Street)          (City)       (State)    (Zip)

Last Previous
ADDRESS _____
(if at present address less than one year)    (Street)          (City)          (State)        (Zip)

HOME TELEPHONE *887-7555*  WORK *869-5169*  OTHER *869-5123*

Are you 18 years old or older? Yes ✓ No _____  Are you authorized to work in the U.S.A.? Yes ✓ No _____

Have you ever been known by any names other than the above? If so, what? *no*

## EMPLOYMENT INTERESTS

How can you contribute to our company's success? *Do my job as best as I can and work safely.*

What are you looking for in a position? *Drum opperto*

1

**DEFENDANT'S EXHIBIT**

Weissman Z

CONFIDENTIAL
SPP-00870



# SMART PAPER LLC

# APPLICANT TRACKING SHEET

| Applicant Name | _Herbert Marcum_ | | |
|---|---|---|---|
| | **Outcome** | **Date** | **Checked by** |
| **Application** | ✓ | 1/16 | RMG |
| **FCRA Notice Signed** | ✓ | 1/16 | RMG |
| **Interview** | ✓ | 1/16 | RMG |
| **Drug Screen** | ✓ | 1/16 | RMG |
| **Reference Checks:**<br>1) TOM WEISER<br><br>2) | _DOES NOT WANT A JOB_ | 1/26 | RMG |
| **Recommendation** _Called+said he do not interested in a job offer_ **DECISION** | _Red_ | 1/26 | RMG |
| **Notification** | | | |

CONFIDENTIAL
SPP-00874

## SMART PAPERS LLC
### Application for Employment

**AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER**                    Date _1-10-01_

    Before you begin: We appreciate your interest in Smart Papers LLC and will give your application serious attention. We provide equal employment opportunity to all persons regardless of age, race, color, national origin, religion, sex, marital status, handicap or disability, veteran status or any other legally protected status.

    Accuracy and completeness of this application and releases are important factors in determining acceptability for employment with our company. Please be neat in completing this form and do so in your own handwriting. Please ask us if you desire any assistance or accommodation because of a disability. Smart Papers LLC provides reasonable accommodations consistent with the law.

    If you complete the application documents fully and submit them prior to the deadline, you will be provided an interview. You may be requested to complete additional forms, undergo a drug screen, submit additional references, participate in additional interviews and supply any other relevant information needed for us to make an informed decision on your application for employment.

    This application will remain active for a period of 6 months. If you wish to be considered for employment beyond that period, a new application must be completed.

USE A SEPARATE SHEET OF PAPER IF YOU NEED ADDITIONAL SPACE TO ANSWER ANY QUESTION COMPLETELY.

### PERSONAL INFORMATION

NAME _RONALD L PELSOR_ SOCIAL SECURITY # _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_

ADDRESS _4084 PRIVET CT._ _HAMILTON_ _OH_ _45011_
              (Street)              (City)       (State)    (Zip)

Last Previous
ADDRESS _____
(if at present address less than one year)  (Street)      (City)    (State)    (Zip)

HOME TELEPHONE _513-896-4346_ WORK _513-869-5759_ OTHER _____

Are you 18 years old or older? Yes _✓_ No _____ Are you authorized to work in the U.S.A.? Yes _✓_ No _____

Have you ever been known by any names other than the above? If so, what? _____ _NO_ _____

### EMPLOYMENT INTERESTS

How can you contribute to our company's success? _ALMOST 20 YEARS OF PAPER MAKING EXPERIENCE, AS WELL AS UNDERSTANDING THE PRINCIPLES OF WHAT MAKES A GOOD BUSINESS_

What are you looking for in a position? _AN INTEREST IN THE BUSINESS, FAIR PAY AND BENEFITS AS WELL AS JOB SECURITY._

1



DEFENDANT'S EXHIBIT
Weissman 3

CONFIDENTIAL
SPP-00795

## SMART PAPER LLC

## APPLICANT TRACKING SHEET

**Applicant Name** *Ronald Pelsor*

|  | Outcome | Date | Checked by |
|---|---|---|---|
| **Application** | ✓ | 1/19 | SW |
| **FCRA Notice Signed** | ✓ | 1/19 | SW |
| **Interview** | Green | 1/19 | SW |
| **Drug Screen** |  | 1/19 |  |
| **Reference Checks:**<br>1) Ed McCoy<br>2) (ATI) | Yellow<br>~~Red~~ | 1/25 | AKS |
| **Recommendation** DNWO | Red Yellow<br>Red | 1/25 | AKS |
| **DECISION** |  |  |  |
| **Notification** |  |  |  |

CONFIDENTIAL
SPP-00799

# SMART PAPERS LLC
## Application for Employment

**AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER**                Date _1-11-01_

 Before you begin: We appreciate your interest in Smart Papers LLC and will give your application serious attention. We provide equal employment opportunity to all persons regardless of age, race, color, national origin, religion, sex, marital status, handicap or disability, veteran status or any other legally protected status.

 Accuracy and completeness of this application and releases are important factors in determining acceptability for employment with our company. Please be neat in completing this form and do so in your own handwriting. Please ask us if you desire any assistance or accommodation because of a disability. Smart Papers LLC provides reasonable accommodations consistent with the law.

 If you complete the application documents fully and submit them prior to the deadline, you will be provided an interview. You may be requested to complete additional forms, undergo a drug screen, submit additional references, participate in additional interviews and supply any other relevant information needed for us to make an informed decision on your application for employment.

 This application will remain active for a period of 6 months. If you wish to be considered for employment beyond that period, a new application must be completed.

USE A SEPARATE SHEET OF PAPER IF YOU NEED ADDITIONAL SPACE TO ANSWER ANY QUESTION COMPLETELY.

## PERSONAL INFORMATION

NAME _Merrill C Sowell_          SOCIAL SECURITY # _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_

ADDRESS _8 Danielle St. Hamilton Ohio      45013_
     (Street)          (City)     (State)     (Zip)

Last Previous
ADDRESS _3355 Stahlhaber     Hamilton     Ohio     45013_
(if at present address less than one year)     (Street)          (City)          (State)     (Zip)

HOME TELEPHONE _8923554_  WORK _8695111_ OTHER_____

Are you 18 years old or older? Yes _✓_ No _____  Are you authorized to work in the U.S.A.? Yes _✓_ No _____

Have you ever been known by any names other than the above? If so, what? _None_

## EMPLOYMENT INTERESTS

How can you contribute to our company's success? _I have worked my way up 4th hand to machine tender over the last thirty five years._

What are you looking for in a position? _____

1

**DEFENDANT'S EXHIBIT**
_Weissman 7_

CONFIDENTIAL
SPP-00855

# SMART PAPER LLC

## APPLICANT TRACKING SHEET

**Applicant Name** Merrill Sorrell

|  | Outcome | Date | Checked by |
|---|---|---|---|
| **Application** | ✓ | 1/17 | Rmg |
| **FCRA Notice Signed** | ✓ | 1/17 | Rmg |
| **Interview** | Gr | 1/17 | Rmg |
| **Drug Screen** | ✓ | 1/17 | Rmg |
| **Reference Checks:**<br>1) Jeff Cochran<br>2) | G | 1/24 | mrw |
| **Recommendation** | G | 1/24 | mrw |
| **DECISION** Candidate does not want offer |  |  |  |
| **Notification** |  |  |  |

Candidate called the selection center & indicated
that he did not want an offer

CONFIDENTIAL
SPP-00859